UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>STATE OF CONNECTICUT,<br><br>     Plaintiffs,<br><br>     v.<br><br>LEANSPA, LLC, a Connecticut<br>limited liability company,<br><br>NUTRASLIM, LLC, a Connecticut<br>limited liability company,<br><br>NUTRASLIM U.K. LTD, also d/b/a LEANSPA<br>U.K. LTD., an United Kingdom limited liability<br>company, and<br><br>BORIS MIZHEN, individually and as an officer<br>of LEANSPA, LLC, NUTRASLIM, LLC, and<br>NUTRASLIM U.K. LTD,<br><br>     Defendants. | **FILED UNDER SEAL**<br><br>Case No. _____<br><br>November 7, 2011 |

**CERTIFICATION OF PLAINTIFF FEDERAL TRADE COMMISSION'S COUNSEL
PURSUANT TO FED. R. CIV. P. 65(B) IN SUPPORT OF PLAINTIFFS'
*EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER
AND *EX PARTE* MOTION TO TEMPORARILY SEAL ENTIRE FILE**

I, Darren H. Lubetzky, hereby declare as follows:

1. I am over twenty-one years of age and am a citizen of the United States. I am one of the attorneys representing Plaintiff Federal Trade Commission ("FTC") in this action.

2. I am a member in good standing in the bars of Illinois, Washington, D.C., and New York. My work address is Federal Trade Commission, Northeast Region, One Bowling Green, Suite 318, New York, NY 10004. Unless indicated otherwise, I have personal knowledge of the facts stated herein and, if called as a witness, would competently testify thereto.

3. I submit this certification pursuant to Rule 65(b)(1)(B) of the Federal Rules of Civil Procedure in support of the *ex parte* motion filed by Plaintiffs FTC and the State of Connecticut ("Plaintiffs") for a Temporary Restraining Order ("TRO Motion"), and in support of the Plaintiffs' request that the TRO be issued without notice to defendant Boris Mizhen and company defendants, LeanSpa, LLC, Nutraslim, LLC, and Nutraslim U.K. Ltd., also doing business as Leanspa U.K. Ltd. (collectively "Defendants"). I also submit this declaration in support of the Plaintiffs' *Ex Parte* Motion to Temporarily Seal Entire File ("Motion to Seal") filed contemporaneously with the Plaintiffs' TRO Motion.

4. Pursuant to Fed. R. Civ. P. 65(b)(1)(B), this Court may issue a TRO without notice to Defendants if "the movant's counsel certifies in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed herein, the Plaintiffs have not provided Defendants with notice of the filing of this action or of the Plaintiffs' application for a TRO. The interests of justice require that the Plaintiffs' application be heard *ex parte*.

5. The evidence set forth in the Memorandum of Law in Support of the Plaintiffs' TRO Motion and the supporting exhibits, filed concurrently herewith, demonstrates that since 2010, Mizhen has operated an unlawful internet marketing scheme through the company defendants that: (a) deceptively markets trial offers of diet supplements and enrolls consumers into continuity plans where consumers incur unauthorized recurring charges and cannot easily cancel; (b) misleads consumers into believing Defendants will provide full refunds upon request; and (c) makes false and unsubstantiated claims that use of Defendants' diet supplements cause rapid and substantial weight loss.

6. Plaintiffs seek an *ex parte* TRO that is designed to preserve the status quo and prevent Defendants from causing additional consumer harm and from dissipating assets and destroying evidence in order to ensure the possibility of a final remedy pending a hearing on preliminary injunctive relief.

7. Plaintiffs make their application for a TRO *ex parte* because there is ample reason to believe that Defendants have the motivation and opportunity to conceal and dissipate assets as well as destroy business records, as demonstrated by the following reasons:

(A) For over a year, Defendants have operated a widespread deceptive enterprise causing substantial consumer injury. Defendants hired marketing affiliates that set up fabricated online news reports to lure consumers to sign up for purportedly free trial samples of Defendants' diet supplements. Consumers who signed up for the free trials were automatically enrolled by Defendants into negative option continuity plans where consumers could not cancel and incurred recurring unauthorized charges.

(B)     Mizhen, the principal behind this enterprise, has been sued twice by Microsoft for operating a separate scheme designed to circumvent Microsoft's Hotmail spam filters and disseminate large volumes of spam email. Both lawsuits resulted in permanent injunctions against Mizhen and other entities he controls. (*See Microsoft Corporation v. Mizhen et al.*, 2:10-cv-00966-RSM (W.D. Wa., filed June 10, 2010) (attached in the Appendix filed herewith, at Tab 6, Att. L.)

(C)     Mizhen has operated this deceptive marketing scheme under at least three different company names, using a variety of different website domain and brand names. In addition, Mizhen has commingled funds obtained from consumers into several bank accounts, including a personal joint account.

(D)     As a result of the large volume of consumer complaints resulting from this scheme, the Connecticut Department of Consumer Protection contacted Mizhen beginning in March 2011 to refund consumers who submitted complaints to it and some consumers who had submitted complaints to the Connecticut BBB. Despite these contacts from law enforcement, Mizhen has continued to perpetuate this scheme.

(E)     The company defendant LeanSpa, LLC ("LeanSpa") was placed in one of VISA Inc. ("VISA")'s merchant monitoring programs for excessive chargebacks in October 2010. After VISA placed LeanSpa into its merchant monitoring program, several U.S. banks terminated the company's merchant accounts used to process consumer sales transactions. LeanSpa is now using one or more banks outside the U.S. to process sales. According to VISA, the use of offshore banks is a technique used by merchants attempting to avoid identification in VISA's merchant monitoring programs.

8. Consequently, absent the requested *ex parte* relief and seal order, it is reasonably likely that Defendants will destroy documents and dissipate or hide assets. If Defendants are permitted the opportunity to hide their assets and destroy business records, it may render ineffective any restitution order this Court may enter at the ultimate disposition of this matter, and irreparably harm consumers victimized by Defendants' deceptive scheme.

9. As illustrated by the following examples (provided on information and belief), it has been the FTC's experience that defendants who have engaged in calculated, deliberate, and extensive deception, will in fact destroy documents and conceal or dissipate assets when they receive notice of law enforcement actions. I am reliably informed of the following matters:

(1) In *FTC v. Home Assure, LLC, et al.*, No. 8:09-cv-547 (M.D. Fla. filed Mar. 24, 2009) (Judge Steven D. Merryday), a mortgage foreclosure rescue scam, the court entered an ex parte freeze on the assets of two corporate and four individual defendants. Within hours after receiving notice of the asset freeze order, an individual defendant depleted the funds from the checking accounts of one of the corporate defendants. The FTC filed a motion for contempt against the individual defendant for violating the Court's order and requested that funds be returned. The court ordered the individual defendant to return the funds, which he still has not done.

(2) In *FTC v. Connelly, et al.*, No. 8:06-CV-701 (C.D. Cal. 2006) (Judge David O. Carter), the court issued on August 9, 2006 an *ex parte* TRO with an asset freeze against one defendant, but provided notice to the other two individual defendants by issuing an Order to Show Cause as to why their assets should not be frozen.

After receiving notice of the court's ruling, all three defendants withdrew at least $800,000, some of which was clearly already subject to the asset freeze.

(3) In *FTC v. Stewart Finance Company, et al.*, No. 1:03-CV-2468 (N.D. Ga. 2003) (Judge Jack T. Swamp), the FTC obtained a noticed TRO with asset freeze. One day after entry of the court's order, the individual defendant set into motion a plan to secretly dissipate certain real estate held in a trust subject to the asset freeze. Upon discovering that the defendant sold the property for approximately $446,000, the FTC filed and the court granted a motion for contempt against the defendant and his son, who helped dissipate the assets. Even though the contempt motion was granted, the FTC was still unable to recover all of the dissipated assets.

(4) In *FTC v. Physicians Health, et al.*, No. 2:02-CV-2936 (C.D. Cal. 2002) (Judge Robert M. Takasugi), the FTC informed defendants on Monday, April 8, 2002, that the FTC would be filing a complaint and seeking a TRO against them on Wednesday, April 10, 2002. On Wednesday, after filing the case and obtaining the TRO, the FTC faxed a copy of the signed and entered TRO to the defendants at their offices. Upon receiving notice of the TRO, the defendants removed or shredded most of their records and documents, including all customer files.

(5) In *FTC v. Inetintl.com, Inc., et al.*, No. 2:98-CV-2140 (C.D. Cal. 1998) (Judge Christina A. Snyder), the FTC obtained an *ex parte* TRO with an asset freeze. The FTC served the TRO on banks where the defendants were known or suspected to have accounts. While the person who was serving the TRO for the

FTC was at one of the banks and speaking to a branch manager about the TRO, one of the defendants came into the bank, after having been served with the TRO, and attempted to withdraw money from his account there. He was unsuccessful.

(6) In *FTC v. Intellicom, et al.*, No. 97-CV-4572 (C.D. Cal. 1997) (Judge Margaret M. Morrow), a telemarketing investment fraud case, the FTC obtained an *ex parte* TRO with an asset freeze and knew of 20-30 banks with potential assets. The FTC served the banks as fast as possible with the order, but one defendant, before he could be served, removed $40,000 one hour before the FTC arrived at the bank. Another defendant called a bank that the FTC served and asked the manager to wire out the contents of one account frozen by the order. The manager caught the red flag in the system and refused to release the requested $100,000.

(7) In *FTC v. Chierico, et al.*, No. 1:96-CV-1754 (S.D. Fla. 1996) (Judge K. Michael Moore), the court issued an *ex parte* TRO with asset freeze. Within hours of service upon the defendant, he and his wife requested issuance of a $500,000 certified check from their joint brokerage account, made payable to her alone. The couple then deposited the certified check into a bank account in the wife's sole name. The FTC learned of the withdrawal from the brokerage firm and presented the bank with sufficient evidence for it to freeze the wife's account.

(8) In *FTC v. O'Day*, No. 6:94-CV-1108 (M.D. Fla. 1994) (Judge Anne C. Conway), a telemarketing fraud case, a district court denied the FTC's request to issue an *ex parte* TRO with asset freeze, and scheduled a noticed hearing on the relief sought.

        Several days later, the FTC served notice of its action and the upcoming hearing. Within hours, an individual defendant withdrew approximately $200,000 from one of his bank accounts, thereby making it difficult for the FTC to preserve those funds for consumer redress.

(9)    In *FTC v. Academic Guidance Servs., Inc., et al.*, No. 92-3001 (D.N.J. 1992) (Judge Anne E. Thompson), a case involving the fraudulent telemarketing of business opportunities, the defendants discovered that the FTC intended to file its case against them (and seek an *ex parte* TRO) the following week. An informant told the FTC that the defendants then leased a document shredder and spent the weekend destroying documents. The FTC verified that a shredder had been leased, and one of defendant's employees confirmed that documents had been shredded.

(10)    In *FTC v. Applied Telemedia Engineering and Management, Inc.*, et al., No. 1:91-CV-635 (S.D. Fla. 1991) (Judge Ursula Ungaro), another telemarketing fraud case, the defendants were advised, pursuant to an agreement with the FTC, that the FTC had filed its complaint and intended to seek a TRO with an asset freeze from the court. When the FTC's agents went to defendants' offices to serve process, they observed defendants removing boxes of documents from the premises. The FTC moved for, and received, an *ex parte* TRO the following day.

10.    For the reasons stated above, as contemplated by Federal Rule of Civil Procedure 65(b), there is probable cause to believe that immediate and irreparable damage to consumers will result from the dissipation of assets and from the concealment, transfer, or destruction of

Defendants' records if Defendants receive advance notice of the Plaintiffs' application for a temporary restraining order. Thus, it is in the interests of justice that this Court enter the requested TRO without notice to Defendants.

11. For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if any of the Defendants receive premature notice of the filing of this action. Thus, the interest of justice would be served if the Plaintiffs' *Ex Parte* Motion for an Order Temporarily Sealing Entire File were granted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 7, 2011 in New York, NY

Darren H. Lubetzky