# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FEDERAL TRADE COMMISSION, and

STATE OF CONNECTICUT,

      Plaintiffs,

      v.

LEANSPA, LLC, a Connecticut
limited liability company,

NUTRASLIM, LLC, a Connecticut
limited liability company,

NUTRASLIM U.K. LTD, also d/b/a LEANSPA
U.K. LTD., an United Kingdom limited liability
company, and

BORIS MIZHEN, individually and as an officer
of LEANSPA, LLC, NUTRASLIM, LLC, and
NUTRASLIM U.K. LTD,

      Defendants.

**FILED UNDER SEAL**

Case No. _____

**November 7, 2011**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THE *EX PARTE* MOTION
FOR A TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, THE
APPOINTMENT OF A RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER
TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

## TABLE OF CONTENTS

TABLE OF RELEVANT AUTHORITIES.......................................................................iii

INTRODUCTION................................................................................................1

FACTUAL BACKGROUND...................................................................................3

I.      MIZHEN FORMED AN ENTERPRISE SELLING DIETARY
SUPPLEMENTS THROUGH THE COMPANY DEFENDANTS HE
CONTROLS..............................................................................................3

II.     DEFENDANTS' DECEPTIVE PRACTICES ........................................................6

     A.    Defendants Used Fake News Reports to Promote Their Products and
Drive Consumers to Websites They Operate................................................6

     B.    Defendants Obtain Consumers' Credit and Debit Card Information
Through Deceptive Trial Offers and False Product Claims.....................10

     C.    Defendants Cause Consumers To Incur Substantial Unauthorized
Charges Resulting In a Large Number of Consumer
Complaints and Disputed Charges...........................................................13

III.    OTHER ENTITIES INVOLVED IN THIS DECEPTIVE SCHEME
HAVE RECENTLY FILED LAWSUITS AGAINST
DEFENDANTS......................................................................................16

     A.    The FBD Lawsuit Involves Payment Processing Entities Used By
Defendants ............................................................................................17

     B.    The LeadClick Lawsuit Involves a Marketing Affiliate Network Used By
Defendants ............................................................................................18

ARGUMENT....................................................................................................18

I.      THIS COURT HAS AUTHORITY UNDER THE FTC ACT AND
CUTPA TO ISSUE THE REQUESTED PRELIMINARY INJUNCTIVE
RELIEF..................................................................................................19

     A.    The FTC Act Authorizes the Court to Grant Immediate

Temporary Relief ..................................................................................19

B.      CUTPA also Authorizes the Court to Grant Immediate
        Temporary Relief..........................................................................21

II.     PLAINTIFFS' EVIDENCE SATISFIES THE PUBLIC
        INTEREST STANDARD FOR ISSUING PRELIMINARY
        INJUNCTIVE RELIEF IN THIS CASE..............................................21

        A.      Plaintiffs Are Likely to Succeed on the Merits that Defendants
                Violated the FTC Act, EFTA, and CUTPA..............................23

                1.      FTC's Claims under the FTC Act...............................24

                2.      The State's Claims under CUTPA................................26

                        a.      Deceptive Conduct............................................27

                        b.      Unfair Acts or Practices....................................28

                        c.      Per se Violations of CUTPA.............................28

                3.      Plaintiffs' TRO Application Satisfies the Threshold
                        Showing of a "Fair and Tenable Chance of Success"
                        of FTC Act and CUTPA Violations.............................29

                4.      Defendants are Violating EFTA..................................32

        B.      The Equities Strongly Weigh in Favor of Granting the
                Proposed Injunctive Relief That Includes an Asset Freeze and
                Appointment of a Temporary Receiver......................................33

III.    EX PARTE RELIEF IS NECESSARY TO PROTECT THE
        PUBLIC INTEREST............................................................. ..........37

CONCLUSION......................................................................................38

# TABLE OF RELEVANT AUTHORITIES

**Federal Cases**

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977)....................22, 33

*City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010).................22

*Delaware Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964)..........................................................29

*Figgie Int'l, Inc.*, 107 F.T.C. 313 (1986).................................................................................. 28

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)...........................................22, 34

*FTC v. Amy Travel Serv.*, 875 F.2d 564 (7th Cir. 1989).......................................................20, 25

*FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008).......................................31

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011).....................................................20

*FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)..............20, 22, 23, 25

*FTC v. Direct Mktg. Concepts*, 624 F.3d 1 (1st. Cir. 2010).......................................................29

*FTC v. Figgie Int'l Inc.*, 994 F.2d 595 (9th Cir. 1993).................................................................31

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)....................................25

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996).............................................................20

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982)...............................................................20, 34

*FTC v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000)..................................................29

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998)..................................................25

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, (9th Cir. 2010)............................................30

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)...................................................20

*FTC v. Think Achievement Corp.*, 312 F.3d 259 (7th Cir. 2002).................................................32

*FTC v. Thomsen-King & Co.*, 109 F.2d 516 (7th Cir. 1940).......................................................33

*FTC v. Verity Int'l Ltd.*, 443 F.3d 48 (2d Cir. 2006)............................................................24

*FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193 (S.D.N.Y. 2000)....................................22, 23, 24

*FTC v. Warner Commc'ns*, 742 F.2d 1156 (9th Cir. 1965).........................................................36

*FTC v. Willms*, No. C11-828-MJP, 2011 WL 4103542 (W.D. Wash. Sept. 13, 2011)................31

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988)................................25, 36

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)............................................33, 36

*FTC v. Kuykendall*, 312 F.3d 1329 (10th Cir. 2002)...............................................................31

*FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).............................................................25

*In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979)...............................................................37

*Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006)........................................35

*Niresk Indus. Inc. v. FTC*, 278 F.2d 337 (7th Cir. 1960)..........................................................25

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)................................................................20

*Removatron v. FTC*, 884 F.2d 1489 (1st Cir. 1989).................................................................25

*SEC v. American Board of Trade*, 830 F.2d 431 (2d Cir. 1987).............................................34, 35

*SEC v. Byers*, 609 F.3d 87 (2d. Cir. 2010).........................................................................35, 36

*SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082 (2d Cir. 1972)......................................................34

*SEC v. Prater*, 289 F. Supp. 2d 39 (D. Conn. 2003)...............................................................23

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980).....................................................................35

*United States v. Acorn Tech. Fund, LP*, 429 F.3d 438 (3d Cir. 2005)........................................36

*United States v. Diapulse Corp. of Am.*, 457 F.2d 25 (2d Cir. 1972)....................................22, 36

*United States v. Walsh*, 331 U.S. 432 (1947)........................................................................36

iv

## State Cases

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296 (2005)..................................21

*Andrus v. Maloney*, 5 Conn. L.Rptr. 321 (Conn. Super. Ct. Jan. 6, 1992)....................................27

*BEC Corp. v. Dep't of Envtl. Prot.*, 256 Conn. 602 (2001)..........................................................30

*Caldor v. Heslin*, 215 Conn. 590 (1990).............................................................................26, 27

*Cheshire Mortgage Servs., Inc. v. Montes*, 223 Conn. 80 (1992)..........................................26, 28

*Cohen v. Roll-A-Cover, LLC*, 131 Conn. App. 443(2011)............................................................27

*Conaway v. Prestia*, 191 Conn. 484 (1983)...............................................................................26

*Dep't of Transp. v. Pacitti*, 43 Conn. App. 52 (1996)............................................................22, 23

*Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334 (1999)......................................28

*Johnson Elec. Co. v. Salce Contr. Assocs.*, 72 Conn. App. 342
(2002).........................................................................................................................................26

*Kosilla v. Collins Group, Inc.*, No. CV-00-0801571, 2000 Conn. Super. LEXIS
3318 (Conn. Super. Ct. Nov. 29, 2000)......................................................................................23

*State v. Tomasso*, No. CV-04-4002651-S, 2005 Conn.Super. LEXIS 888 (Conn.
Super. Ct. Apr. 1, 2005)..............................................................................................................28

*Town of Enfield v. Ingraham*, No. TTD-V074007649S, 2008 Conn. Super. LEXIS 1359
(Conn.Super. Ct. May 28, 2008)..................................................................................................23

*Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105 (2005)..................................................27, 30
Web Press Services Corp. v. New London Motors, Inc., 203 Conn. 342 (1987).........................26

*Willow Springs Condo. Assn., Inc. v. Seventh BRT Dev. Corp.*, 245 Conn. 1 (1998)..................21

**Federal Statutes and Rules**

15 U.S.C. § 41................................................................................*passim*

15 U.S.C. § 45(a)...........................................................................*passim*

15 U.S.C. § 52................................................................................*passim*

15 U.S.C. § 53................................................................................*passim*

15. U.S.C. § 1693............................................................................1, 19

Fed. R. Civ. Pro. 65(b)....................................................................37

Fed. R. Evid. 1006..........................................................................31

Fed. R. Evid. 807............................................................................31

**State Statutes**

Conn. Gen. Stat. **§** 42-110.............................................................*passim*

## INTRODUCTION

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Connecticut (the

"State"), seek an *ex parte* temporary restraining order against Connecticut resident Boris Mizhen

and three related entities he owns and controls, LeanSpa, LLC, NutraSlim, LLC, and NutraSlim

U.K. Ltd., (collectively, "Defendants") to halt an internet marketing scheme that deceptively

markets trial offers of diet supplements and enrolls consumers into continuity plans where they

incur unauthorized recurring charges and cannot easily cancel.  Plaintiffs' Complaint charges

Defendants with violating Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, the

Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and the Connecticut Unfair

Trade Practice Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a).  Plaintiffs move *ex parte* to seek

an immediate halt to Defendants' deceptive marketing scheme and to prevent Defendants from

dissipating assets and destroying evidence in order to preserve this Court's ability to order

effective final relief.  In support, Plaintiffs submit evidence that over a thousand consumers

across the country have already been victimized, and that Defendants' scheme is ongoing.[1]

In 2010, Mizhen set up web-based companies that market and sell dietary supplements.

For over seven months, Defendants promoted their products by using marketing affiliates that

placed bogus news stories online claiming that consumers can lose substantial weight without

diet or exercise by using Defendants' products.  Consumers were directed from these fake

"news" stories to Defendants' ordering webpages, which offer free trial samples of their acai-

---

[1]   An Appendix of exhibits is filed in support of this motion.  Citations to the Appendix are noted herein as "Tab [number], [Name of declarant] Dec. at [Paragraph cite or bates number]".  Included in the Appendix are declarations from consumers as well as representatives from VISA Inc., the Connecticut Better Business Bureau ("BBB"), and investigators from the FTC and the Connecticut Attorney General's Office.

berry and "colon cleanse" products.  Defendants' websites induce consumers to pay only a nominal fee, typically $4.95 or less, for shipping and handling to obtain the free trial samples. The trial programs are anything but free.  Defendants charge consumers $79.99 for the trial samples unless consumers affirmatively cancel within a narrow window of time.  Consumers who pay online to obtain the trial samples are also automatically enrolled in continuity plans where they are charged $79.99 every month for recurring shipments (or, approximately $160 a month if they signed up for two trial products) unless they cancel.

Defendants make it very difficult for consumers to cancel the continuity plans.  When consumers place their orders online on Defendants' websites, small print at the bottom of the order webpages states that consumers can call within 14 days to "avoid the purchase fee of $79.99 and enrollment in the auto-shipment program."  Some consumers do not see this fine print or are unaware they have to cancel within 14 days to avoid being charged for the trial samples and additional recurring shipments.  When consumers do call to try and cancel, they have great difficulty reaching a live person.  In addition, Defendants impose other obstacles to canceling that are only disclosed on separate webpages.  Specifically, consumers have to obtain a Return Merchandise Authorization number and then mail the products to a facility.  Even when consumers jump through these hurdles, they still incur charges.

Defendants have taken in at least $25 million from consumers so far and are now using offshore banks to process online sales.  Accordingly, Plaintiffs seek, on an *ex parte* basis, immediate temporary injunctive relief, including an asset freeze and appointment of a temporary receiver over the company defendants to preserve the Court's ability to provide effective final relief to the victims.

## FACTUAL BACKGROUND

Since at least August 2010, Mizhen has marketed and sold dietary supplements on the Internet through LeanSpa, LLC, NutraSlim, LLC, and NutraSlim U.K. Ltd. ("Company Defendants") under various products names, including "LeanSpa with Acai," "LeanSpa with HCA," "LeanSpa Cleanse," "NutraSlim," "QuickDetox," and "SlimFuel." Defendants use a variety of deceptive marketing tactics to first lure consumers to their websites and then enroll them in negative option plans where they make charges to unauthorized consumers' credit and debit cards.

## I.   MIZHEN FORMED AN ENTERPRISE SELLING DIETARY SUPPLEMENTS THROUGH THE COMPANY DEFENDANTS HE CONTROLS.

In mid-2010, Mizhen began to form corporations, open bank accounts, and register Internet domain names as part of an overall marketing enterprise created to sell dietary supplements. As shown below, the Company Defendants are part of a single enterprise controlled by Mizhen. The companies operate out of the same office space and share employees. In addition, consumer funds have been transferred back and forth between several bank accounts, including at least one of Mizhen's personal bank accounts.

The Company Defendants were all formed in a six-month period from April to December 2010. In April 2010, Mizhen incorporated Nutraslim, LLC. Mizhen later incorporated Leanspa, LLC in July 2010. Both companies were formed in Connecticut and share the same office address at 420 East Main Street, Branford, Connecticut 06405.[2] (Tab 6, Declaration of FTC

---

[2]   Mizhen formed several other companies that shared the same Connecticut address: Media Network, Inc.; New Age Opt-In, Inc.; and I-Permission, Inc. In June 2010, Microsoft sued Mizhen and these other entities for an alleged spamming operation. *See Microsoft Corporation v. Mizhen et al.*, 2:10-cv-00966-RSM (W.D. Wa., filed June 10, 2010) (attached at Tab 6, Marino Dec., Att. L at FTC-LS 639.) According to the Complaint, Mizhen and others

Investigator Michael Marino (hereinafter "Marino Dec.") at ¶¶ 3-4, Att. A&B.)  LeanSpa UK,

Ltd. was incorporated in December 2010 in the United Kingdom, and later changed its name to

NutraSlim UK, Ltd. in March 2011. (*Id.* at ¶ 4, Att. C at FTC-LS 409).[3]  Mizhen signed company

documents as the "CEO" of NutraSlim UK, Ltd.  (*Id.* at ¶ 17(a).)

 In May 2010, Mizhen began to obtain Internet domain names through GoDaddy.com,

Inc. ("GoDaddy") and other entities that provide domain registration services.  Mizhen initially

created an account with GoDaddy using the company name LeanSpa, LLC.  Mizhen used this

GoDaddy account to register over forty (40) Internet domain names, including leanspa.com and

tryleanspa.com, from May 2010 through March 2011.  (*Id.* at ¶ 6(a).)  In March 2011, Mizhen

created another GoDaddy account using the company name LeanSpa UK Ltd.[4]  This second

GoDaddy account has registered over sixty (60) Internet domain names, including

trynutraslim.com and tryquickdetox.com.  (*Id.*)  As discussed further below, Defendants use

---

"conspired and executed a scheme to create millions of unauthorized Microsoft Hotmail e-mail accounts that Defendants then used to sanitize their spam e-mail messages in an attempt to circumvent Microsoft's Hotmail spam filters." (*Id.* at ¶1.)  In June 2011, the lawsuit settled with a $10 million judgment entered against the named company defendant entities. (ECF Dkt No. 27.)  That was the second time Microsoft sued Mizhen for engaging in an unlawful spam campaign directed at Microsoft's Hotmail users.  In 2003, Microsoft sued Mizhen and his company, Merchant Commerce, LLC in Washington state court. *See Microsoft Corp. v. Merchant Commerce, LLC et al.*, 03-2-15706-6 (Wash. Super. Ct. 2003) (Tab 6, Marino Dec., Att. L at FTC-LS 659.)  That case resulted in a permanent injunction against Mizhen and the defendant company as well as a $2 million judgment against the company.  (*Id.* at FTC-LS 677, 681.)

[3]  James Capuras is listed as the contact for NutraSlim UK Ltd.'s account used to register website domain names.  (*Id.* at ¶ 6(B).)  Capuras is also identified as the "COO" of LeanSpa, LLC.  (*Id.* at 17(a).)  The Company Defendants shared at least one other employee or officer, Chann Kin, who responded to consumer complaints on behalf of both NutraSlim UK, Ltd. and LeanSpa, LLC. (Tab 4, Joanne Zak, Vice President of Operations at Connecticut BBB (hereinafter "Zak Dec."), at ¶ 15.)

[4]  The contact information on this account was later transferred from Mizhen to James Capuras and the company's name changed to NutraSlim UK Ltd. (*Id.* at ¶ 6(b).)

these websites, such as tryleanspa.com and trynutraslim.com, to promote and sell "trial" offers of diet supplements.

In mid-2010, Mizhen submitted applications to obtain merchant accounts at banks to process the sales transactions when consumers sign up online for Defendants' "trial" offers and enter their credit and debit card information. Mizhen has used at least six different banks to process consumer sales transactions. (Tab 5, Declaration of Andrew Chen of Visa Inc. (hereinafter "Chen Dec.") at ¶29.) For example, in July 2010, Mizhen submitted a merchant account application for "Nutraslim-Leansspa" to National Bank of California. (*Id.* at ¶ 34, Att. C at FTC-LS 384.) In October 2010, Mizhen submitted another merchant account application for "LeanSpa, LLC" to First Bank of Delaware. (*Id.* at ¶36, Att. D at FTC-LS 388.) Later, in May 2011, Mizhen submitted a merchant application for LeanSpa to HSBC Bank, N.A. (*Id.* at ¶41, Att. F at FTC-LS 400-03.)

Mizhen also set up in mid-2010 several bank accounts used to deposit and transfer consumer funds obtained from the payment processors. In July 2010, Mizhen opened a brokerage account at Wells Fargo Advisors in the name of LeanSpa, LLC. The LeanSpa, LLC brokerage account was linked to two bank accounts, one account in the name of LeanSpa, LLC ending in #2431 and a personal bank account (#4115) in the name of Mizhen and his wife, Angelina Strano. (Tab 7, Declaration of FTC Economist Dr. Kenneth Kelly (hereinafter "Dr. Kelly Dec."), at ¶¶ 3-4.) Mizhen also opened two other bank accounts at Wells Fargo Bank, N.A. – one account (#7901) was opened in May 2010 in the name of NutraSlim, LLC, and the other account (#9168) was opened in September 2010 in the name of LeanSpa, LLC. (*Id.* at ¶ 3.) Mizhen transferred funds to and from the accounts he set up. (*Id.* at ¶¶ 6-8.)

From September 2010 through June 2011, more than $25 million was deposited from several payment processors (reflecting funds obtained from consumers) into two of the bank accounts Mizhen set up; the NutraSlim account (#7901) and the LeanSpa brokerage account (#2431). (*Id.* at ¶9.)  From September 2010 to December 2010, more than $2 million was deposited to the NutraSlim account (#7901) from the National Bank of California. (*Id.* at ¶9(A).)  From October 2010 to July 2011, approximately $24.5 million was deposited into the LeanSpa account (#2431) from First Bank of Delaware, Global Payments, and HSBC Bank.  (*Id.* at ¶¶9(B)-(D).)

Mizhen transferred funds back and forth among these two accounts (which received funds from the payment processors) and other accounts he controlled, including a personal bank account (#4115), the other LeanSpa account (#9168), and another account ending in number 3769.  (*Id.* at ¶¶7, 10(C).)  In addition, some funds from the LeanSpa account (#9168) were in turn transferred to an overseas account for "NutraSlim." (*Id.* at ¶ 10(B).)  Accordingly, the finances and operations of the Company Defendants are interrelated and controlled by Mizhen.

## II.   DEFENDANTS' DECEPTIVE PRACTICES

### A.   Defendants Used Fake News Reports to Promote Their Products and Drive Consumers to Websites They Operate.

Defendants use other entities known as "affiliate marketers" to advertise their products and attract consumers to Defendants' websites.  Defendants hire affiliate marketers through third parties known as "affiliate networks" that match merchants with the marketing affiliates.  Defendants pay affiliate networks a fee for each consumer who originates from one of the network affiliate's webpages and lands on one of Defendants' websites and submits an

application for one of Defendants' "risk free" trial offers.  (*See* Tab 1, Declaration of FTC Investigator Douglas McKenney (hereinafter "McKenney Dec.") at ¶¶ 4-5.)

From at least September 2010 to at least April 2011, Defendants hired marketing affiliates that set up webpages designed to look like legitimate independent news sites.  The webpages featured phony investigative reports and reviews on Defendants' diet supplements followed by a section full of glowing consumer "comments" about the products.[5]  Printouts of examples of these bogus websites are attached as Exhibits to the Complaint and included in the Appendix.[6]   The "news" sites use deceptive fake news formats designed to look like legitimate news sites.  Specifically, the sites contain:

- graphical images or text at the top that imply the sites are affiliated with objective news organizations such as "Channel8News," "News6," and "USA Health News;"

- subject tabs used on news websites such as "U.S.," "World," "Politics," and "Health;"

- logos of major news outlets such as CNN, MSNBC, and Fox News; and

- articles titled to appear as investigational reports such as "Acai Berry Products Reviewed Most Effective Ones Found;" "1 Trick of a Tiny Belly: Reporter Loses Her 'Belly' Using 1 Easy Tip;" and " "Acai Berry Diet Exposed! Miracle Diet or Scam?"

_____

[5]   In mid-April 2011, the FTC filed ten lawsuits against "marketing affiliates" in connection with these bogus news stories.  *See FTC Seeks to Halt 10 Operators of Fake News Sites from Making Deceptive Claims About Acai Berry Weight Loss Products*, FTC Press Release (April 19, 2011), http://www.ftc.gov/opa/2011/04/fakenews.shtm.

[6]   *See* Compl., Exs. A-C; *see also, e.g.,* Tab 1, McKenney Dec., Atts. B (FTC-LS 5), D (FTC-LS 43), P (FTC-LS 140), S (FTC-LS 170).  The printouts of the website captures span over a seven-month period from September 2010 to April 2011.

*See id.*

The websites provide a purported investigative reporter's account of her use of several of Defendants' dietary products, such as "LeanSpa Acai," "LeanSpaCleanse," and "LeanSpa with Pure HCA."[7] The reporter typically claimed that by using these products, she experienced dramatic weight loss of at least twenty-five pounds in four weeks with "no special diet" and "no intense exercise." Following the reporter's account are comments posted by purported consumers endorsing the products. (*Id.*.)

Nearly everything about these "news" sites is fake. The websites are not maintained by news organizations, and the reporter, the investigation, and the consumer comments are all fabricated. The photographs of the reporters are copied from other, legitimate news stories, and the comments from purported consumers are cut and pasted from other fake sites. (Tab 3, FTC Investigator Sallie Schools (hereinafter "Schools Dec.") at ¶¶ 15-20.) In addition, the claims about weights loss from using Defendants' products are false. The dramatic weight loss described by using Defendants' products is not possible.[8]

---

[7]   The fake news sites typically promoted more than one product. In some instances, the fake news sites promoted and contained hyperlinks to one of Defendants' products combined with products from another merchant. (*See, e.g.*, Tab. 1, McKenney Dec. at ¶ 7, Att. B at FTC-LS 5-8.) In other instances, the fake news sites promoted only Defendants' products. (*See, e.g.*, *id.* at ¶ 35, Att. S at FTC-LS 170-78.)

[8]   According to Dr. Edward Blonz, a nutritional expert from the University of California, San Francisco, who reviewed Defendants' product labels, the stated weight loss on these "news" websites of at least 25 pounds in four weeks using Defendants' products is simply not possible. (Tab 2, Declaration of Dr. Edward Blonz (hereinafter "Dr. Blonz Dec."), at ¶¶ 5-6, 48.)

The new story webpages are nothing more than advertisements set up to direct consumers to sign up for "free" trials of Defendants' products.[9]  Throughout the sites are hyperlinks to the webpages operated by the Defendants.  The sites also emphasized that Defendants' products are available for "free trials" by highlighting or bolding the terms "free trial." (*See, e.g.*, Tab 1, McKenney Dec., Att. B (FTC-LC 6) & Att. D (FTC-LS 43, 45).)

In many instances, the sites used "pop-ups" when consumers attempted to navigate away from or close the webpage, in which a message popped-up further emphasizing that the products were available on a free or risk-free trial basis by containing the following statements (or substantially similar language) :

> "IMPORTANT: Are you sure you don't want to take advantage of the LeanSpa Acai and Natura Cleanse Free Trial?"

> "Don't forget - they will only be available for a limited time.  Since these trials are completely free, there is no cost or risk to you.  You can also give them away if you'd like. Or start on the 4 week test that Stacie completed. . . ."

(*See, e.g.*, Tab 1, McKenney Dec. at ¶13, Att. E at FTC-LS 50.)

Defendants began receiving consumer complaints about these fake news sites from the Connecticut Better Business Bureau as early as November 2010, where consumers explained they had ordered Defendants' products after seeing what appeared to be legitimate news articles featuring these products.  (Tab 4, Zak Dec. ¶¶ 12(A) - (E).)  Despite these repeated complaints,

---

[9]   The fake sites typically contained certain inconspicuous statements either hidden at the very top among the more prominent fake news imagery and text or buried at the very bottom of the site.  In some instances, the sites included the vague term "advertorial" in small font at the top of the websites. (*See, e.g.*, Compl. Ex. A at FTC-LS 76.)  In other instances, the fake sites contained in small text buried at the very bottom statements that read "[t]his website and page on this website is based loosely off a true story, but has been modified in multiple ways, including, but not limited to, the story, the photos, and the comments . . . ." (*See, e.g.*, Tab 1, McKenney Dec., Att. B at FTC-LS 8.)

Defendants continued using these bogus news sites to lure consumers to their websites for at

least another six months to April 2011 – when the FTC filed a series of lawsuits against the

marketing affiliates who operated the fake news sites.  (*See* pp. 7, fn. 5)

**B.  Defendants Obtain Consumers' Credit and Debit Card Information Through Deceptive Trial Offers and False Product Claims.**

Defendants induce consumers to provide their credit or debit card account

information by representing on their website landing pages that their products are clinically

shown to cause substantial weight loss and can be obtained on a free or risk-free "trial" basis for

which consumers pay only a nominal shipping and handling fee for the trial samples.

When consumers click on the embedded links on the affiliate marketers' websites, they

are directed to a webpage, such as "tryleanspa.com," "leanspacleanse.com,"  "trynutraslim.com,"

or "tryquickdetox.com" operated by Defendants.  (*See* Tab 1, McKenney Dec. at ¶¶ 7-8, 24-25,

36, Att. B (FTC-LS 5-13), Att. K (FTC-LS 98-107) & Att. T (FTC-LS 179-88).)   Defendants'

websites claim that use of their products will cause consumers to "burn fat" and "lose weight,"

and contain statements such as "Get a Celebrity Looking Body Today!", "Get Lean This

Month!", and "The Media is Sold on Acai."  (*See, e.g., id.* at Att B (FTC-LS 11-12).)

As early as December 2010, Defendants' website (tryleanspa.com) included statements

falsely indicating that "Clinical Studies" prove their products cause substantial weight loss.  In

particular, Defendants' website on top states "Clinically Tested to Reduce Body Fat," and

prominently displays a photo of a physician and a bar graph under the header "LeanSpa Clinical

Results," showing "fat loss" between 5 to 13 pounds by "actual study participants."[10] (*Id.* at Att. K (FTC-LS 102-03).)   The "Clinical Results" or "Pilot Study" touted on Defendants' website, however, is not "objective scientific evidence," and does not show that Defendants' products will cause rapid substantial weight loss.[11] (Tab 2, Dr. Blonz. Dec. at ¶¶ 7, 37-39.)

Moreover, Defendants' landing webpages (tryleanspa.com, leanspacleanse.com, and trynutraslim.com) promote a free trial offer with a "100% Satisfaction Guarantee," in which consumers only need to pay a nominal fee for shipping and handling for their trial bottles. Defendants' webpages typically state on top "Try it Today!" and "100% Satisfaction Guarantee."[12] (*See* Tab 1, McKenney Dec. at ¶ 8, Att. B (FTC-LS 11).)  At the bottom of the webpages, Defendants display a "30 Day Money Back Guarantee" icon. (*Id.* at FTC-LS 13.)

Furthermore, the Defendants' landing webpages also create the impression that consumers will have at least thirty days to try the products, instead of Defendants' narrower 14-day trial period.  For example, Defendants' landing webpages stated "Get Lean This Month!" and feature a "30 Day Money Back Guarantee" icon as well as purported testimonials making specific references to a "30 day trial" or having "tr[ied] LeanSpa for 30 days." (*See id.* at Att D (FTC-LS

_____

[10]  Defendants' websites contain inconspicuous footnotes in small font at the very bottom that include a statement that reads: "Typical weight loss results were reported on average at 1 lb - 2 lbs per week.  Individuals are remunerated." (*Id.* at Att. K (FTS-LS 104).)

[11]  The "Pilot Study" discussed on Defendant's landing webpages (tryleanspa.com) is accessible on other webpages operated by Defendants such as leanspa.com and slimfuel.com.  (Tab 6, Marino Dec. at ¶¶ 7-8.)  Plaintiffs' retained expert, Dr. Blonz, reviewed Defendants' "Pilot Study," and concluded it did "not qualify as objective scientific evidence," because of a "lack of product binding, a lack of peer-review, no placebo control," and the participants were compensated for specific performance.  (Tab 2, Dr. Blonz Dec. at ¶¶ 37-39.)

[12]  On other webpages, leanspa.com and slimfuel.com, Defendants also promote a 30 day money back guarantee, and state: "Try it for 30 days. . . .You have nothing to lose but weight!" (*See* Tab 6, Marino Dec. at ¶¶ 7-8, Atts. F & G.)

47-49).)

Defendants' landing pages contain embedded links to order pages under the headers, "Where Should We Send the Trial Bottle," or "Act Now to Claim Your Trial Bottle!" To create a sense of urgency, the sites state: "Hurry! Limited to 1 Order Per Household." (*Id.* at Att. B, FTC-LS 11-13). If consumers try to navigate away from the site, pop-up messages appear containing the following statements offering the trials for reduced nominal shipping and handling fees:

> Don't miss out on this GREAT OFFER!!!  Just press Cancel to remain on this page and receive an instant discounted S&H price of $1.95.

(*See e.g.,* Tab 1, McKenney Dec. at ¶¶ 9-11, Att. C (FTC-LS 34.))

Consumers are then directed to an order page where they are prompted to submit their credit or debit card information for the free "trial" product.   (*Id.* at ¶¶ 10-11, Att. C (FTC-LS 35-37).)  Most order pages include a summary of the order that is designed to look like an invoice and prominently indicates that the consumers will not be charged for the trial product beyond the listed shipping and handling fee, typically $4.95 or less.  (*Id.*)  Defendants only disclose in small print at the bottom of the order webpages (at the time the consumer submits his or her payment information) that by placing an order for the trial bottle consumers will be automatically enrolled in a continuity plan for additional charges.  The following statement (or substantially similar language) appears in small print on the order pages:

> Offer details: By placing your order today you'll be shipped a 30 day supply of LeanSpa Weight Loss System tablets (just pay S&H).  If you feel the LeanSpa Weight Loss System is not for you, cancel within 14 days from today to avoid the purchase fee of $79.99 and enrollment in auto-shipment program which sends you 1 bottle every 30 days starting 30 days after your trial period.  You may cancel at any time by contacting our Consumer Care Department via phone 1-888-839-9990.

(*Id.*)

When consumers submit their contact and payment information to obtain the trial bottles, they receive emails confirming their order and showing again no charge for the products, except for a nominal fee for shipping and handling.  The order confirmations typically do not mention that consumers would be enrolled in a continuity plan and incur additional charges automatically if they do not cancel.  (*See* Tab 3, Schools Dec. at ¶ 21, Att. K (FTC-LS 338.))

Defendants' representations about the free and risk-free nature of the trial offers lead consumers to believe that the trial offers involved no or only nominal costs. Instead, Defendants deceptively enrolled consumers into continuity plans that they could not easily cancel and that resulted in substantial unauthorized charges.

**C.    Defendants Cause Consumers To Incur Substantial Unauthorized Charges Resulting In a Large Number of Consumer Complaints and Disputed Charges.**

Beginning in August 2010, more than a thousand consumers across the country have submitted complaints to the Connecticut Better Business Bureau and law enforcement agencies against the Company Defendants for: (i) recurring unauthorized charges incurred after the consumers had ordered online the purported free trial samples; and (ii) that consumers could not cancel recurring monthly product shipments.  (Tab 4, Zak Dec. at ¶¶ 8-11, 13-14; Tab 6, Marino

Dec. at ¶¶ 12-16.)  Defendants' operations are active[13] and their deceptive practices are ongoing, as law enforcement agencies continue to receive complaints against Defendants of unauthorized charges.[14]  (*Id.*)

      In particular, consumers report that after they ordered Defendants' free trial products, Defendants charged them substantial monthly charges (typically $79.99 for one product, or $149 for two products) for the trial samples as well as unwanted additional product shipments.  (Tab 4, Zak Dec. at ¶10; Tab 6, Marino Dec. at ¶13.)[15]  Although the order webpages stated in small print at the bottom of the order pages that consumers would be enrolled in an "auto-shipment program," some consumers did not see this disclosure or were unaware they had to take affirmative steps to avoid being charged for additional shipments.  (*See* Tab 16, Declaration of Bill Ivey (hereinafter "Ivey Dec.") at ¶¶ 5-8.)

      In some instances, Defendants charged consumers additional charges of $79.99 before consumers even received the products and before the end of the 14-day trial period.  (*See* Tab 6, Marino Dec. at  ¶13; *see also, e.g.,* Tab 9, Declaration of Leah Argenziano (hereinafter,

---

[13]  In August 2011, an undercover investigator went to Defendants' office at 420 East Main Street, Branford, Connecticut, and spoke with an individual at the office who confirmed that this office was "LeanSpa's corporate office" and directed the undercover investigator to order supplements online at the "slimfuel" website.  (Tab 8, Declaration of Stephen Hennessey, Connecticut Office of Attorney General Office (hereinafter "Hennessey Dec.") at ¶¶ 4-5.)  In addition, Defendants' websites (trynutraslim.com and tryquickdetox.com) are currently operational and promoting trial offers to consumers.  (Tab 6, Marino Dec. at ¶ 10.)

[14]  Since July 2011, the FTC's complaint database has received over 160 complaints against Defendants.  (Tab 6, Marino Dec. at ¶ 12.)  In addition, consumers have submitted complaints reporting that they have incurred unauthorized debits under a different billing descriptor, "Slimfuel," in July and August 2011 after ordering Defendants' other products.  (*Id.* at ¶ 14.)

[15]  *See also generally* consumer declarations attached at Tabs 9 to 18.

-14-

"Argenziano Dec.") at ¶ 8; Tab 11, Declaration of Pamela Sue Colbert (hereinafter "Colbert Dec") at ¶7.)

In addition, consumers repeatedly reported they could not cancel or get out of the Defendants' continuity programs that they were automatically enrolled in and that the Defendants refused to provide full refunds.  For example, consumers had difficulty reaching a live person when they tried to call the number on Defendants' websites to process their cancellation or refund request.  (Tab 4, Zak Dec. at ¶11(A); Tab 3, Schools Dec. at ¶ 21(Day 12).)  Consumers who attempted to cancel by going to the Defendants' websites and clicking on the "Easy Cancel" option received a notice that their account could not be found or that if they cancelled they would be charged $19.41 for the bottle they received.  (Tab 4, Zak Dec. at ¶11(B); Tab 3, Schools Dec. at ¶ 21(Day 12).)  In addition, consumers who attempted to cancel by sending emails to Defendants often received only automated messages.  (Tab 4, Zak Dec. at ¶11(C); Tab 3, Schools Dec. at ¶ 21(Day 12), Att. O (FTC-LS 347).)

Moreover, Defendants require consumers to obtain a Return Merchandise Authorization ("RMA") number and then mail the products back in order to process their cancellation and obtain a refund.  (Tab 9, Argenziano Dec. at ¶11; Tab 15, Declaration of Sharon Ingalsbe (hereinafter "Ingalsbe Dec." at ¶¶ 9-10.)  At the time consumers signed up for the free trial, these additional requirements were only disclosed on separate webpages accessible through hyperlinks.  (*See* Tab 1, McKenney Dec. at ¶¶ 8 & Ex B (FTC-LS 11-26).)  Even when consumers went through each of these additional hurdles, they still could not obtain full refunds or cancel the monthly subscription and continue incurring unauthorized charges.  (Tab 4, Zak Dec. ¶ 11D; Tab 6, Marino Dec. at ¶ 13.)

-15-

As a result of their deceptive practices, Defendants incurred a high level of disputed charges or "chargebacks" and were placed in one of VISA's merchant monitoring programs, referred to as the High-Risk Chargeback Monitoring Program ("HRCMP"), back in October 2010.[16] (Tab 5, Chen Dec. at ¶25.)  According to VISA's records, from June 2010 through April 2011, Defendants posted over 783,687 sales drafts, totaling over $28 million in sales through VISA's payments network alone.  (*Id.* at ¶ 29.)  During this period, Defendants posted more than $7 million (about 25% of the total sales amount) in sales chargebacks (which are initiated by a bank) and credit vouchers (or refunds issued by the merchant).  (*Id.*)  After VISA placed Defendants in its HRCMP, several U.S. banks terminated Defendants' merchant accounts and stopped processing sales transactions for Defendants.  (*Id.* at ¶31.)  Defendants are now using offshore banks to process consumer sales transactions.  (*Id.* at ¶¶ 43-45.)

## III.   OTHER ENTITIES INVOLVED IN THIS DECEPTIVE SCHEME HAVE RECENTLY FILED LAWSUITS AGAINST DEFENDANTS.

Defendants have been recently sued in two separate actions by other parties who were involved in Defendants' deceptive scheme.  *See First Bank of Delaware v. LeanSpa, LLC, et al.,* No. 1:11-cv-00675-UNA (D. Del. filed Aug. 1, 2011) ("FBD Lawsuit"); *LeadClick Media, Inc. v. LeanSpa, LLC et al.,* No. 4:11-cv-04423-DMR (N.D. Cal. filed Sept. 6, 2011) ("LeadClick Lawsuit").  Copies of the Complaints are included in the Appendix.  (Tab 6, Marino Dec. at ¶17, Atths. J and K.)  Both federal lawsuits involve entities that facilitated Defendants' unlawful

---

[16]   VISA's records show that Defendants used several billing descriptors, which are the descriptive words that appear on a cardholder's debit or credit card statement next to the charge or debit, that included the terms "Leanspa" and "Nutraslim."  (Tab 5, Chen Dec. at ¶¶ 27-28.)  Consumer complaints report Defendants are using another billing descriptor, "Slimfuel."  (Tab 6, Marino Dec. at ¶ 14.)  According to VISA, the use of multiple descriptors is one technique used by merchants to evade VISA's merchant chargeback monitoring program and avoid being assessed additional fees.  (Tab 5, Chen Dec. at ¶ 18.)

activities, First Bank of Delaware ("FBD") and LeadClick Media, Inc. ("LeadClick").  As discussed below, these lawsuits risk impeding this Court's ability to order effective final relief by further depleting Defendants' assets and potentially interfering with the proposed receivership.  Plaintiffs therefore seek in the proposed TRO a temporary stay of these actions.

## A.      The FBD Lawsuit Involves Payment Processing Entities Used By Defendants.

One lawsuit was filed by First Bank of Delaware ("FBD"), which processed consumer sales transactions for Defendants for at least seven months from October 2010 through April 2011.  (Tab 5, Chen Dec.¶ 35.)  FBD continued to process sales for Defendants even though FBD was alerted by VISA in December 2010 about Defendants' excessive chargebacks.  (*Id.*)  During that time period, FBD processed over $20 millions for Defendants through VISA's payment network alone.  (*See id.* at Att. A (FTC-LS 367) (summing "Sales Draft" amounts for "First Bank of Delaware").)  FBD and another entity named Check21.com, LLC ("Check21") earned fees and a percentage of Defendants' sales for processing Defendants' sales transactions. (*Id.* at ¶37, Att. D.)

On August 1, 2011, FBD filed a lawsuit in Delaware district court against LeanSpa, LLC and Mizhen as well as Check21 and its principal Ido Meros arising from FBD's processing services for Defendants.  (Tab 6, Marino Dec., Att. K.)  The Complaint alleges that "[b]y the time First Bank of Delaware learned LeanSpa, LLC and Boris Mizhen were engaged in a large consumer fraud, First Bank of Delaware had already been subjected to more than $1.8 million in chargeback handling fees in a seven-month period."  (*Id.* at ¶ 4.)  On September 30, 2011, the named company defendants, LeanSpa, LLC and Check21, filed answer and counterclaims and the individual defendants, Mizhen and Meros, filed motions to dismiss.

**B.      The LeadClick Lawsuit Involves a Marketing Affiliate Network Used By Defendants.**

The other lawsuit was filed by LeadClick, an affiliate network hired by Defendants to promote their products and drive online consumer traffic to Defendants' ordering webpages. From September 2010 to April 2011, Defendants paid LeadClick over $8 million to direct consumers to Defendants' websites.  (Tab 7, Dr. Kelly Dec. at ¶ 10(A).)

On September 6, 2011, LeadClick filed a lawsuit in the Northern District of California against Mizhen and company defendants, LeanSpa, LLC, NutraSlim UK Ltd., NutraSlim, LLC, New Age Opt In Inc., and Media Network, Inc.  (Tab 6, Marino Dec., Att. J.)  According to LeadClick's lawsuit, the Defendants hired LeadClick from September 2010 to April 2011 "for online internet advertising campaigns relating to Defendants' diet and weight loss products," in which Defendants "agreed to pay [LeadClick] a set fee for each 'Action,' or instance in which an internet user clicks on one of Plaintiff's network lines, lands on Defendants' sites and completes and submits Defendants' application." (*Id.* at ¶ 15.).  LeadClick seeks over $10 million from the named defendants.  (*Id.* at ¶¶ 18-19.)  On October 11, 2011, the named defendant companies filed an answer and Mizhen moved to dismiss.

## ARGUMENT

Plaintiffs seek an *ex parte* temporary restraining order ("TRO") that: (1) enjoins Defendants from continuing their unlawful activities; (2) freezes Defendants' assets; (3) appoints a receiver over the Company Defendants; (4) permits the temporary receiver and Plaintiffs immediate access to the Company Defendants' business premises; (5) stays litigation involving the Defendants; and (6) seeks an order to show cause why a preliminary injunction should not be

-18-

issued.  This Court has authority to enter the requested relief that is needed to put an immediate stop to Defendants' ongoing deceptive scheme and prevent Defendants from dissipating assets and destroying evidence pending a full hearing on this matter.  Courts in the Second Circuit have repeatedly granted similar TROs in civil law enforcement actions.[17]

## I.     THIS COURT HAS AUTHORITY UNDER THE FTC ACT AND CUTPA TO ISSUE THE REQUESTED PRELIMINARY INJUNCTIVE RELIEF.

### A.     The FTC Act Authorizes the Court to Grant Immediate Temporary Relief.

The FTC, an independent government agency, enforces the FTC Act, 15 U.S.C. § 41 *et seq.,* and charges Defendants with violating Sections 5 and 12 of the FTC Act.  Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).  Section 12 of the FTC Act prohibits the dissemination of "any false advertisement . . . for the purpose of inducing . . . the purchase of food [or] drugs." 15 U.S.C. § 52(a).  The FTC also enforces provisions of the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693-1693r ("EFTA"), and brings a claim against Defendants under Section 907(a) of EFTA, which requires that a "preauthorized electronic fund transfer from a consumer's account . . . be authorized by the consumer only in writing" and that "a copy of such authorization . . . be provided to the consumer when made." 15 U.S.C. § 1693e(a).

---

[17]  *See, e.g., FTC v. Global U.S. Resources, et al.,* No. 3:10-cv-01457-VLB (D. Conn. Sept. 14, 2010), ECF No.13 (granted ex parte TRO with asset freeze); *FTC v. Consumer Health Benefits Assoc., et al.,* No. 1:10-cv-03551-ILG (E.D.N.Y. Aug. 3, 2010), ECF No.1 (granted *ex parte* TRO with asset freeze and appointment of a receiver); *FTC v. Epixtar Corp.,* No. 03-cv-08511-DAB (S.D.N.Y. Oct. 29, 2003), ECF No.9 (same); *FTC v. Blumstein,* No. 01-cv-08987-MB (S.D.N.Y. Oct. 17, 2001), ECF No.11 (same); *FTC v. R&R Consultants, Inc.,* No. 01-cv-01537-TJM (N.D.N.Y. Oct. 10, 2001), ECF No.10 (same); *FTC v. Guzzetta,* No. 01-cv-02335 (E.D.N.Y. Apr. 17, 2001), ECF No.5 (same); *FTC v. Int'l Direct,* No. 97-cv-00721 (D. Conn. Apr. 16, 1997), ECF No.12 (same).

Section 13(b) of the FTC Act gives this Court the authority to grant preliminary injunctive relief against violations of any law enforced by the FTC.  15 U.S.C. § 53(b).  Section 13(b) provides in pertinent part that "in proper cases the Commission may seek, and, after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b).  "[C]ourts have consistently held that 'the unqualified grant of statutory authority to issue an injunction order under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.'"  *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996).

It is well established that incident to the express statutory authority in Section 13(b) to issue a permanent injunction, a district court may exercise its full inherent equitable power to order any preliminary injunctive relief, including freezing assets and appointing a receiver, that may be needed to make permanent relief possible.[18]  Moreover, since the public interest is implicated here, the district court's equitable powers "assume an even broader and more flexible character than when only a private controversy is at stake." *Gem Merch. Corp.*, 87 F.3d at 469 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

---

[18] *See, e.g., Gem Merch. Corp.*, 87 F.3d at 468-70 (court's authority to exercise full equitable powers is especially appropriate in a Section 13(b) case); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717-719 (5th Cir. 1982) (district court can exercise full range of traditional equitable remedies);*FTC v. H.N. Singer*, 668 F.2d 1107, 1113 (9th Cir. 1982) (the district court has "authority to grant any ancillary relief necessary to accomplish complete justice"); *FTC v. Amy Travel Serv.*, 875 F.2d 564, 571 (7th Cir. 1989) ("in a proceeding under section 13(b), the statutory grant of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers");*FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 325 (S.D.N.Y. 2001) ("courts have held repeatedly that district courts may employ the full range of equitable remedies incident to their power to grant injunctive relief sought by the FTC under Section 13(b)") (footnote omitted).

**B.    CUTPA also Authorizes the Court to Grant Immediate Temporary Relief.**

CUTPA broadly prohibits "unfair or deceptive acts or practices in the conduct of any

trade or commerce." Conn. Gen. Stat. § 42-110b(a).  The "purpose of CUTPA is to protect the

public from unfair practices in the conduct of any trade or commerce. . . . The entire act is

remedial in character . . .   and must be liberally construed in favor of those whom the legislature

intended to benefit." *Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 310

(2005) (quoting *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.*,

245 Conn. 1, 42, 717 A.2d 77 (1998)).

In effectuating this purpose, the legislature in § 42-110m(a) expressly granted the State

the power to apply "for an order temporarily or permanently restraining and enjoining the

continuance of such act or acts or for an order directing restitution and the appointment of a

receiver in appropriate instances, or both."  Conn. Gen. Stat. § 42-110m(a).  Additionally, "[t]he

court may award the relief applied for or so much as it may deem proper including reasonable

attorney's fees, accounting and such other relief as may be granted in equity." *Id.*

Thus, under Section 13(b) of the FTC Act and Section 42-110m of CUTPA, this Court

may order temporary or preliminary relief that is necessary to preserve the possibility of

effective final relief, including an order freezing assets and appointment of a receiver.   As

demonstrated below, such relief is clearly warranted in this case.

**II.    PLAINTIFFS' EVIDENCE SATISFIES THE PUBLIC INTEREST STANDARD
FOR ISSUING PRELIMINARY INJUNCTIVE RELIEF IN THIS CASE.**

In determining whether to grant a TRO or preliminary injunction to law enforcement

agencies acting under statutory authority to safeguard the public interest, there is a presumption

of irreparable harm.[19]   Under this more lenient "public interest" standard, the Court need only

consider two factors: (1) the likelihood that Plaintiffs will ultimately succeed on the merits; and

(2) the balance of equities.  *See, e.g., FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1233 (9th

Cir. 1999).  Plaintiffs need only demonstrate a "fair and tenable chance of ultimate success on

the merits" to satisfy the first prong.  *FTC v. Verity Int'l,* 124 F. Supp. 2d at 199; *Crescent*

*Publ'g Group,* 129 F. Supp. 2d at 319.

Although proof of a statutory violation "does not deprive the court of discretion and does

not obligate the court automatically to grant every injunction sought for every violation,"

*Department of Transportation v. Pacitti,* 43 Conn. App. 52, 58, 682 A.2d 136 (1996), the

equitable balancing of interests in a statutory injunction case places a relatively light burden on

the State.  *Id.*  "It is not for the courts to second guess agencies on the danger to the public

interest or welfare or to second guess the legislature about the relative importance of such danger

vis-à-vis the burden of harm inflicted on a citizen. . . ."  *Id.*

"Thus, while the plaintiff need not prove irreparable harm or lack of adequate remedy at

law, it must prove that the equities weigh in its favor which, of course, includes balancing the

---

[19]   The standard for granting preliminary injunctive relief under Section 13(b) differs from that typically applied to private litigants.  The Second Circuit applies a modified standard where, as here, the applicant is a government agency that is acting under its statutory authority to safeguard the public interest. *See City of New York v. Golden Feather Smoke Shop, Inc.,* 597 F.3d 115, 120 (2d Cir. 2010); *United States v. Diapulse Corp. of America,* 457 F.2d 25, 27 (2d Cir. 1972) ("[T]he function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants."); *see also FTC v. Verity Int'l, Ltd.,* 124 F. Supp. 2d 193, 199 (S.D.N.Y. 2000) (noting that the "statutory or 'public interest' standard" applies when the FTC seeks preliminary injunctive relief).  In these cases, the agency is not required to make a showing of irreparable harm; instead, there is a "presumption of irreparable harm based on a statutory violation." *Golden Feather,* 597 F.3d at 120; *see also CFTC v. British Am. Commodity Options Corp.,* 560 F.2d 135, 141 (2d Cir. 1977) (noting "well established rule" that agencies "need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits, but only that there is a reasonable likelihood that the wrong will be repeated") (citations and footnote omitted).

harm to the defendant, and that there is a likelihood of probable success on the merits." *Town of Enfield v. Ingraham*, No. TTD-V074007649S, 2008 Conn. Super. LEXIS 1359, at *11 (Conn. Super. Ct. May 28, 2008); *accord Dep't of Transp. v. Pacitti*, 43 Conn. App. 52, 58, 682 A.2d 136 (1996); *Kosilla v. Collins Group, Inc.*, No. CV-00-0801571, 2000 Conn. Super. LEXIS 3318, at *6-7 (Conn. Super. Ct. Nov. 29, 2000).

In balancing the equities, the Court should afford less weight to private hardship concerns where the case implicates public equities. *See Verity Int'l,* 124 F. Supp.2d at 199; *Crescent Publ'g Group,* 129 F. Supp.2d at 319. Moreover, where, as here, a defendant's conduct "reflects systematic wrongdoing rather than a mere incidental violation, it presents strong grounds for the issuance of a preliminary injunction." *SEC v. Prater*, 289 F. Supp. 2d 39, 54 (D. Conn. 2003) (citation omitted).

The evidence submitted with this application clearly meets the public interest statutory standard for interim injunctive relief. These materials demonstrate that defendant Mizhen, through the Company Defendants, has been deliberately operating an online marketing scheme that for over a year deceptively enrolls consumers across the country into negative option continuity plans for dietary supplements. Both the ongoing federal and state statutory violations and the need to halt the deceptive scheme are clear. The requested relief is therefore proper and necessary.

### A.   Plaintiffs Are Likely to Succeed on the Merits that Defendants Violated the FTC Act, EFTA, and CUTPA.

Plaintiffs' Complaint contains sixteen counts against Defendants. The FTC brings four counts under Section 5 of the FTC Act (Counts 1 to 4), one count under Sections 5 and 12 of the

FTC Act (Count 5), and one count under the EFTA and its implementing Regulation E (Count 6).   The State brings ten counts under the CUTPA (Counts 7 to 16), which correspond to Counts 1 through 4 and 6.   Plaintiffs' TRO application clearly exceeds the threshold showing of success of "a fair and tenable chance of ultimate success on the merits" that Defendants violated a federal or state statute to obtain preliminary injunctive relief. *See Verity*, 124 F. Supp. 2d at 199.

### 1.    FTC's Claims under the FTC Act

The FTC alleges that Defendants violated and continue to violate the FTC Act by: (i) misrepresenting that their trial offers are free or risk-free and failing to adequately disclose material features of their negative option continuity plans (Counts 1 and 2); (ii) misleading consumers that they will provide full refunds (Count 3); (iii) misleading consumers that their products were tested positively by independent investigative journalists employed by objective news sources and that the favorable consumer testimonials posted on the "news" sites were genuine (Count 4); and (iv) making false and unsubstantiated claims that the use of their dietary supplements will result in rapid and substantial weight loss and that clinical studies prove that their products will cause rapid and substantial weight loss (Count 5).

Section 5(a) of the FTC Act declares unlawful "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  "To prove a deceptive act or practice under [Section 5], the FTC must show three elements: [1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3], the representation, omission, or practice is material." *FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (citations and footnote omitted).  "The deception need not be made with intent to deceive; it is enough that representations or practices were likely to mislead consumers acting reasonably."

*Id.,* citing *FTC v. World Travel Vacation Brokers,* 861 F.2d 1020, 1029 (7th Cir. 1988).

"Deception may be found based on the net impression created by a representation." *FTC v. Stefanchik,* 559 F.3d 924, 928 (9th Cir. 2009) (quotation omitted).  To determine the net impression, courts view the advertisement "as it would be seen by the public generally" including those "who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions." *Niresk Indus. Inc. v. FTC,* 278 F.2d 337, 342 (7th Cir. 1960) (citation omitted).  Because it is the net impression that determines whether a practice is illegal under the FTC Act, any disclaimer used in an effort to avoid liability must be "sufficiently prominent and unambiguous to change the apparent meaning and to leave an accurate impression." *Removatron v. FTC,* 884 F.2d 1489, 1497 (1st Cir. 1989).

Moreover, an individual defendant is liable and subject to injunctive relief for his own conduct as well as acts of a corporate defendant if the individual participated directly in the unlawful activities *or* had the authority to control such activities and knew of the acts and practices.  *See, e.g., Amy Travel,* 875 F.2d at 573; *Crescent Publ'g Group,* 129 F. Supp. 2d at 324.  Direct participation or authority to control the company can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel,* 875 F.2d at 573.  The knowledge requirement may be satisfied by showing "actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574; *see also FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000)*; FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 259-60 (E.D.N.Y. 1998).

2.      **The State's Claims under CUTPA.**

The State alleges that the Defendants violated and continue to violate CUTPA by: (i) misrepresenting that their trial offers are free or risk-free (Count 7); (ii) failing to disclose material conditions, contingencies or limitations to their offer of Products to consumers (Count 9); (iii) misrepresenting to consumers that they will provide full refunds (Count 11); (iv) misleading consumers that their products were tested positively by independent investigative journalists employed by objective news sources and that the favorable consumer testimonials posted on the "news" sites were genuine (Count 13); and (v) debiting consumers' bank accounts on a recurring basis without obtaining a written authorization and without providing to the consumer a copy of a written authorization signed by the consumer (Count 15).  The State alleges that the Defendants' violations of CUTPA as alleged were willful, and thus seeks civil penalties of up to $5,000 per each violation (Counts 8, 10, 12, 14, and 16).

CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Gen. Stat. § 42-110b(a).  A cause of action may be maintained under CUTPA by proving an unfair act or practice, *e.g. Cheshire Mortgage Servs., Inc. v. Montes*, 223 Conn. 80 (1992); *Conaway v. Prestia*, 191 Conn. 484 (1983); or a deceptive act or practice, *see e.g. Caldor, Inc. v. Heslin*, 215 Conn. 590 (1990); *Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342 (1987).  CUTPA expressly states that "it is the intention of the legislature that [CUTPA] be remedial and be so construed."  Conn. Gen. Stat., § 42-110b(b); *see also Johnson Elec. Co. v. Salce Contr. Assocs.*, 72 Conn. App. 342, 353 (2002), *cert. denied* 262 Conn. 922 (2002).

In Connecticut, it is a "black letter principle that a corporate officer may be held personally liable for tortious conduct in which the officer directly participated, regardless of whether the statutory basis for the claim expressly allows liability to be imposed on corporate officers." *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 145 (2005). More specifically with respect to individual liability for violations of CUTPA, the Connecticut Appellate Court recently affirmed a trial court decision holding the president of an LLC individually liable under CUTPA. *See Cohen v. Roll-A-Cover, LLC*, 131 Conn. App. 443, 469 (2011) (holding that "it is not the employment relationship that was dispositive in establishing [LLC president's] personal liability under CUTPA; it was his conduct.").[20]

### a.  Deceptive Conduct

The State may prove a CUTPA violation by showing that the suspect conduct is deceptive. In *Caldor v. Heslin*, 215 Conn. 590 (1990), the Court set forth three requirements to determine if an act or practice may be deceptive:

> First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under

---

[20]  Connecticut trial courts have similarly repeatedly held that Connecticut's limited liability statutes do not shield a member or manager of a limited liability company or corporate officer from personal liability under CUTPA. Quite to the contrary, individuals are liable for their own conduct. *See, e.g., Sentry Constr. Corp. v. Revolation Enter., LLC*, No. 065000790, Conn. Super. LEXIS 3104, 27-29 (Conn. Super. Ct. Dec. 5, 2008); *Mexico Constr. v. Thompson*, No. CV 07 5002988, 2008 Conn. Super. LEXIS 1710 (Conn. Sup. Ct. July 9, 2008); *Feen v. Benefit Plan Adm'rs*, No. 406726, 2000 Conn. Super. LEXIS 2415 (Conn. Super. Ct. Sept. 7, 2000); *Silber v. Carotenuto & Sons Gen. Contractors, Inc.*, No. CV 98 0416562, 2000 Conn. Super. LEXIS 343 (Conn. Super. Ct. Feb. 8, 2000); *Bardon Tool & Mfg. Co., Inc. v. The Torrington Co.*, No. CV960473455, 1996 Conn. Super. LEXIS 2981 (Conn. Sup. Ct. Oct. 31, 1996); *Sabo v. Automated Light Techn., Inc.*, No. 0110800, 1994 Conn. Super. LEXIS 1516 (Conn. Super. Ct. Jun. 3, 1994); *Fishman v. L&M Dev.*, No. 057205, 1992 Conn.Super. LEXIS 2605 (Conn. Super. Ct. Aug. 26, 1992); *Wall v. Post Pub'g Co., Inc.*, No. CV91037579, 1992 Conn. Super. LEXIS 884 (Conn. Super. Ct. Mar. 24, 1992); *Andrus v. Maloney*, 5 Conn. L.Rptr. 321 (Conn. Super. Ct. Jan. 6, 1992); *Vitano v. Townline Assocs.*, No. CV89028136, 1991 Conn. Super. LEXIS 1833 (Conn. Super. Ct. Aug. 2, 1991); *see also* 2 L. Ribstein and R. Keatinge, Limited Liability Companies (2005) §12:4 ("[l]imited liability . . . does not protect the members or managers from direct individual liability for their own wrongs").

the circumstances.  Third, the misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct.

*Id.* at 597, quoting *Figgie Int'l, Inc.*, 107 F.T.C. 313, 374 (1986).

### b.      Unfair Acts or Practices

Pursuant to CUTPA, an act or practice is "unfair" if it "offends public policy as it has been established by statutes, the common law or otherwise," it is "immoral, unethical, oppressive, or unscrupulous" or "causes substantial injury to consumers." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 105 (1992) (Internal citations omitted).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 368 (1999).

### c.      Per se Violations of CUTPA

Certain acts, practices and methods have been established by state statute or by regulation of the Commissioner of Consumer Protection to be per se violations of CUTPA.  *See* Conn. Gen. Stat. § 42-110(c).  Pertinent here is Regulations of Connecticut State Agencies § 42-110b-22, which provides that "[w]hen an offer is made in an advertisement and there is a material contingency, condition or limitation on the offer, it shall be an unfair or deceptive act or practice to fail to conspicuously state such contingency, condition or limitation reasonably adjacent to the offer."  Proof of public interest or injury is not required in actions brought by the State.  *See* Conn. Gen. Stat. § 42-110m(a); *accord State v. Tomasso*, No. CV-04-4002651-S, 2005 Conn. Super. LEXIS 888 (Conn. Super. Ct. Apr. 1, 2005).

-28-

3.      **Plaintiffs' TRO Application Satisfies the Threshold Showing of a "Fair and Tenable Chance of Success" of FTC Act and CUTPA Violations.**

Defendants' violations of the FTC Act and CUTPA are clear and pervasive, and Mizhen's direct participation and control over this illegal conduct is clear.  In mid-2010, Mizhen formed and began operating an enterprise to market and sell dietary supplements.  In particular, Mizhen formed and controlled each of the Company Defendants.  The Company Defendants share the same office location and employees.  In addition, Mizhen transferred funds in and out of the bank accounts set up for each Company Defendant.  *See* pp. 3-6.  These facts show that the Defendants operated as a common enterprise rather than distinct entities.  Accordingly, they are all jointly and severally liable for violations of the FTC Act.  *See Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (per curiam); *accord FTC v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (finding common enterprise where corporate defendants were under common control; shared office space, employees, and officers and conducted their business through a "maze of interrelated companies.").

The basic scheme used in the sale of Defendants' products was to first lure consumers through bogus news stories to landing webpages operated by Defendants.  Defendants hired marketing affiliates to drive online consumer traffic to Defendants' websites.  Defendants had knowledge that the affiliates were promoting Defendants' products for over a seven-month period by creating the false impression that the sites were objective news reports.[21]  *See* pp. 9-10.

---

[21]   The use of buried or small types disclaimers on some of the fake news websites is insufficient to cure the deceptive nature of these websites. *See, e.g., FTC v. Direct Mktg. Concepts,* 624 F.3d 1, 12 n.9 (1st. Cir. 2010) ("[S]uch disclaimers would not leave an accurate impression but instead would only cause confusion," and "[a] statement that studies prove a product cures a certain disease, followed by a disclaimer that the statement is opinion and the product actually does not cure the disease, leaves an overall impression of nonsense, not clarity").

Defendants' reckless indifference (at a minimum) that the affiliates they hired were engaged in dishonest or fraudulent conduct by using bogus news sites to promote Defendants' products and direct online consumer traffic to Defendants' own websites is deceptive and violates the FTC Act and CUTPA. *See FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010) (finding principal defendants personally liable under FTC Act where their "failure to investigate numerous consumer complaints and their deliberate construction of a 'Chinese Wall' between [their company and the agents] rises to the level of reckless indifference."); *see also BEC Corp. v. Dep't of Envtl. Prot.*, 256 Conn. 602, 618 (2001) (applying "responsible corporate officer" test for individual liability, under which officers can be liable when their "actions or inactions resulted in the violation."); *accord Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 143-145 (2005) (noting that the responsible corporate officer doctrine "adopted in *BEC Corp.* required only that the officer have a position of responsibility and influence from which he could have prevented the corporation from engaging in the conduct.").

Moreover, Defendants' websites contain misleading and deceptive offers or advertisements of risk-free or free trial offers. Defendants use these deceptive trial offers to lure consumers to submit their credit or debit card information to pay for only a nominal shipping fee. *See* pp. 10-13. However, this was not the only charge. Defendants later charge consumers for the trial package unless consumers ship the package to a shipping facility at their own cost. In addition, at the same time the trial package was ordered, Defendants enroll the consumer into a continuity plan that includes recurring charges unless the consumer cancels within a narrow time frame. Defendants further make it extremely difficult for consumers to cancel and keep consumers from receiving full refunds. *See* pp. 15. Defendants' failure to disclose the true

-30-

terms of the negative option and continuity plan are deceptive and violate the FTC Act and CUTPA.[22] *See, e.g., FTC v. Willms*, No. C11-828-MJP, 2011 WL 4103542, at *4-6 (W.D. Wash. Sept. 13, 2011) (granting preliminary injunction where defendants inadequately disclosed the true terms of their continuity plans).

Plaintiffs submit evidence showing Defendants' scheme was in fact deceptive and has caused substantial consumer injury. Plaintiffs' evidence includes declarations from consumers who incurred unauthorized charges on their credit or debit cards after they ordered the allegedly free trial products. (Tabs 9 to 18.) Plaintiffs also submit declarations from the Connecticut Better Business Bureau and a FTC investigator stating that over a thousand consumers have complained about Defendants and that the consumer complaints consistently reported that they incurred unauthorized charges from Defendants and that consumers could not easily cancel Defendants' continuity plans and could not get their money back.[23] (Tabs 4 and 6.) In addition, Plaintiffs present further evidence of Defendants' systematic deceptive practices in that Defendants had excessive rates of "chargebacks" or disputed charges in addition to issuing a high level of refunds. (Tab 5.) The fact that some consumers obtained partial or even full

---

[22] Defendants also violate the FTC Act through false and unsubstantiated product claims made on the bogus news sites as well as websites they operate. The FTC may demonstrate the deceptive nature of advertising claims by either (1) demonstrating the falsity of the claims; or (2) showing that defendants lacked a reasonable basis for making the claims, i.e., "substantiation." *See, e.g., FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 n.11 (D. Conn. 2008). Dr. Blonz's expert testimony shows that Defendants' falsely advertised the effectiveness of their weight loss products. *See* pp. 8 n.8, 11 n.11.

[23] Plaintiffs' summaries of the complaints are admissible. Fed. R. Evid. 1006. Further, the statements recorded in the complaints are admissible under the residual exception to the hearsay rule. Fed. R. Evid. 807; *see also FTC v. Kuykendall*, 312 F.3d 1329, 1343 (10th Cir. 2002), *aff'g* 371 F3d 745, 767 (10th Cir. 2004) (ruling that consumer complaints are admissible); *FTC v. Figgie Int'l Inc.*, 994 F.2d 595 (9th Cir. 1993) (finding consumer complaint letters to the FTC admissible under Rule 807's predecessor, Rule 803(24)) (Rule 803(24) and 804(B)(5) were amended and consolidated in Rule 807 in 1997).

refunds does not "sanitize" the deception or somehow "redeem" a lie. *See FTC v. Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir. 2002) (noting that obtaining a refund is not "costless," and fraudsters know "many consumers would not bother to seek" a refund of a relatively small payment of less than $50). Such deceptive acts and practices clearly constitute FTC Act and CUTPA violations.

> **4.     Defendants are violating EFTA**

The FTC alleges that Defendants also violated and continue to violate the EFTA by causing electronic fund transfers from consumers' bank accounts on a recurring basis without (a) obtaining written authorization signed or similarly authenticated from consumers, and (b) providing to the consumer a copy of a written authorization signed or similarly authenticated. *See* 15 U.S.C. § 1693e(a). EFTA violations are deemed violations of the FTC Act. 15 U.S.C. § 1693o. The evidence described above also supports a finding of likelihood of success on the EFTA violations.

Additionally, the State alleges that the Defendants' violations of the public policies embodied in the EFTA violate CUTPA. Indeed, the Defendants' immoral and unscrupulous acts in violation of the EFTA are comprised of numerous instances of debiting consumers' bank accounts on a recurring basis without written authorization, as well as the failure to provide consumers with copies of any written authorization. Such conduct is the antithesis of fair business practices, and supports a finding of likelihood of success on the State's claims in Counts 15 and 16.

**B.    The Equities Strongly Weigh in Favor of Granting the Proposed Injunctive Relief That Includes an Asset Freeze and Appointment of a Temporary Receiver.**

Plaintiffs seek injunctive relief to protect the public in halting an ongoing nationwide deceptive scheme perpetuated by Defendants.  The proposed TRO is specifically designed to preserve the status quo and ensure the possibility of a final remedy pending a hearing on preliminary injunctive relief.  Consistent with orders issued in other civil enforcement cases (*see* pp. 19 n.17), the TRO would: (1) temporarily enjoin Defendants' deceptive marketing and sales practices (Sections I to IV); (2) freeze Defendants' assets (Sections V, VII); (3) appoint a temporary receiver over the Company Defendants (Section X); (4) permit the temporary receiver and Plaintiffs immediate access to the Company Defendants' business premises and records (Section XIX); (5) issue a stay of other lawsuits that may impact the proposed receivership (Section XXV); and (6) allow Plaintiffs to take limited expedited discovery as to the existence and location of Defendants' assets and business records. (Section XXIX).

In balancing the equities, "the public interest should receive greater weight" than Defendants' private concerns.  *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (noting public equities include "effective relief" for the FTC).  That is particularly true where, as here, the evidence shows that Defendants' enterprise is rooted in deception, for a "court of equity is under no duty 'to protect illegitimate profits or advance business which is conducted (illegally).'" *CFTC v. British Am. Commodity Options Corps.*, 560 F.2d at 143, *citing FTC v. Thomsen-King & Co.,* 109 F.2d 516, 519 (7th Cir. 1940).  The public equities here are compelling.  For over a year, Mizhen has operated an enterprise under various entity names and involving different product names, websites and bank accounts.  Defendants' operation is based

on deception and has caused substantial, ongoing consumer harm.

The temporary and preliminary relief sought here is designed to prohibit Defendants from engaging in these deceptive practices and prevent further consumer injury.  In addition, Plaintiffs' proposed TRO contains provisions tailored to preserve the Court's ability to issue effective relief and ensure that Defendants do not conceal or dissipate assets and destroy business records and other evidence.  Where Defendants' operation is permeated by deception or fraud, there is good cause to believe that defendants are likely to attempt to dissipate assets or destroy records.  *See SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (affirmed asset freeze order because "court could not be assured that appellants would not waste their assets prior to refunding public investors' money" because of the fraudulent nature of their violations).  Furthermore, there is a particular risk here of a dissipation or concealment of assets since there is evidence of commingling funds among various company and personal bank accounts and Defendants' use now of offshore bank accounts.  *See* pp. 5-6, 16.

Accordingly, an asset freeze is a proper equitable remedy to ensure the availability of permanent relief and is essential to prevent the Defendants from dissipating or concealing assets during the pendency of this litigation.  *See Affordable Media*, 179 F.3d at 1236 ("Obviously the public interest in preserving illicit proceeds . . . for restitution to the victims is great."); *H.N. Singer,* 668 F.2d at 1113 (asset freeze appropriate "to obtain restitution of moneys fraudulently obtained.").  An asset freeze is necessary in this case to preserve funds where Defendants have taken in more than $25 million from consumers through deceptive means.

In addition, Plaintiffs seek appointment of a temporary receiver to maintain the status quo and prevent the diversion of corporate assets.  *See SEC v. American Board of Trade*, 830 F.2d

431, 436 (2d Cir. 1987).  The temporary receiver will be in a position to prevent further

consumer injury and ensure that consumers will not continue to be unlawfully charged.  The

temporary receiver will also help identify injured consumers and examine the scope of consumer

injury caused by Defendants' unlawful practices.  Relatedly, Plaintiffs' proposed TRO permits

the temporary receiver and Plaintiffs immediate access to the business premises of the Company

Defendants for the purpose of locating, copying, and preserving relevant evidence and permits

Plaintiffs expedited discovery of the location of Defendants' assets and records to prevent the

destruction or concealment of evidence.

Finally, a federal court supervising a receivership has inherent equitable authority to issue

a variety of ancillary relief to protect the receivership assets, including an order staying a non-

party from prosecuting an action.  *See SEC v. Byers*, 609 F.3d 87, 89-91 (2d. Cir. 2010) ("district

courts possess the authority and discretion to enter anti-litigation orders, including those that bar

the filing of involuntary bankruptcy petitions [by non-parties] absent the district court's

permission");  *SEC v. Wencke*, 622 F.2d 1363, 1369-71 (9th Cir. 1980) (the district court's

authority to issue an order staying a non-party from bringing litigation derived from "the

inherent power of a court of equity to fashion effective relief.").  "Because the court's power of

injunction in a receivership proceeding arises from its power over the assets in question, non-

parties to the underlying litigation may be bound by a blanket stay, so long as the non-parties

have notice of the injunction."  *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551-52

(6th Cir. 2006) (noting "[t]he receivership court has a valid interest in . . . the costs of defending

any suit as a drain on receivership assets.").

The litigation stay is necessary (1) to allow the receiver "a chance to do the important job

of marshaling and untangling a company's assets" without being hindered by litigation and (2) because of "the very real danger of litigation expenses diminishing the receivership estate." *United States v. Acorn Tech. Fund, LP*, 429 F.3d 438, 443 (3d Cir. 2005). The stay is particularly appropriate here given the non-parties who are involved in the two pending suits appear to have all facilitated the unlawful activity and profited from the scheme. *See SEC v. Byers*, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) (approved receiver's plan to prohibit parties "involved in the fraudulent scheme" from recovering funds from the receivership estate.)

In contrast, there are no compelling private equities. Any hardship that a preliminary injunction and asset freeze imposes on the Defendants would be temporary and outweighed by the public interest in preserving assets for redress to injured consumers. *Cf. World Travel*, 861 F.2d at 1031 & n.9 (court has a "duty to ensure that the assets of the corporate defendants [are] available to make restitution to injured consumers") (listing cases). Additionally, the conduct prohibitions in the proposed order impose no undue hardship where defendants "can have no vested interest in business activity found to be illegal." *Diapulse Corp.*, 457 F.2d at 29 (quoting *United States v. Walsh*, 331 U.S. 432 (1947)). In short, compliance with the law is not an unreasonable burden. *See World Wide Factors*, 882 F.2d at 347 (affirmed district court's finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment.") (citing *FTC v. Warner Commc'ns*, 742 F.2d 1156, 1165 (9th Cir. 1965).

### III.   *EX PARTE* RELIEF IS NECESSARY TO PROTECT THE PUBLIC INTEREST.

An *ex parte* TRO is needed to prevent Defendants from dissipating assets and destroying evidence.  Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given.  Rule 65(b) provides in relevant part:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A)   specific facts in an affidavit or a verified complaint clearly shows immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).  As the Second Circuit has observed, Rule 65 "by its very terms allows for the issuance of an Ex parte temporary restraining order when (1) the failure to issue it would result in 'immediate and irreparable injury, loss, or damage' and (2) the applicant sufficiently demonstrates the reason that notice 'should not be required.'" *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979) (noting proper circumstances for *ex parte* relief include situations where notice would "render fruitless further prosecution of the action.").

The application for *ex parte* relief is based on the Plaintiffs' experience that it is likely that defendants who, as here, engage in enterprises rooted in deception will dissipate assets or destroy evidence if they receive notice of a law enforcement filing before service of the requested TRO.  *See* Ex. A to TRO Motion.  Moreover, the principal behind this enterprise has a history of fraudulent conduct in which he has been sued twice for allegedly operating a scheme

-37-

to circumvent Microsoft's Hotmail spam filters and disseminate spam email to Microsoft's Hotmail users. *See* pp. 3 n.2. Based on the illegal nature of this long-running operation, Mizhen's fraudulent history, and Defendants' use of offshore banks to process sales transactions, there is cause to believe that Defendants will dissipate or conceal their assets and destroy property or evidence relating to this operation.

These facts demonstrate that entry of this temporary interim order without notice to Defendants is warranted to preserve the possibility of effective final relief by maximizing the funds available to compensate harmed consumers and preserving critical evidence.

## CONCLUSION

Defendants are operating a deceptive marketing scheme that has victimized over a thousand consumers nationwide. Swift action is necessary to halt this scheme and to preserve the availability of final relief for injured consumers, pending a hearing on preliminary injunctive relief. Accordingly, Plaintiffs request that the proposed *ex parte* temporary restraining order be granted.

Respectfully submitted,

WILLIAM K. TOM
General Counsel

LEONARD L. GORDON
Regional Director
Northeast Region

Dated: November 7, 2011

Darren H. Lubetzky
David W. Dulabon
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318

New York, NY 10004
Tel: (212) 607-2898
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: ddulabon@ftc.gov

John Hughes (CT 05289)
Assistant United States Attorney
Chief of Civil Division
157 Church Street
New Haven, CT 06510
Tel: (203) 821-3700
Fax: (203) 773-5373
Email: john.hughes@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION


GEORGE JEPSEN,
ATTORNEY GENERAL,

Dated: _11/4/11_

Phillip Rosario (CT 00999)
Matthew F. Fitzsimmons (CT26981)
Jonathan F. Blake (CT 22321)
Office of the Attorney General
110 Sherman Street
Hartford CT 06105
Tel: (860) 808-5400
Fax: (860) 808-5593
Email: Phillip.Rosario@ct.gov
Email: Matthew.Fitzsimmons@ct.gov
Email: Jonathan.Blake@ct.gov
Attorneys for Plaintiff
STATE OF CONNECTICUT

-39-