UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | |
| STATE OF CONNECTICUT, | Case No. 3:11-cv-1715 (JCH) |
| Plaintiffs, | The Honorable Janet C. Hall |
| v. | |
| LEANSPA, LLC, a Connecticut limited liability company, | October 19, 2012 |
| NUTRASLIM, LLC, a Connecticut limited liability company, | |
| NUTRASLIM U.K. LTD, also d/b/a LEANSPA U.K. LTD., an United Kingdom limited liability company, | |
| BORIS MIZHEN, individually and as an officer of LEANSPA, LLC, NUTRASLIM, LLC, and NUTRASLIM U.K. LTD, | |
| LEADCLICK MEDIA, INC., a California corporation, and LEADCLICK MEDIA, LLC, as a successor limited liability company, and | |
| RICHARD CHIANG, individually and as an officer of LEADCLICK MEDIA INC. | |
| Defendants, and | |
| ANGELINA STRANO, | |
| Relief Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF
DEFENDANTS LEADCLICK MEDIA, INC., LEADCLICK MEDIA, LLC, AND
RICHARD CHIANG (AS AN OFFICER OF LEADCLICK MEDIA, INC.)
TO DISMISS COUNTS IV, XIII AND XIV OF THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.      INTRODUCTION............................................................................................ 1

II.     BACKGROUND.............................................................................................. 2

        A.      Initial Complaint and Preliminary Injunction Order................................ 2

        B.      Plaintiffs' Amended Complaint and Related Proceedings.................................... 3

III.    ARGUMENT.................................................................................................. 6

        A.      The Court Should Construe the Amended Complaint Liberally........................... 6

        B.      The CDA is an Affirmative Defense that Does Not Justify
                Dismissal at this Stage of the Proceedings............................................... 7

        C.      The CDA's Purpose and Immunity Provisions........................................................8

        D.      The Face of the Amended Complaint Does Not Indicate
                that the LeadClick Defendants are Entitled to CDA Immunity........................... 10

                1.      The LeadClick Defendants are not an "interactive computer
                        service" provider and therefore not entitled to CDA immunity...............11

                2.      The LeadClick Defendants also are not entitled to CDA
                        immunity because they are an "information content provider"...............14

IV.     CONCLUSION............................................................................................... 18

## TABLE OF AUTHORITIES

### Cases

Ascentive, LLC v. Opinion Corp., 842 F. Supp. 2d 450 (E.D.N.Y. 2011) .............................12, 13

Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003) ......................................................................13, 14

Ben Ezra, Weinstein and Co., Inc. v. American Online, Inc.,
    206 F.3d 980 (10th Cir. 2000) .........................................................................................8

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002) .......................................................6

Connecticut National Bank v. Germain, 503 U.S. 249 (1992) ....................................................12

Curran v. Amazon.com, Inc., No. 2:07-cv-0354,
    2008 WL 472433 (S.D.W.Va. Feb. 19, 2008) ..............................................................17

Doctor's Associates, Inc. v. QIP Holders, LLC, No. 3:06-cv-1710 (JCH),
    2007 WL 1186026 (D. Conn. Apr. 19, 2007) (Hall, J.) ...............................................7, 8

Doctor's Associates, Inc. v. QIP Holders, LLC, No. 3:06-cv-01710 (VLB),
    2010 WL 669870 (D. Conn. Feb. 19, 2010) (Bryant, J.) ......................................10, 15, 18

Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003) ................................................................7

Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,
    521 F.3d 1157 (9th Cir. 2008) ...........................................................................13, 14, 15

FTC v. Accusearch, 570 F.3d 1187 (10th Cir. 2009) .....................................9, 10, 14, 15, 16, 17

Stratton-Oakmont, Inc. v. Prodigy Services Co.,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ..............................................................9

Swift v. Zynga Game Network, LLC, No. C09-05443,
    2010 U.S. Dist. LEXIS 117355 (N.D. Cal. Nov. 3, 2010) ................................................7

Universal Communications Systems, Inc. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007)........12, 13

Zeran v. American Online, Inc., 129 F.3d 327 (4th Cir. 1997)....................................................10

**Statutes**

Communications Decency Act,
    47 U.S.C. § 230 ....................................................................................................passim

Connecticut Unfair Trade Practices Act,
    Conn. Gen. Stat. §§ 42-110b(a), et seq..............................................................................3

Federal Trade Commission Act,
    15 U.S.C. §§ 45(a) and 52 ................................................................................................3

**Miscellaneous**

Fed. R. Civ. P. 12(b)(6) ...............................................................................................passim

H. Conf. Rep. No. 104-458 (1996),
    *reprinted at* 1996 U.S.C.C.A.N. 10, 207-08 ...................................................................9

Restatement (Third) of Agency § 1.02, comment (a) ................................................17

I.      **INTRODUCTION**

Defendants LeadClick Media, Inc., LeadClick Media, LLC, and Richard Chiang (in his capacity as an officer of LeadClick Media, Inc.) (collectively, the "LeadClick Defendants") moved to dismiss Counts Four, Thirteen, and Fourteen of Plaintiffs', the Federal Trade Commission ("FTC") and the State of Connecticut ("State," and together with the FTC, "Plaintiffs"), Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that these claims are barred by the Communications Decency Act of 1996 ("CDA"). The LeadClick Defendants' motion is not only procedurally premature, but also is based on a mischaracterization of what Plaintiffs allege.

In their Amended Complaint, Plaintiffs charge that the LeadClick Defendants were direct participants in a deceptive marketing scheme that lured consumers to pay online for trial samples of purported diet supplements sold by defendant Boris Mizhen and companies he operated (collectively, the "LeanSpa Companies").  Consumers who paid for these trial samples were then enrolled into continuity plans they could not easily cancel and incurred substantial unauthorized monthly charges.  Specifically, the Amended Complaint alleges that the LeanSpa Companies hired the LeadClick Defendants to provide online marketing campaigns for their diet supplements and to generate consumer leads.  As part of their marketing and lead generation efforts, the LeadClick Defendants recruited and paid various third-party affiliates.  These affiliates then set up fake news stories for the purposes of generating consumer leads for the LeanSpa Companies.  The products featured in these fake news sites were determined by the LeadClick Defendants.  The LeadClick Defendants split with their affiliates the millions in fees they received from the LeanSpa Companies for consumer leads generated from these fake news

1

sites.  When the level of disputed consumer charges, or chargebacks, began to put the entire

scheme at risk, the LeadClick Defendants worked with the LeanSpa Companies to prolong the

scheme by attempting to manipulate the monthly chargeback ratio monitored by the credit card

networks.  As a result, the LeadClick Defendants encouraged and directed the continued use of

these fake sites to dupe consumers and generate leads for the LeanSpa Companies.  The CDA

does not provide immunity to the LeadClick Defendants for their own alleged active

participation in a nationwide deceptive marketing scheme that took in more than $25 million

from consumers.

    The LeadClick Defendants' motion should be denied.  First, as a threshold matter, the

LeadClick Defendants' invocation of immunity under the CDA is an affirmative defense that, as

this Court has observed, is generally not properly addressed in a Rule 12(b)(6) motion, but

instead should be resolved on a more developed evidentiary record.  Moreover, the Amended

Complaint does not facially demonstrate that the LeadClick Defendants are immune from this

federal and state law enforcement action.

## II.  <u>BACKGROUND</u>

### A.    <u>Initial Complaint and Preliminary Injunction Order</u>

    Plaintiffs commenced this action on November 7, 2011 against Boris Mizhen ("Mizhen")

and companies he controls, LeanSpa, LLC, NutraSlim, LLC, and NutraSlim U.K., Ltd.

(collectively, the "LeanSpa Defendants"), to stop the deceptive marketing of various purported

weight loss products under brand names including LeanSpa™ and NutraSlim™ and to obtain

redress for the consumers in this District and throughout the United States who were victimized

by this scam.  (Dkt. No. 1).  Plaintiffs concurrently moved <u>ex parte</u> for a temporary restraining

2

order ("TRO") against the LeanSpa Defendants.  (Dkt. No. 3).  On November 14, 2011, Judge

Robert Chatigny granted in part Plaintiffs' TRO application, ordered that the LeanSpa

Defendants' assets be frozen, and scheduled a preliminary injunction hearing before this Court

on November 22, 2011.  (Dkt. Nos. 23, 24).  On November 24, 2011, Judge Vanessa L. Bryant

entered a Stipulated Preliminary Injunction Order, freezing the assets of the LeanSpa Defendants

to preserve the status quo pending trial.  (Dkt. No. 36).

      **B.**       **Plaintiffs' Amended Complaint and Related Proceedings**

      Plaintiffs learned that those responsible for this deceptive scheme extended beyond the

LeanSpa Defendants.  With the Court's leave, on July 26, 2012, Plaintiffs filed an Amended

Complaint (the "Amended Complaint" or "Am. Compl.") naming the LeanSpa Defendants'

primary lead generator and its principal as additional defendants.[1]  (Dkt. No. 90).

      Specifically, the Amended Complaint names LeadClick Media, Inc. and its successor,

LeadClick Media, LLC (collectively, "LeadClick"), and Richard Chiang ("Chiang"),

individually and as an officer of LeadClick Media, Inc., as defendants.  The Amended Complaint

alleges violations of Section 5 and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, and the

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), et seq. against the

LeanSpa Defendants, LeadClick, and Chiang for engaging in a variety of deceptive marketing

and business practices to generate sales.  The deceptive practices alleged include, among other

things, disguising advertisements as independent news reports to promote the LeanSpa

---

[1]  The Amended Complaint also names Angelina Strano ("Strano"), wife of defendant Mizhen, as a relief
defendant, alleging that she received ill-gotten proceeds from the LeanSpa Defendants with no legitimate
claim to those funds.  (Am. Compl. ¶¶ 16, 134-36).

Defendants' products (the "fake news reports" or the "fake news sites").  (Am. Compl. ¶¶ 25-40).

As described in the Amended Complaint, the LeanSpa Defendants hired LeadClick to provide online Internet marketing campaigns and generate online consumer leads for the LeanSpa Defendants' diet supplement and weight loss products.  (Am. Compl. ¶ 25).  The LeanSpa Defendants paid LeadClick a prearranged fee, referred to as a "Cost Per Action," for each consumer purchase that it generated, and these payments totaled over $8 million from at least September 2010 through April 2011.  (Id. ¶¶ 26, 29).  LeadClick also reviewed the LeanSpa Defendants' websites to help improve "conversions," or the number of consumers who ordered one of the LeanSpa Defendants' trial products.  (Id. ¶ 27).

As part of the marketing campaigns for the LeanSpa Defendants, LeadClick, in turn, contracted with its own cadre of "affiliate marketers" to promote the LeanSpa Defendants' products and to generate consumer leads.  (Id. ¶ 25).  From at least September 2010 to at least April 2011, these affiliate marketers hired by LeadClick to generate consumer leads for the LeanSpa Defendants used websites designed to look like news reports to lure consumers to the LeanSpa Defendants' websites.  (Id. ¶ 29).  The news reports used by the affiliate marketers and the LeadClick Defendants to promote the LeanSpa Defendants' products were fake.  (Id. ¶ 32).  Reporters or commentators pictured on the websites were fictional and never conducted the tests or experienced the results described in the reports.  (Id.).  The "responses" or "comments" following the reports were simply additional advertising content, not independent statements from ordinary consumers.  (Id.).  The sole purpose of these fake news websites was to promote the LeanSpa Defendants' products, alone or in combination with other products, and deceptively

4

entice consumers to the LeanSpa Defendants' websites or "landing" pages.  (Id. ¶¶ 34, 36).

As alleged in the Amended Complaint, the LeadClick Defendants did not just recruit and pay the affiliate marketers to generate leads for the LeanSpa Defendants, but they also monitored the affiliates' use of these fake news sites and coordinated with defendant Mizhen the use of these fake sites to generate leads for the LeanSpa Defendants.  (Id. ¶¶ 28, 38).  In particular, the LeadClick Defendants discussed with Mizhen which products should be paired with the LeanSpa Defendants' products on these fake sites.  (Id. ¶ 38).

In addition, the Amended Complaint alleges that the LeadClick Defendants assisted the LeanSpa Defendants to continue this deceptive scheme in the face of escalating disputed customer charges, or chargeback rates, monitored by credit card associations.  (See id. ¶ 40)  For example, the LeadClick Defendants discussed with Mizhen the LeanSpa Companies' monthly chargeback levels and ways to manipulate the chargeback level by increasing the volume of leads generated by LeadClick in order to increase the monthly total number of transactions and thereby reduce the monthly chargeback rate.  (Id. ¶¶ 28, 40).  The LeadClick Defendants also discussed with Mizhen the use of offshore payment processors after several U.S. banks terminated or threatened to terminate the LeanSpa Defendants' merchant processing account as a result of excessive chargebacks.  (Id. ¶ 40).

On September 11, 2012, Plaintiffs moved for a preliminary injunction order that, *inter alia*, freezes defendant Chiang's assets up to the amount for which he is jointly and severally liable with LeadClick.  (Dkt. No. 119).  In support of their motion, Plaintiffs submitted evidence showing Chiang's knowing and central participation in the use of fake news sites to generate leads for the LeanSpa Defendants, as well as his involvement in trying to circumvent VISA's

merchant monitoring program by manipulating the LeanSpa Companies' chargeback rates.  (Dkt. No. 122 at pp. 14-18).  Plaintiffs' evidence of LeadClick's active participation in developing and using the fake news sites to generate leads was not limited to Chiang, however.  Other contemporaneous documents show another LeadClick employee instructing Mizhen to modify the LeanSpa Companies' webpage to correspond with the "applauding of HCA on *the article page*," (see Dkt. No. 122, Ex. 18 at CLGX 628, emphasis added), while another LeadClick employee advised an affiliate to "just add advertorial" on the top of the fake news report instead of "removing the reporter pics."  (Id. at CLGX 99, lines 21:06).

On September 28, 2012, the LeadClick Defendants filed the instant motion to dismiss based on Section 230 of the CDA, 47 U.S.C. § 230.  (Dkt. No. 155).  For the reasons stated below, the LeadClick Defendants' motion should be denied.

## III.   ARGUMENT

### A.   The Court Should Construe the Amended Complaint Liberally.

In ruling on motions to dismiss for failure to state a claim, courts must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (vacating and remanding district court's order dismissing plaintiff's Amended Complaint pursuant to Rule 12(b)(6)).  "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  Id. (quoting Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000)).

6

**B.     The CDA is an Affirmative Defense that Does Not Justify Dismissal at this Stage of the Proceedings.**

The LeadClick Defendants do not dispute the sufficiency of the allegations stating a claim for relief under the FTC Act and CUTPA.  Rather, they claim they are entitled to immunity from liability for their role in using fake news reports to market the LeanSpa Defendants' products pursuant to Section 230 of the CDA, 47 U.S.C. § 230.  (LeadClick Defs.' Mot. to Dismiss at 2).  As this Court has observed, however, in Doctor's Associates, Inc. v. QIP Holders, LLC, No. 3:06-cv-1710 (JCH), 2007 WL 1186026 (D. Conn. Apr. 19, 2007) (Hall, J.):

> [I]nvocation of Section 230(c) immunity constitutes an affirmative defense[, a]s the parties are not required to plead around affirmative defenses, such an affirmative defense is generally not fodder for a Rule 12(b)(6) motion.

Id. at *2 (quoting Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004)); see also Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses.").  Instead, "such a defense is generally addressed as a Rule 12(c) or Rule 56 motion."  Doctor's Assocs., 2007 WL 1186026, at *2 (quoting Novak, 309 F. Supp. 2d at 452).

The LeadClick Defendants' CDA immunity claim raises factual issues as to several statutory requirements that the LeadClick Defendants must establish: (1) whether LeadClick is a "provider or user of an interactive computer service," as the term is defined by the CDA; and (2) whether LeadClick is "responsible, in whole or in part, for the creation or development" of the fake news sites.  47 U.S.C. §§ 230(c)(1), (f)(3).  Cf. Swift v. Zynga Game Network, LLC, No. C09-05443, 2010 U.S. Dist. LEXIS 117355, at *18 (N.D. Cal. Nov. 3, 2010) (denying motion to dismiss and noting whether CDA immunity exists for a defendant alleged to have

served as an online intermediary or broker between an online game developer and third party

advertisers is "a fact-based inquiry").

At a minimum, Plaintiffs should be entitled to develop through discovery the facts in

support of their claims.  Doctor's Assocs., 2007 WL 1186026, at *2 (denying defendants' motion

to dismiss count of amended complaint without prejudice to raise the CDA claim as a Rule 56

Motion following discovery).  The LeadClick Defendants' motion is thus premature and should

be dismissed for this reason alone.  Moreover, there is no factual basis upon which CDA

immunity may be conferred on the LeadClick Defendants.

### C.      The CDA's Purpose and Immunity Provisions.

Section 230 of the CDA was enacted to further two goals.  First, it seeks "to promote the

continued development of the Internet and other interactive computer services and other

interactive media."  47 U.S.C. § 230(b)(1).  With respect to this goal, courts have noted that

Congress wanted to make sure that the Internet could continue to "'offer a forum for a true

diversity of political discourse, unique opportunities for cultural development, and myriad

avenues for intellectual activity.'"  Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc.,

206 F.3d 980, 985 n.3 (10th Cir. 2000), quoting 47 U.S.C. § 230(a)(3).  The section's second

goal is to remove "disincentives for the development and utilization of blocking and filtering

technologies that empower parents to restrict their children's access to objectionable or

inappropriate online material," while at the same time "ensur[ing] vigorous enforcement of

Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by

means of computer."  47 U.S.C. §§ 230(b)(4), (5).

The CDA promotes these goals by providing certain immunities for internet service providers where third parties post content on their websites.  "The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others."  FTC v. Accusearch, Inc., 570 F.3d 1187, 1195 (10th Cir. 2009).  Indeed, Congress enacted the CDA to overturn Stratton-Oakmont, Inc. v. Prodigy Services Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).  See H. Conf. Rep. No. 104-458, at 194 (1996), reprinted at 1996 U.S.C.C.A.N. 10, 207-08; see also Accusearch, 570 F.3d at 1195.  In Stratton-Oakmont, the court held that because Prodigy had voluntarily deleted some messages from its message boards on the basis of offensiveness and bad taste, it therefore became legally responsible under state law for messages that it failed to delete.  1995 WL 323710, at *10.

The CDA's statutory immunity provision set forth in Section 230(c), which is entitled "Protection for 'Good Samaritan' blocking and screening of offensive material," provides two forms of immunity.  Section 230(c) reads as follows in its entirety:

(c)     Protection for "Good Samaritan" blocking and screening of offensive material.

(1)     Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)     Civil liability

No provider or user of an interactive computer service shall be held liable on account of –

(A)     any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessive, violent, harassing, or otherwise

9

> objectionable, whether or not such material is constitutionally protected; or
>
> (B)    any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in [subparagraph A].

47 U.S.C. § 230(c).

The first exemption, set forth in § 230(c)(1) above,

> precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.

Zeran v. American Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997); see also Accusearch, 570

F.3d at 1195.  The second exemption, set forth in § 230(c)(2) above, immunizes those internet

service providers that filter offensive material.

The LeadClick Defendants claim immunity only under the first exemption set forth in

§ 230(c).  Because, as shown below, there is no factual basis to support their CDA claim, the

Court should deny their Motion to Dismiss.

**D.    The Face of the Amended Complaint Does Not Indicate that the LeadClick Defendants are Entitled to CDA Immunity.**

In determining whether immunity under the CDA is available, there is no dispute that the

LeadClick Defendants must establish all three elements set forth in Doctor's Assocs., Inc. v. QIP

Holders, LLC: "[i] whether Defendant is a provider of an interactive computer service; [ii] if the

postings at issue are information provided by another information content provider; and [iii]

whether Plaintiff's claims seek to treat Defendant as a publisher or speaker of third party

content." Doctor's Assocs., Inc. v. QIP Holders, LLC, No. 3:06-cv-01710 (VLB), 2010 WL

669870, at *22 (D. Conn. Feb. 19, 2010) (Bryant, J.) (citation omitted) (denying defendants'

motion for summary judgment on the basis of CDA immunity).  As discussed more fully below, the LeadClick Defendants clearly fail to establish any of these requirements to qualify for immunity under the CDA.

      1.      <u>The LeadClick Defendants are not an "interactive computer service"
provider and therefore not entitled to CDA immunity.</u>

To satisfy the first immunity requirement, an entity must be a "provider or user of an interactive computer service."  47 U.S.C. § 230(c)(1).  The CDA defines "interactive computer service":

> The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(f)(2).[2]  Nothing in the Amended Complaint establishes LeadClick as an "interactive computer service" provider under the CDA.  There is no indication that LeadClick "provides or enables computer access" to the Internet or provides any "interactive" service on the Internet to anyone.

In their motion, the LeadClick Defendants refer to a single paragraph in the Amended Complaint (¶ 26), and claim that LeadClick is an "interactive computer service provider" because it "provide[s] the pass-through network links used to link [their affiliates'] webpages with LeanSpa's webpages."  (LeadClick Defs.' Mem. in Supp. Mot. to Dismiss at 13-14).

_____

[2]  "Access software provider" is defined as:
> a provider of software (including client or server software), or enabling tools that do any one or more of the following:
> (A)     filter, screen, allow, or disallow content;
> (B)     pick, choose, analyze, or digest content; or
> (C)     transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.  § 230(f)(4).

However, there is no support to expand the definition of "interactive computer service" provider to cover an entity solely because it links websites operated by its business partners to effectuate a commercial transaction or, as here, an alleged marketing scam.  Indeed, such an expansive interpretation not only ignores the term "interactive," but would render meaningless another CDA provision, 47 U.S.C. § 230(d), that contemplates a public interface by requiring "interactive computer service" providers to notify its customers that parental control protections are commercially available.  Statutes should not be interpreted in a manner that renders any term superfluous.  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) (stating that courts are required to "disfavor interpretations of statutes that render language superfluous").

Nor do the cases cited by the LeadClick Defendants provide any support.  Two of the cases cited by the LeadClick Defendants illustrate the "prototypical service" for qualifying for this statutory immunity – online message boards (or bulletin boards).  For example, in Universal Communications Systems, Inc. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007), the court found that defendant Lycos was a provider of an "interactive computer service" where it operated bulletin boards on which the public could post comments about a publicly traded company.  Id. at 415-16, 419.  In Ascentive, LLC v. Opinion Corp., 842 F. Supp. 2d 450 (E.D.N.Y. 2011), the court found that the website PissedConsumer.com constitutes an "interactive service provider" where it operates as an online message board and allows consumers to submit negative reviews about

companies.[3]  Id. at 474-76.  These cases do not support the expansion of the CDA to cover an

entity that provides no interactive website or computer access to the general public.

     The third case cited by the LeadClick Defendants – Batzel v. Smith, 333 F.3d 1018 (9th

Cir. 2003) – also is inapplicable.  Batzel involved a defendant, Tom Cremers ("Cremers"), who

operated a listserv and a public website, the Museum Security Network ("MSN"), from the

Netherlands.  As operator of the listserv, he frequently circulated emails among members of the

listserv and posted the emails on MSN's website.  When he received an email from defendant

Smith containing defamatory statements about plaintiff Batzel, he included it on the website and

listserv.  Smith had suggested in that email that Batzel possessed artwork stolen by the Nazis.

Although the Ninth Circuit held that Cremers might be considered a "user" of an interactive

computer service because he used the internet to post the website and distribute the newsletter,

the court also held that "[m]ore development of the record" was necessary to determine if

Cremers did qualify for immunity under Section 230, and remanded the matter to the district

court for further proceedings to develop the facts.[4]  Batzel, 333 F.3d at 1030-31, 1035.  Here,

Plaintiffs' Amended Complaint does not allege that the LeadClick Defendants are an operator of

---

[3]  Moreover, in Universal Communications Systems and Ascentive, the plaintiffs sought to hold the
defendants liable for statements of a third party merely because the defendants posted the statements on
the internet.  See Universal Commc'n Sys., 478 F.3d at 415; Ascentive, 842 F. Supp. 2d at 474-46.  Here,
the Plaintiffs seek to hold the LeadClick Defendants responsible for their own alleged conduct –
providing deceptive online marketing campaigns using fake news sites as part of their lead generation
activities for the LeanSpa Defendants.

[4]  The Ninth Circuit, sitting en banc, subsequently stated that it had doubts as to the correctness of the
Batzel panel's determination that the defendant was a "user" of an interactive computer service.  Fair
Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1170 n.28 (9th Cir.
2008) (en banc).  The problem with Batzel is that, with respect to the first immunity requirement (the
entity must be a "provider or user of an interactive computer service"), the panel's interpretation ignores
the word "interactive."  Moreover, the panel's broad interpretation in no way furthers Congress's purpose,
which was to preserve the unique interactive aspect of the internet, see § 230(b)(2), because it was far
from clear that there was anything interactive about Cremer's website or newsletter.

a listserv or a public website.  Nor do the LeadClick Defendants even claim that they are a "user" of any purported interactive computer service.  See LeadClick Defs.' Memo. in Support of Mot. to Dismiss at 13-15 (claiming that "LeadClick is an Interactive Computer Service *Provider*") (emphasis added).  Moreover, the Ninth Circuit recognized that determining whether someone is entitled to Section 230 immunity *requires development of a factual record*.  Batzel, 333 F.3d at 1035.

In sum, there is no indication that LeadClick provides a web platform that interfaces with the public.  Instead, LeadClick only claims it provides network links to facilitate private commercial transactions.  This is not enough to fall under the "interactive computer service" provider exemption.  The LeadClick Defendants' Motion to Dismiss should therefore be denied.

2.    The LeadClick Defendants also are not entitled to CDA immunity because they are an "information content provider."

Even assuming, *arguendo*, that the LeadClick Defendants could establish they are an "interactive computer service" provider, they also must establish that they are not an "information content provider" of the deceptive material that gives rise to the causes of action against them, *i.e.*, the fake news reports.  47 U.S.C. § 230(c)(1).  The CDA provides no immunity for "interactive computer services" that are also "information content providers." Accusearch, 570 F.3d at 1197; see also Roommates.com, 521 F.3d at 1162, 1165.

The CDA defines "information content provider" as "any person or entity that is responsible, *in whole or in part*, for *the creation or development* of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3) (emphasis added).  Courts have recognized that "[t]his is a broad definition, covering even those who are responsible for the development of content only 'in part.'"  Accusearch, 570 F.3d at 1197,

14

quoting <u>Universal Commc'n Sys.</u>, 478 F.3d at 419.  As a result, "there may be several information content providers with respect to a single item of information (each being 'responsible,' at least in part, for its 'creation or development')."  <u>Id.</u>; <u>see also</u> <u>Roommates.com</u>, 521 F.3d at 1166 (noting that the definition of "information content provider" may encompass more than just the entity that created the content on a website).

Thus, the critical inquiry here in determining whether the LeadClick Defendants are an "information content provider" is whether they are "responsible" for the "development" of the fake news sites in any way.  In <u>Doctor's Associates</u>, the Court addresses this factual inquiry by distinguishing between neutral conduits that "merely published information provided by third parties" and those entities that are "actively responsible for the creation and development" of false and deceptive advertising.  <u>Doctor's Associates</u>, 2010 WL 669870, at *23 (Bryant, J.). This distinction between an entity that is merely a passive conduit for content and one that has more active involvement follows decisions in other circuits.  <u>See</u> <u>Accusearch</u>, 570 F.3d at 1199 (concluding that "a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content"); <u>Roommates.com</u>, 521 F.3d at 1167-68 (holding provider of an online roommate-matching service was responsible for the development of discriminatory preferences in its users' profile pages).  No fair reading of the Amended Complaint would lead to the conclusion that the LeadClick Defendants had no responsibility for the development of the fake news sites.

The LeadClick Defendants claim (at pp. 15-16) that the Amended Complaint contains no allegations that would demonstrate they are responsible for the creation or development of the fake news sites, but they only discuss the alleged facts that the fake news sites were on their

15

affiliates' websites and that the LeadClick Defendants knew that their affiliates were using these fake sites, and simply ignore the rest.  For example, according to the Amended Complaint, the affiliates were hired and paid by the LeadClick Defendants to generate leads for the LeanSpa Defendants.  These fake news articles appearing on the affiliates' websites were created and used as part of the LeadClick Defendants' lead generation campaigns they provided for the LeanSpa Defendants.  This commercial purpose was the sole reason for the existence of these fake sites.  The LeadClick Defendants split revenues with their affiliates for the leads generated from these fake news sites.  The LeadClick Defendants also provided direction by discussing which products should be featured on these fake sites with the LeanSpa Defendants.  The LeadClick Defendants knowingly solicited further use of these sites by continuing to pay affiliates for consumer leads generated by these sites.  The LeadClick Defendants further attempted to prolong the use of these sites by trying to help conceal the resulting high level of consumer chargebacks from VISA.  (See Am. Compl. ¶¶ 25-40).

The Amended Complaint does not portray the LeadClick Defendants as a mere passive conduit for the fake news websites.  Indeed, had the LeadClick Defendants run their lead generation campaigns for the LeanSpa Defendants in the same alleged manner but in hard-copy ads or on the radio or television, instead of over the Internet, they would be liable for violating the same federal and state laws and nothing would immunize their conduct.  Their duty to refrain from soliciting and encouraging the use of deceptive ads "should not depend on the medium within which [they] choose[] to operate."  Accusearch, 570 F.3d at 1206, n.5 (concurrence).

The Tenth Circuit's decision in Accusearch is instructive.  There, the FTC sued a website operator for violating the FTC Act by providing confidential telephone records to its customers

16

over the Internet.  Id. at 1190.  To obtain the confidential records, the defendant assigned

searches to third-party researchers who sent the records directly to the defendant.  Id. at 1191.

The defendant, in turn, passed the records to its customers via email and its website.  Id. at 1191-

92.  The defendant argued that the researchers were third parties so it could not be treated as the

publisher of the unlawful content under the CDA.  Id. at 1195-98.  The Tenth Circuit affirmed

the grant of summary judgment for the FTC and held that the defendant could not claim

immunity under the CDA because it: (1) "solicited requests for [] confidential information";

(2) "paid researchers to obtain it"; (3) "knowingly sought to transform virtually unknown

information into a publicly available commodity"; and (4) "knew that its researchers were

obtaining the information through fraud and other illegality."  Id. at 1199.

> Here, the Amended Complaint alleges that the LeadClick Defendants: (1) hired and

solicited the affiliates to generate consumer leads as part of their marketing campaign for the

LeanSpa Defendants[5]; (2) paid the affiliates for leads generated from these deceptive sites; and

(3) knew that the affiliates were using deceptive sites to generate leads and continued paying

---

[5]   The LeadClick Defendants also rely on LeadClick's own purported terms of service agreement with
their affiliates.  (Defs.' Mem. in Supp. Mot. to Dismiss at 5-6.)  They attach a form agreement as an
exhibit and ask the Court to consider the document under the doctrine of incorporation.  However, the
terms of service document they attach is neither integral to the complaint nor authenticated.  Courts have
denied similar attempts by defendants to rely on their own terms of service on a 12(b)(6) motion.  See,
e.g., Curran v. Amazon.com, Inc., No. 2:07-cv-0354, 2008 WL 472433, at *13-14 (S.D.W.Va. Feb. 19,
2008) (denying defendant's attempt to use its terms of service webpage to support its CDA immunity
claim, noting that a "party's website is self-serving and there is no assurance that the content is authentic .
. . [r]elying on a party's website . . . is akin to relying on their memoranda").  Here, the terms of service
document is not controlling or dispositive to Plaintiffs' claims.  The relationship between LeadClick and
its affiliates is determined not merely by how they label their relationship, but by their actual practices.
See generally Restatement (Third) of Agency § 1.02 cmt. a ("how the parties to any given relationship
label it is not dispositive").  Moreover, evidentiary issues exist as to when and how the terms of service
form they attach to their motion was actually used.  This form is unsigned and "dated 01/04/08," at least
two years before the conduct at issue in this case.  The affidavit attesting to the terms of service form is
from counsel who has no apparent personal knowledge of the form's actual use.  The exhibit therefore
should not be considered on a Rule 12(b)(6) motion.

them.  There is absolutely no basis from the Amended Complaint upon which the LeadClick

Defendants can claim they are immune under the CDA for furthering this alleged marketing

scam.[6]

Therefore, the LeadClick Defendants' motion to dismiss should be denied.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the FTC and the State of Connecticut respectfully request

that the Court deny the LeadClick Defendants' motion to dismiss Counts Four, Thirteen, and

Fourteen of the Amended Complaint.

Respectfully submitted,

WILLARD K. TOM
General Counsel

WILLIAM H. EFRON
Regional Director
Northeast Region

Dated: October 19, 2012

_/s/ David W. Dulabon_
Darren H. Lubetzky (phv04227)
David W. Dulabon (phv05052)
Savvas S. Diacosavvas (phv05494)
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2898
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: ddulabon@ftc.gov
Email: sdiacosavvas@ftc.gov

---

[6]  The LeadClick Defendants also fail to establish the third element because the Amended Complaint
does not seek to hold them liable for "third party" content for the same reasons discussed in pages 14-18
above.  See generally Doctor's Assocs., 2010 WL 669870, at *23-24 (addressing the second and third
CDA immunity prongs together, stating that defendants' role was "unclear at this stage" as to these
elements, and denying defendants' motion for summary judgment).

18

John Hughes (CT 05289)
Assistant United States Attorney
Chief of Civil Division
157 Church Street
New Haven, CT 06510
Tel: (203) 821-3700
Fax: (203) 773-5373
Email: john.hughes@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

GEORGE JEPSEN,
ATTORNEY GENERAL,

Dated: October 19, 2012          _/s/ Jonathan J. Blake_____
                                 Phillip Rosario (CT 00999)
                                 Matthew F. Fitzsimmons (CT 26981)
                                 Jonathan J. Blake (CT 22321)
                                 Office of the Attorney General
                                 110 Sherman Street
                                 Hartford CT 06105
                                 Tel: (860) 808-5400
                                 Fax: (860) 808-5593
                                 Email: Phillip.Rosario@ct.gov
                                 Email: Matthew.Fitzsimmons@ct.gov
                                 Email: Jonathan.Blake@ct.gov

                                 Attorneys for Plaintiff
                                 STATE OF CONNECTICUT

**CERTIFICATE OF SERVICE**

   This is to certify that on the 19th day of October 2012, I electronically filed the foregoing Plaintiffs' Opposition to Motion of Defendants LeadClick Media, Inc., LeadClick Media, LLC, and Richard Chiang (as an officer of LeadClick Media, Inc.) to Dismiss Counts IV, XIII and XIV of the Amended Complaint with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

            */s/David W. Dulabon*
            David W. Dulabon (phv05052)
            Federal Trade Commission
            Northeast Region
            One Bowling Green, Suite 318
            New York, NY 10004
            Phone: (212) 607-2898
            Fax: (212) 607-2822
            Email: ddulabon@ftc.gov