UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION et al., | : : | CIVIL ACTION NO. 3:11-CV-1715 |
| Plaintiff, | : : | |
| v. | : : | |
| LEANSPA, LLC, et al., Defendants. | : : : | JANUARY 29, 2013 |

**RULING RE: MOTIONS TO DISMISS FILED BY RELIEF DEFENDANT ANGELINA STRANO (DOC. NO. 109), THE LEADCLICK DEFENDANTS (DOC. NO. 155), AND RICHARD CHIANG (DOC. NO. 179)**

**I.     INTRODUCTION**

Plaintiffs, the Federal Trade Commission (the "FTC") and the State of Connecticut (the "State") (collectively, "plaintiffs"), commenced this action by filing under seal a Complaint For Permanent Injunction And Other Equitable Relief (Doc. No. 1) and a Motion seeking Temporary Restraining Order ("TRO") (Doc. No. 3) against individual defendant Boris Mizhen ("Mizhen") and entity defendants LeanSpa, LLC, NutraSlim, LLC, and NutraSlim, U.K., Ltd. (collectively, the "LeanSpa Entities," and with Mizhen, the "LeanSpa defendants"). On November 14, 2011, Judge Robert N. Chatigny issued an ex parte Temporary Restraining Order freezing the assets of the LeanSpa defendants, and scheduled a hearing for November 22, 2011, ordering the LeanSpa defendants to show cause why the court should not enter a preliminary injunction order against them. Temporary Restraining Order and Order To Show Cause (Doc. No. 24). On November 21, 2011, the parties filed a Consent Motion stipulating to a preliminary injunction. Consent Motion for Preliminary Injunction (Doc. No. 32).

1

On November 22, 2011, Judge Vanessa Bryant entered a Stipulated Preliminary Injunction Order (Doc. No. 36) (the "November 22 Order"), ordering, among other things, the freezing of assets that were "[o]wned or controlled, directly or indirectly, by," "[h]eld for the benefit of," "[i]n the actual or constructive possession of," "[o]wned, controlled by, or in the actual or constructive possession of any [entity] directly or indirectly owned, managed, or controlled by," or "subject to access by" the LeanSpa defendants.  November 22 Order (Doc. No. 36) at 12–13.

On July 26, 2012, plaintiffs amended their Complaint and added defendants LeadClick Media, Inc. and LeadClick Media, LLC (as successor in interest to LeadClick Media) (collectively, "LeadClick"), as well as LeadClick's officer Richard Chiang ("Chiang," and along with LeadClick, the "LeadClick defendants").  Am. Compl. (Doc. No. 90) ¶¶ 14–15.  The Amended Complaint also named Angelina Strano ("Strano"), Mizhen's wife, as a relief defendant.  Id. ¶ 16.  The Amended Complaint alleges violations of sections 5(a) and 12 of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. §§ 45(a), 52; section 907(a) of the Electronic Funds Transfer Act (the "EFTA"), 15 U.S.C. § 1693e(a); section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b); and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), et seq.  Am. Compl. (Doc. No. 90) ¶¶ 1–2.  The first six counts allege claims by the FTC against the LeanSpa defendants, but only Count 4, regarding misrepresentations relating to alleged "fake news sites" described in the Amended Complaint, also alleges a claim against the LeadClick defendants.

The next ten counts, Counts 7 through 16, allege claims by the State of Connecticut against the LeanSpa defendants, but only Counts 13 and 14 also allege

claims against the LeadClick defendants. Count 13 alleges deceptive acts or practices related to the fake news sites, and Count 14 requests statutory civil penalties for such conduct. Finally, Count 17 seeks to recover from relief defendant Strano funds, or the value of benefits, allegedly received as a result of the LeanSpa defendants' unlawful acts.[1]

## II. FACTUAL BACKGROUND[2]

### A. The LeanSpa and LeadClick Defendants

The Amended Complaint alleges that, beginning sometime in 2010, the LeanSpa defendants engaged in deceptive practices while marketing and selling to consumers, via the Internet, "purported weight-loss and related health products under various brand names." Am. Compl. ¶¶ 18–19. The alleged scheme worked as follows: the LeanSpa defendants' websites offered products to consumers to use on a "risk free" trial basis, plus a nominal shipping and handling fee of $4.95 or less. Id. ¶¶ 21, 41, 44. The LeanSpa defendants advertised that the products came with a "100% satisfaction guarantee." Id. ¶ 55. However, after consumers entered their payment information to pay for the shipping and handling fees, the LeanSpa defendants charged the consumers for the trial products and automatically enrolled those consumers in monthly continuity plans. Under these plans, consumers were charged monthly amounts of $79.99 or more, often without their prior knowledge or authorization. Id. ¶¶ 21, 46–51.

---

[1] On November 15, 2012, plaintiffs filed a Consent Motion For Entry Of A Stipulated Preliminary Injunction Order Against Richard Chang (Doc. No. 177). Under the terms of the attached Proposed Stipulated Preliminary Injunction Order (Doc. No. 177–1) ("Chiang Proposed PI Order"), Chiang agrees to, among other things, a freezing of $270,000 worth of his assets. Chiang Proposed PI Order at 5. This court granted the consent motion and entered the proposed preliminary injunction order on January 16, 2013. See Doc. No. 196.

[2] For purposes of defendants' Motions to Dismiss, this court takes the facts alleged in the Amended Complaint as true and draws all inferences in plaintiffs' favor. See Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003).

Once the payment plans were implemented, consumers encountered difficulty in canceling the payments or getting their money back. Id. ¶ 23. For example, fine print located on certain pages of the websites stated that consumers could call within 14 days to avoid automatic enrollment in the LeanSpa defendants' "auto-shipment program." The fine print also advised consumers that to avoid being charged for the trial products, they must first obtain an "RMA number," return the products, and pay associated postage costs. Id. ¶¶ 48–49. However, the LeanSpa defendants often charged consumers for the trial products before they had the opportunity to cancel, and sometimes even before they received the trial products. Id. ¶ 50. Consumers who attempted to cancel online were informed either that their account could not be found or that they would be charged a fee. Id. ¶¶ 52–53. When consumers called to cancel, they often were unable to reach anyone before incurring additional charges. Id. ¶ 58. Even those consumers who were able to return the products would incur cancelation fees, be offered only partial refunds, or would not be given the refunds they were promised. Id. ¶¶ 57–58.

Plaintiffs allege that, in furtherance of this scheme, the LeanSpa defendants made false and misleading claims about their products. For example, the LeanSpa defendants' websites displayed testimonials from purported customers claiming substantial weight loss from using the products. Id. ¶ 61. The websites also referenced purported clinical studies supporting the supposed fact that the products caused rapid and substantial weight loss. Id. ¶¶ 62–66.

Plaintiffs also allege that the LeanSpa defendants hired the LeadClick defendants from at least September 2010 until April 2011 to market their products and

4

drive online consumers to their websites. Id. ¶¶ 25–40. To accomplish this task, the LeadClick defendants hired third-party "affiliate marketers" who created fake news sites promoting the LeanSpa defendants' products. These fake news sites would purport to provide objective reports and other information about the products, and would display names and logos of major television networks to give consumers the false impression that the studies had been shown on those networks. However, the Amended Complaint alleges that these studies and reports were in fact false and never performed. To add to this elaborate scheme, the fake reports would include responses and comments that appeared to be, but were not in fact, statements from independent consumers. Id. ¶¶ 28–32. Finally, these fake news sites contained links to the LeanSpa defendants' websites. These links purportedly were provided by the LeadClick defendants. The LeanSpa defendants allegedly paid the LeadClick defendants a set fee each time a consumer clicked on a link on a fake news site, ended up on one of the LeanSpa defendants' websites, and purchased a product. Id. ¶ 26. Plaintiffs allege that the LeanSpa and LeadClick defendants knew that the affiliate marketers were using these fake news sites. Id. ¶ 38. Plaintiffs further allege that the LeanSpa and LeadClick defendants monitored and acted to further the use of these sites. For example, the LeanSpa and LeadClick defendants allegedly monitored the fake news sites and discussed which products on the fake sites should be paired with certain of the LeanSpa defendants' products. Id. Chiang and Mizhen also coordinated directly regarding LeadClick's "lead generation activities, . . . including the use of blogs or fake news sites . . . ." Id. ¶ 28. Additionally, when the LeanSpa defendants learned about consumer complaints and disputed consumer charges resulting in high "chargeback"

5

rates on credit cards, the LeanSpa and LeadClick defendants discussed strategies to reduce the impact of the excessive chargebacks. Id. ¶¶ 39–40.

### B. Relief Defendant Angelina Strano

Mizhen is the CEO and owner of the LeanSpa Entities. Am. Compl. ¶ 9. Strano is Mizhen's spouse. Id. ¶ 16. Plaintiffs allege that Strano received funds that are proceeds of the LeanSpa defendants' unlawful actions and to which she has no legitimate claim. Id. ¶¶ 16, 134–35.

### III. STANDARD

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief'" (alteration in original)). The court takes the factual allegations of the complaint to be true, Hemi Grp., LLC v. City of New York, 130 S.Ct. 983, 986–87 (2010), and draws all reasonable inferences in plaintiff's favor, Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009). However, the tenet that a court must accept a complaint's allegations as true is inapplicable to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (citing Twombly, 550 U.S. at 555).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).

## IV.  DISCUSSION

### A.  LeadClick Defendants' Motion to Dismiss

The LeadClick defendants seek to dismiss Counts 4, 13, and 14 of the Amended Complaint, which allege misrepresentations and deceptive acts and practices related to the so-called "fake news sites," on the basis that LeadClick (and Chiang, in his capacity as an officer of LeadClick) is an interactive computer service provider that has immunity under section 230 of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230. See LeadClick Mot. to Dismiss (Doc. No. 156).  The CDA provides that, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The LeadClick defendants are entitled to immunity under the CDA if (1) LeadClick is an interactive computer service provider or user; (2) plaintiffs' claims are based on "information provided by another information content provider"; and (3) plaintiffs' claims would treat LeadClick as the "publisher or speaker" of such information. See Doctor's Assocs., Inc. v. QIP Holders, LLC ("Doctor's Assocs. I"), No. 06-cv-1710, 2007 WL 1186026, at *2 (D. Conn. Apr. 19, 2007) (citing Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)).

Immunity under the CDA constitutes an affirmative defense that "is generally not fodder for a Rule 12(b)(6) motion." Doctor's Assocs. I, 2007 WL 1186026, at *2 (quoting Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004)). Rather, "such a defense is generally addressed as a Rule 12(c) or Rule 56 motion." Id. at *2 (internal quotation marks and citations omitted). The LeadClick defendants argue that this court should nonetheless grant them immunity at the motion to dismiss stage because each element of the defense "appears on the face of the complaint." Mem. in Support of LeadClick Mot. to Dismiss (Doc. No. 156) ("LeadClick Mem. Mot. to Dismiss") at 4 (citing Jones v. Bock, 549 U.S. 199, 215 (2007)), 20.

This court cannot conclude from the face of the Amended Complaint that the LeadClick defendants are entitled to immunity under the CDA. First, the Amended Complaint does not establish on its face that LeadClick is an interactive computer service provider. The CDA defines an interactive computer service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). The LeadClick defendants argue that a fake news site constitutes an interactive computer service, LeadClick Mem. Mot. to Dismiss at 13 (citing Ascentive, LLC v. Opinion Corp., 842 F. Supp. 2d 450, 473 (E.D.N.Y. 2011)), and that LeadClick acted as a provider of such services because it provided the "pass-through network links" used to link the affiliate marketers' fake new sites to the LeanSpa defendants' websites, id. at 14 (citing Am. Compl. ¶ 26).

However, the cases cited by the LeadClick defendants involved defendants that operated or hosted websites where users could post comments or reviews or access

8

other content, or that were search engines.  See, e.g., Universal Commc'ns Sys., 478 F.3d at 415 (anonymous postings on "Internet message board operated by" defendant); Ascentive, 842 F. Supp. 2d at 454 (business reviews posted by consumers on defendant's website); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 252 (4th Cir. 2009) (consumer reviews posted on defendant's website); Atl. Recording Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690, 692 (S.D.N.Y. 2009) (defendant's website contained index of links to files hosted on third-party websites); Murawski v. Pataki, 514 F. Supp. 2d 577, 582 (S.D.N.Y. 2007) (search engine); Parker v. Google, Inc., 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006) (search engine); Parisi v. Sinclair, 774 F. Supp. 2d 310, 312 (D.D.C. 2011) (books listed on defendants' websites).

     Here, the Amended Complaint does not allege that the LeadClick defendants operated online message boards or review websites, or even that they operated websites at all.  The Amended Complaint merely alleges that LeadClick provided network links that directed consumers from one website to another.  It is unclear whether providing such network links "provides or enables computer access by multiple users to a computer server" in the way that hosting a website, message board, or search engine does.  See 47 U.S.C. § 230(f)(2).  At the very least, plaintiffs should have the opportunity to develop facts, during discovery, showing what is involved in the creation of the "network links."  Accordingly, this court finds that, on the face of the Amended Complaint, it is plausible that LeadClick is not an "interactive computer service provider" as that term is defined under the CDA.

Even if it were indisputable that LeadClick were an "interactive computer service provider," the LeadClick defendants still would not be entitled to section 230 immunity, because it is plausible on the face of the Amended Complaint that LeadClick is not an information content provider—i.e., that it is not "responsible, <u>in whole or in part</u>, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3) (emphasis added). The LeadClick defendants argue that the Amended Complaint attributes the allegedly deceptive content to third-party affiliate marketers. LeadClick Mem. Mot. to Dismiss at 15–16 (quoting Am. Compl. ¶¶ 29–30, 33). However, this does not mean that the LeadClick defendants are not also information content providers. See, e.g., <u>FTC v. Accusearch</u>, 570 F.3d 1187, 1197 (10th Cir. 2009) ("[T]here may be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development.'" (quoting 47 U.S.C. § 230(f)(3)).

The LeadClick defendants argue that mere knowledge of the deceptive content does not "undermine LeadClick's CDA immunity." LeadClick Mem. Mot. to Dismiss at 16 (citing <u>Universal Commc'n Sys.</u>, 478 F.3d at 19). However, the Amended Complaint alleges more than mere knowledge on the part of the LeadClick defendants. For example, plaintiffs allege that Chiang, in his capacity as an officer of LeadClick, "coordinated directly with Mizhen regarding LeadClick's lead generation activities for the LeanSpa defendants, including the use of blogs or fake news sites . . . ." Am. Compl. ¶ 28. Plaintiffs also allege that the LeadClick defendants, along with the LeanSpa defendants, "monitored and had knowledge" of the affiliate marketers' use of fake news sites and "discussed which products to pair with the LeanSpa Defendants' products on

10

the fake news sites." Id. ¶ 38.  These allegations go beyond mere knowledge:  they allege that the LeadClick defendants discussed use of the fake websites and how to "pair" products with that deceptive content.  Further, the Amended Complaint describes how the LeadClick defendants contemplated implementing strategies designed to disguise the "high level" of chargebacks resulting from leads generated from the fake news sites.  See Am. Compl. ¶¶ 39–40.  These allegations can plausibly be read to allege that the LeadClick defendants were "actively responsible" for the "development of" at least part of the deceptive content on the fake news sites.  See Doctor's Assocs., Inc. v. QIP Holders LLC ("Doctor's Assocs. II"), No. 06-cv-1710, 2010 WL 669870, at *23 (Feb. 19, 2010).  Thus, this court concludes that, on the face of the Amended Complaint, it is plausible that LeadClick is an information content provider; and the LeadClick defendants cannot claim immunity under the CDA.  See FTC v. Accusearch, 570 F.3d 1187, 1197 (10th Cir. 2009) ("[A]n interactive computer service that is also an information content provider of certain content is not immune from liability arising from publication of that content." (quoting Fair Hous. Council v. Roommates.com, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc))).

Because it is plausible on the face of the Amended Complaint that the LeadClick defendants do not satisfy at least one of the first two prongs of the test for section 230 immunity, this court does not need to evaluate whether the LeadClick defendants have met the third prong.

In support of their claim of immunity, the LeadClick defendants attempt to distinguish the facts of this case from those in Doctor's Associates I, a case in which this court declined to decide section 230 immunity on a motion to dismiss.  There,

defendant Quiznos sponsored a contest inviting contestants to submit video entries about its rival Subway. Id. at *1. The question there was whether Quiznos was entitled to immunity with respect to allegedly false and misleading advertising in the submitted videos. Id. This court held that it could not determine, on a motion to dismiss, whether Quiznos was entitled to section 230 immunity, because "whether or not Quiznos is an 'information content provider' is a question awaiting further discovery." Id. at *2. The LeadClick defendants argue that, unlike in Doctor's Associates I, plaintiffs here failed to allege that the LeadClick defendants "solicited the subject matter contained in the" deceptive content at issue. LeadClick Mem. Mot. to Dismiss at 20–21.

However, this argument is unavailing. Based on the allegations discussed above—that the LeadClick defendants coordinated the use of the fake new sites, monitored them, discussed how to use the information in concert with LeanSpa's products, and developed strategy intended to permit the use of the deceptive content to continue—it is plausible, on the face of the Amended Complaint, that the LeadClick defendants solicited allegedly deceptive content on the fake news sites.

B. Chiang's Motion to Dismiss

Chiang also filed a Motion to Dismiss in his individual capacity seeking to dismiss Counts 4, 13, and 14 of the Amended Complaint. Mem. in Support of Chiang's Mot. to Dismiss (Doc. No. 179) ("Chiang Mem. Mot. to Dismiss") at 1–2. Chiang makes three main arguments, and the court will address each of them in turn.

Chiang's first argument is that, if the court grants the LeadClick defendants' Motion to Dismiss, it should grant his as well because he is an employee of LeadClick. Chiang Mem. Mot. to Dismiss (Doc. No. 179-1) at 6–7. This argument is moot because

the court did not grant the LeadClick defendants' Motion to Dismiss.  See supra Section IV.A.

Second, Chiang argues that, whether or not this court grants LeadClick defendants' Motion to Dismiss, plaintiffs have failed to state the "factual prerequisites" to establish Chiang's personal liability.  Chiang Mem. Mot. to Dismiss at 7–13.  "An individual will be liable for corporate violations of the FTC Act if (1) he participated directly in the deceptive acts *or* had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth."  FTC v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009) (emphasis in original); FTC v. Consumer Health Benefits Ass'n, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012) (quoting Stefanchik).

Plaintiffs have plausibly alleged that Chiang participated directly in, or had the authority to control, LeadClick's deceptive acts.  Chiang argues that plaintiffs have not met this prong because they have not alleged that Chiang "owned LeadClick or operated it for his personal benefit."  Chiang Mem. Mot. to Dismiss at 8 (citing FTC v. Standard Educ. Soc'y, 302 U.S. 112, 120 (1937)).  However, Standard Education Society simply stands for the uncontroversial proposition that ownership of a corporation or operation of it for personal benefit can establish individual liability.  The court nowhere stated that these circumstances were necessary conditions for finding individual liability.  In fact, plaintiffs reference several cases in which non-owner, individual defendants were found joint and severally liable with corporate defendants for violations of the FTC Act.  See Pl.'s Mem. of Law in Opp. to Chiang Mot. to Dismiss

(Doc. No. 183) ("Pl.'s Opp. to Chiang Mot. to Dismiss") at 13 (listing cases).  Rather, authority to control the company is sufficient and can be evidenced by, among other things, "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."  FTC v. Amy Travel Servs., Inc., 875 F.2d 564, 573 (7th Cir. 1989) (citing FTC v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1292 (D. Minn. 1985)); FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008) (citing Amy Travel).  The Amended Complaint pleads such allegations:  plaintiffs allege that Chiang was an officer of LeadClick and "formulated, directed, controlled, had the authority to control, or participated in the acts and practices" described in paragraphs 25 through 40 of the Amended Complaint.  Am. Compl. ¶ 15.  In those paragraphs, plaintiffs allege specific acts by LeadClick and Chiang, including the following:  the hiring of affiliate marketers to generate leads for the LeanSpa defendants, monitoring the affiliate marketers' use of fake news sites, discussing with the LeanSpa defendants the pairing of their products on the fake news sites, and discussing strategy intended to disguise the high rate of chargebacks generated by LeadClick's deceptive marketing practices.  Id. ¶¶ 25, 38–40.  Plaintiffs also allege that Chiang met with Mizhen to discuss LeadClick's "use of blogs or fake news sites to market [the LeanSpa Entities'] products and obtain consumer leads."  Id. ¶ 28.  Chiang argues that this allegation is "inadequate" because it fails to identify "specifics about the substance" of such discussions.  Chiang Mem. Mot. to Dismiss at 9.  However, alleging that Chiang (an officer of LeadClick) spoke with Mizhen (the owner of the LeanSpa Entities) regarding the use of the fake news sites is sufficient to plausibly state Chiang's participation in or control over LeadClick's actions.  Moreover, plaintiffs'

allegations are not merely conclusory.  They identify specific acts that Chiang and LeadClick took regarding the fake news sites, including, in at least one instance, a discussion Chiang had with Mizhen about LeadClick's alleged deceptive practices.

Chiang also argues that his position as "division manager . . . acting in the normal course of the corporation's business" stands in contrast to the "direct and substantial" involvement of defendants in other cases.  Id. at 8–9 (citing cases).  However, none of the cases Chiang cites occurred in the context of a motion to dismiss.  See, e.g., FTC v. Cyberspace.com, LLC, No. C00-1806L, 2002 WL 32060289 (W.D. Wash. Jul. 10, 2002) (summary judgment); FTC v. Bronson Partners, LLC, 564 F. Supp. 2d 119 (D. Conn. 2008) (summary judgment).  In those cases, the parties had the benefit of discovery.[3]  Here, at the motion to dismiss stage, the question is not whether plaintiffs have provided sufficient evidence, but rather, whether they have sufficiently made a plausible claim that they are entitled to relief.  Under this standard, the allegations mentioned above plausibly support a claim that Chiang was directly and substantially involved in LeadClick's activities regarding the allegedly deceptive content at issue.  At the summary judgment stage, after the parties have engaged in discovery, Chiang will be entitled to challenge whether there is evidence sufficient to merit a trial.

Plaintiffs have also plausibly alleged Chiang's knowledge of, or reckless indifference to, the alleged misrepresentations.  See Stefanchik, 559 F.3d at 931 (9th Cir. 2009).  A court may consider an individual's "degree of participation" in the corporation's affairs as "probative of [that individual's] knowledge." Amy Travel, 875

---

[3] Chiang also cites FTC v. H.N. Singer, Inc., 668 F.2d 1107 (9th Cir. 1982), which involved an appeal of a preliminary injunction entered by the district court below.  That case is similarly unhelpful.  The Ninth Circuit noted that the district court had considered "pleadings, memoranda and affidavits" before granting preliminary injunctive relief, and also noted that defendants did not contest on appeal that the evidence supported finding of preliminary injunctive relief against them.  Id. at 1109.

F.2d at 574 (citing FTC v. Int'l Diamond Corp., 1983 WL 1911 at *5 (N.D. Cal. Nov. 8, 1983)).  Here, the same allegations cited above that supported prong one also plausibly allege Chiang's knowledge or reckless indifference.  Allegations that the LeadClick defendants (a term that includes Chiang) hired affiliate marketers and monitored those marketers' use of the fake news sites plausibly supports the claim that Chiang participated in and was involved in LeadClick's activities.  Moreover, plaintiffs alleged that Chiang, "[a]s an officer and representative of LeadClick," coordinated with Mizhen regarding LeadClick's "use of blogs or fake news sites" and "discussed the LeanSpa Defendants' monthly sales and chargeback levels."  Am. Compl. ¶ 28.  As pled, these allegations plausibly suggest Chiang's participation in LeadClick's activities as they related to the affiliate marketers and fake news sites.  Chiang argues that plaintiffs' allegations do not plead reckless indifference, and he attempts to contrast the facts in the Amended Complaint with those described by the Ninth Circuit in another case.  Chiang Mem. Mot. to Dismiss at 11 (citing FTC v. Neovi, Inc., 604 F.3d 1150, 1156 (9th Cir. 2010)).  However, Neovi was decided at the summary judgment stage.  The FTC had access to a factual record developed through discovery, which is unavailable at the motion to dismiss stage.  Based on the allegations in the Amended Complaint, plaintiffs have alleged sufficient facts to plausibly support the second prong.

The allegations that establish Chiang's personal liability under the FTC Act also establish his personal liability under CUTPA.  As this court has noted, "It is well established in Connecticut that a director or officer who commits [a] tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort."  Envtl.

Energy Servs., Inc. v. Cylenchar, Ltd., 2011 WL 4829851 at *6 (D. Conn. Oct. 12, 2011) (quotation marks and citations omitted) (alteration in original); see Wall v. Post Publ'g Co., No. CV 91-03-75-79S, 1992 WL 67382 *1 (Conn. Super. Mar. 26, 1992) ("[P]ersonal liability may attach in a CUTPA claim where it is alleged that the individual defendant participates in, controls or directs the acts or practices of a defendant corporation."). Moreover, "cases under the [FTC Act] serve as a lodestar for interpretation of the open-ended language of CUTPA." Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 179 (1986) (listing cases).

Finally, Chiang argues that, even if his personal liability is established, plaintiffs cannot recover monetarily from him. According to Chiang, both the FTC Act and CUTPA limit plaintiffs' recovery to equitable relief, which in this case is the amount by which he was unjustly enriched. Because "there is not a single allegation in the Amended Complaint that Mr. Chiang obtained any unlawful, ill-gotten or wrongly gained assets from the alleged conduct," the Amended Complaint does not allege that he benefited personally from LeadClick's actions, and plaintiffs may not seek monetary relief. See Chiang Mem. Mot. to Dismiss at 9, 13–15.

As mentioned previously, the Amended Complaint establishes Chiang's involvement in LeadClick's deceptive practices. Further, the FTC Act grants authority to courts to grant "equitable relief, including monetary relief." FTC v. Bronson Partners, LLC, 654 F.3d 359, 365 (2d Cir. 2011). Chiang argues that such relief must be based on a defendant's unjust enrichment. See Chiang Mem. Mot. to Dismiss at 14 (citing FTC v. Verity Int'l, Ltd., 443 F.3d 48, 67–68 (2d Cir. 2006), cert denied, 549 U.S. 1278 (2007) (noting that "restitution is measured by the defendant's gain").

Plaintiffs allege that Chiang was an officer of LeadClick and that LeadClick was paid fees for its role in this action. Id. ¶¶ 15, 26. Plaintiffs also allege that the LeadClick defendants, a term that includes Chiang, have been unjustly enriched by their participation in this scheme. Am. Compl. ¶ 137. However, the Amended Complaint does not allege any facts regarding how Chiang was unjustly enriched. The Amended Complaint does not allege that any of LeadClick's fees went to Chiang, nor does it allege that Chiang was paid for his role in the alleged deceptive scheme. Absent such support, these allegations constitute "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Accordingly, the court finds that plaintiffs have failed to plausibly allege that Chiang was unjustly enriched by the deceptive conduct at issue.

    C. Strano

Finally, Strano seeks to dismiss Count 17 of the Amended Complaint, the only count alleged against Strano, for failure to state a claim upon which relief may be granted. See Strano Mot. to Dismiss (Doc. No. 109). Specifically, Strano argues that plaintiffs fail to allege facts regarding transfers of ill-gotten assets to her from any of the other defendants. Mem. of Law in Support of Strano's Mot. to Dismiss (Doc. No. 109-1) ("Strano Mem. Mot. to Dismiss") at 10 (arguing that the Amended Complaint fails to allege any "factual predicate" for claims of such transfers). Strano also argues that plaintiffs had the opportunity to discover such facts, if they existed, when a court-appointed receiver for the LeanSpa defendants (the "Receiver") and plaintiffs "engaged in six months of discovery," some of which was directed toward Strano's involvement. Id. at 12.

Although plaintiffs have not pleaded Strano's involvement in great detail, this court finds that the allegations are sufficient to survive a motion to dismiss. A court is permitted to order equitable relief against a party that has received ill-gotten funds and that does not have a legitimate claim to those funds. SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998) (describing standard for recovering from relief defendant in securities enforcement action). Here, plaintiffs allege that Strano is the spouse of Mizhen, who "owns, directs, or otherwise controls" the LeanSpa Entities, and who directed, controlled, and/or participated in the LeanSpa Entities' deceptive practices. Am. Compl. ¶¶ 9, 13, 16. Plaintiffs also allege that Strano received "or otherwise benefitted from" proceeds of the LeanSpa defendants' unlawful practices, that she "has no legitimate claim" to those funds, and that she will be unjustly enriched if she does not disgorge those funds. Id. ¶¶ 134–36. Strano is correct that these allegations do not specify dates or amounts of any of these alleged transfers. However, the omission of such details at this stage is not fatal to plaintiffs' claim. In FTC v. Ivy Capital, Inc., 2011 WL 2118626 (D. Nev. May 25, 2011), the FTC made allegations against relief defendants that were virtually identical to the allegations in this case. See id. at *4. The relief defendants argued that the complaint was insufficiently pleaded because it failed to allege that the relief defendants participated in or controlled any wrongdoing or had any knowledge of the allegedly fraudulent conduct. Id. In denying the relief defendants' motions to dismiss, the Ivy Capital court noted that all the FTC needed to allege with respect to the relief defendants was that the relief defendants (i) received ill-gotten gains and (ii) have no legitimate claim to the funds. Id. at *4–5. That court further noted that the motions to dismiss were based on "pleading standards rather than the

sufficiency of the evidence," and that "arguments as to the sufficiency of the evidence . . . are inappropriate at this juncture." Id. at *5.

While the Ivy Capital court's holding is not binding, this court finds its reasoning persuasive. The question is whether plaintiffs have plausibly alleged that Strano received ill-gotten funds to which she does not have a legitimate claim, Cavanagh, 155 F.3d at 136, not whether plaintiffs have alleged facts tracing particular funds to Strano. By alleging a spousal relationship between Strano and Mizhen, the owner of the LeanSpa Entities, describing the deceptive conduct of the LeanSpa defendants, and alleging that Strano received funds or otherwise benefited from the LeanSpa defendants' ill-gotten funds, plaintiffs have plausibly alleged a basis for relief.

**V.    CONCLUSION**

For the foregoing reasons, the Motions to Dismiss filed by Strano and the LeadClick defendants (Doc. Nos. 109, 155) are DENIED. The Motion to Dismiss filed by Chiang (Doc. No. 179) is GRANTED in part as to the claim for equitable relief in the form of money, and DENIED in part. Plaintiffs have until **February 20, 2013** to replead their claims to plausibly allege how Chiang was unjustly enriched, if they can do so under the standards set forth above.

**SO ORDERED.**

       Dated at New Haven, Connecticut this 29th day of January, 2013.

                                            /s/ Janet C. Hall
                                            Janet C. Hall
                                            United States District Judge