## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and STATE OF CONNECTICUT, | Case No. 3:11-cv-1715 (JCH) |
| *Plaintiffs*, | The Honorable Janet C. Hall |
| v. | |
| LEANSPA, LLC, a Connecticut limited liability company, | May 27, 2014 |
| NUTRASLIM, LLC, a Connecticut limited liability company, | |
| NUTRASLIM U.K. LTD., also d/b/a LEANSPA U.K. LTD., an United Kingdom limited liability company | |
| BORIS MIZHEN, individually and as an officer of LEANSPA, LLC, NUTRASLIM, LLC, and NUTRASLIM U.K. LTD. | |
| LEADCLICK MEDIA, INC., a California corporation, and LEADCLICK MEDIA, LLC, as a successor limited liability company, and | |
| RICHARD CHIANG, individually and as an officer of LEADCLICK MEDIA, INC., | |
| *Defendants*, and | |
| ANGELINA STRANO, and | |
| CORELOGIC, INC., a Delaware corporation, | |
| *Relief Defendants*. | |

## LEADCLICK DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

## <u>TABLE OF CONTENTS</u>

**Page**

I.     SUMMARY OF ARGUMENT ..................................................................................1

II.    LEGAL ARGUMENT ...........................................................................................4

    1.     Plaintiffs' Motion Must Be Denied Because Plaintiffs Cannot Demonstrate LeadClick's Legal Liability for the Allegedly Deceptive Content in Publishers' Advertisements ......................................................................4

    2.     Even If Plaintiffs Had a Viable Legal Theory, Factual Disputes Preclude Summary Judgment .................................................................................................7

    3.     Plaintiffs Are Not Entitled To Summary Judgment on the Issues of Materiality and Consumer Reliance......................................................................16

    4.     Plaintiffs' Motion Must be Denied Because They Do Not Seek Summary Judgment on LeadClick's Affirmative Defenses....................................................21

    5.     Plaintiffs' Motion Must be Denied Because Monetary Relief is Legally Improper Absent an Injunction. ..........................................................................21

III.    CONCLUSION.................................................................................................23

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
  760 F.2d 442 (2d Cir. 1985) ...................................................................................... 11

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) ............................................................... 14, 15

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)................................................................................................... 6

*Fairbaugh v. Life Ins. Co. of N. Am.*,
  737 F. Supp. 2d 68 (D. Conn. 2010).......................................................................... 11

*Federal Trade Comm'n  v. Freecom Commc'ns, Inc.*,
  401 F.3d 1192 (10th Cir. 2005) ................................................................................. 19

*Federal Trade Comm'n  v. Verity Int'l, Ltd.*,
  443 F.3d 48 (2d Cir. 2006) .......................................................................................... 5

*Federal Trade Comm'n v. Bronson Partners, LLC*,
  564 F. Supp. 2d 119 (D. Conn. 2008)......................................................................... 5

*Federal Trade Comm'n v. Kitco of Nev., Inc.*,
  612 F. Supp. 1282 (D. Minn.1985)........................................................................... 19

*FTC v. Commerce Planet, Inc.*,
  878 F.Supp. 2d 1048 (C.D. Cal. 2012) ............................................................... 16, 20

*FTC v. Febre*,
  128 F.3d 530 (7th Cir. 1997) .................................................................................... 22

*FTC v. Figgie, Int'l.*,
  994 F.2d 595 (9th Cir. 1993) .................................................................................... 19

*FTC v. Medical Billers Network, Inc.*,
  543 F. Supp. 2d 283 (S.D.N.Y. 2008) ...................................................................... 22

*FTC v. Verity Int'l, Ltd.*,
  443 F.3d 48 (2nd Cir. 2006) ..................................................................................... 16

*Gibson v. Craigslist*,
  No. 08 Civ. 7735 (RMB), 2009 WL 1704355 (SDNY June 15, 2009) ...................... 5

*Goddard v. Google, Inc.*,
  640 F.Supp.2d 1193 (N.D. Cal. 2009)...................................................................... 14

*Green v. Am. Online, Inc.*,
  318 F. 3d 465 (3rd Cir. 2003) ..................................................................................... 5

*Harrison v. Nw. Orient Airlines, Inc.*,
  677 F. Supp. 131 (S.D.N.Y. 1987) ........................................................................... 11

*Jurin v. Google Inc.,*
  695 F. Supp. 2d 1117 (E.D. Cal. 2010) .......................................................... 14

*Pac. Inv. Mgmt. Co. LLC. v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010) ............................................................................ 7

*Parker v. Google, Inc.,*
  422 F. Supp. 2d 492 (E.D. Pa. 2006),
  aff'd, 242 Fed. Appx. 833 (3d Cir. 2007),
  cert. den., 552 U.S. 1156 (2008) ..................................................................... 14

*United States v. W.T. Grant*,
  345 U.S. 629 (1953)........................................................................................ 22

*Winbourne v. E. Airlines,*
  632 F.2d 219 (2nd Cir. 1980) ......................................................................... 21

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir.1997) ............................................................................. 5

## State Cases

*Coudert v. Janney Montgomery Scott, LLC*,
  3:03-CV-324 MRK, 2005 WL 1563325 (D. Conn. July 1, 2005).................. 11

*FTC v. Circa Direct, LLC, et al.,*
  Case No. 1:11-cv-02172-RMB-AMD, (D. N.J. Oct. 17, 2011)..................... 22

*Parts.com, LLC v. Yahoo! Inc.,*
  No. 3:13-cv-01078-JLS-WMC, 2013 BL 339124 (S.D. Cal., Dec. 4, 2013) ........................... 14

*Vazquez v. Buhl,*
  Case No. 35319, 2014 WL 1795574 (Conn. App. Ct. May 13, 2014) .............................. 14, 15

## Statutes

15 U.S.C. § 45......................................................................................................... 1

47 U.S.C. § 230....................................................................................................... 4

Defendants LeadClick Media, Inc. and its successor, LeadClick Media, LLC (collectively "LeadClick") submit the following Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment [ECF No. 292].

## I.      SUMMARY OF ARGUMENT

Despite filing a 49-page document containing 236 supposedly "uncontested" factual statements, plaintiffs, the Federal Trade Commission ("FTC") and the State of Connecticut ("Connecticut"), have entirely omitted any assertion that LeadClick designed or created the allegedly deceptive aspects of publisher "news sites" or that any statement in even one of those news sites was attributed to LeadClick.  Indeed, Plaintiffs admit that the news sites were "commonplace" long before they were used by third-party publishers to generate traffic on LeadClick's eAdvertising affiliate network.

In light of these simple concessions, it is clear that Plaintiffs' claims fail under the Second Circuit's "bright line" test for liability under Section 5 of the FTC Act.[1]  Notably, Plaintiffs not only fail to acknowledge this governing law, but they neither cite a single case nor offer a legal theory that supports holding LeadClick liable for the allegedly misleading advertisements of third-party publishers.

Instead, in an effort to paint LeadClick as a participant in a variety of activities that are wholly irrelevant to the narrow claims lodged against the company, Plaintiffs resort to a rambling mischaracterization of the record evidence.  Although Plaintiffs' memorandum of law in support of their motion for summary judgment (the "Memorandum") contains myriad allegations about the misleading advertising practices of the LeanSpa defendants and details a

_____

[1] 15 U.S.C. § 45.

variety of business practices of LeadClick, those items are simply irrelevant to the single narrow assertion in the Complaint, which alleges:

> Defendants, directly or through affiliates acting on their behalf and for their benefit, have represented, expressly or by implication, that:
>
> a.    Objective news reporters have performed independent tests demonstrating the effectiveness of the product featured, including LeanSpa™ Acai, LeanSpa™ with Pure HCA, and LeanSpa™Cleanse; and
>
> b.    The comments following these "news reports" express the views of independent consumers.

Perhaps not surprisingly, in their desperate efforts to vilify LeadClick, Plaintiffs have forgotten —and their Memorandum fails to even mention—that their claim against LeadClick is based only on this simple and narrow theory of liability asserted in the Complaint.

Plaintiffs' motion for summary judgment against LeadClick is fatally flawed and must be denied for the following five independent reasons:

First, Plaintiffs do not present **any evidence** sufficient to support a violation of the FTC Act or the Connecticut Unfair Trade Practices Act ("CUTPA").   Plaintiffs completely ignore the Second Circuit's "bright line" legal standard, which imposes Section 5 liability only when the allegedly deceptive portions of an advertisement are created by or contain an attribution to the defendant.  Although Plaintiffs submit 236 statements of "fact," not a single one of those statements contends that LeadClick created the deceptive "news site" format or that any of the content on those sites mentions LeadClick.  And, notably, Plaintiffs do not even address the legal standards for LeadClick's supposed liability.  Rather, Plaintiffs contend that LeadClick should be held "responsible" because it allegedly knew of, encouraged, and facilitated publishers who were using "news site" advertisements.  At best, this is a theory of "aiding and abetting" liability,

which has been squarely rejected by the U.S. Supreme Court and Second Circuit precedent—and the FTC's own Commissioners have also recognized its demise.

Second, even if Plaintiffs were able to pursue "aiding and abetting" liability, or some other undisclosed and hypothetical legal theory, there are significant factual disputes that prevent entry of summary judgment.  LeadClick vehemently disputes Plaintiffs' characterizations of the record evidence, and denies many of Plaintiffs' distorted factual contentions.  In the event that the Court adopts an alternative theory of liability that makes Plaintiffs' contentions relevant and material, summary judgment still cannot be granted because there would be factual issues in dispute.

Third, there are factual issues that preclude summary judgment on the required elements of deceptiveness, materiality, and consumer reliance.  Even the record evidence submitted by Plaintiffs demonstrates that to the extent consumers were misled, it was exclusively by the independent false advertising of the LeanSpa defendants and their claims of product efficacy, weight loss, "free" trials, and easy returns.  And consumer harm resulted not from the format of "news site" advertising but, instead, from LeanSpa's tricky billing practices and refusal to permit cancellations.  At a minimum, there is a significant factual dispute about the extent to which "news" style advertising, which was ubiquitous in Internet advertising, was material or relied upon by consumers in this setting.

Fourth, Plaintiffs' motion must be denied because they do not seek summary judgment on LeadClick's affirmative defenses.  Strangely, Plaintiffs fail to even mention any of LeadClick's affirmative defenses, including its claim to immunity under Communications Decency Act

Section 230 ("CDA Section 230").[2]  Because Plaintiffs fail to dispose of these issues under

Federal Rule of Civil Procedure 56, summary judgment cannot be granted in Plaintiffs' favor.

Fifth, Plaintiffs are not entitled to any affirmative monetary relief unless a right to

injunctive relief is established.  Because Plaintiffs do not seek—and could not reasonably seek—

to obtain injunctive relief on summary judgment, equitable monetary relief is inappropriate.

## II.   LEGAL ARGUMENT

### 1.   Plaintiffs' Motion Must Be Denied Because Plaintiffs Cannot Demonstrate LeadClick's Legal Liability for the Allegedly Deceptive Content in Publishers' Advertisements

Plaintiffs' Third Amended Complaint[3] (the "Complaint") alleges that LeadClick is

responsible for only two aspects of the "news site" advertisements used by publishers, namely

that the websites: a) purport to be legitimate news websites; and b) contain comments that

purport to express the views of real consumers.[4]  Plaintiffs charge that the LeadClick Defendants,

"directly or through affiliates acting on their behalf and for their benefit have represented

expressly or by implication" that certain websites containing LeanSpa advertisements depicted

objective news reports and independent consumer comments that were neither objective nor

independent.

But the clear evidence demonstrates, and Plaintiffs concede, that LeadClick had no role

whatsoever in creating or publishing the allegedly deceptive content of these advertisements,

which were crafted and widely used by web publishers long before those publishers had any

association with LeadClick.

---

[2] 47 U.S.C. § 230.
[3] **DX 6** (Third Am. Compl. ¶ 70 [DE 246]).
[4] **DX 6** (Third Am. Compl. ¶¶ 82–84 (Count Four)).

Plaintiffs' legal theory of liability remains a mystery.  Although Plaintiffs' Memorandum asserts that "LeadClick's management and promotion of consumer traffic through fake news sites within its eAdvertising Network violated Section 5(a) of the FTC Act,"[5] it does not cite to a single case in which "management" or "promotion" of consumer traffic is sufficient to create liability for the content of third-party advertising.  The "Legal Standards" section of the Memorandum, like the rest of the document, does not cite to a single case discussing, no less imposing, such liability.[6]  In fact, there is no legal citation to support Plaintiffs' wishful legal proposition that "LeadClick was *responsible* for presenting fake news sites to consumers."[7]

Similarly, Plaintiffs argue (without supporting authority) that LeadClick's liability stems from its decision to "not block fake news sites from its Network" despite knowing that such sites were commonplace in the industry.[8]  But again, there is no authority that supports such a legal theory, and Plaintiffs do not cite a single case that stands for such a proposition.  Frankly, any such legal theory would run directly afoul of CDA Section 230, which specifically grants immunity for claims based on a failure to screen or block third party content.[9]

---

[5] Plaintiffs Federal Trade Commission and State of Connecticut's Memorandum of Law in Support of Their Motion for Summary Judgment [ECF 304] ("Pls.' Mem.") at 26.

[6] The sole legal citations on page 27 of the Memorandum are to *Federal Trade Comm'n v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d Cir. 2006) and *Federal Trade Comm'n v. Bronson Partners, LLC,* 564 F. Supp. 2d 119, 124 (D. Conn. 2008).  Both cases cited involved defendants who authored and disseminated the alleged misrepresentations.  Neither of these cases involved the situation presented here, and neither adopted a legal rule for imposition of secondary liability for Section 5 deceptive advertising.

[7] Pls.' Mem. at 29.

[8] Pls.' Mem. at 29.

[9] *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir.1997) (Section 230 grants immunity for "deciding whether to publish, withdraw, postpone, or alter content"); *Green v. Am. Online, Inc.,* 318 F. 3d 465 (3rd Cir. 2003) (immunity for failing to monitor, screen or delete content); *Gibson v. Craigslist,* No. 08 Civ. 7735 (RMB), 2009 WL 1704355, at *7 (SDNY June 15, 2009).

The omission of any legal theory of liability in Plaintiffs' Memorandum is perhaps reflective of the FTC's own acknowledgement that it has no legal right to pursue claims like this. But it is difficult to understand how Plaintiffs could fail to cite to a single viable legal precedent imposing liability in a similar situation, and unfathomable how Plaintiffs could fail to even address the Second Circuit's "bright line" test for liability under Section 5.

As discussed extensively in LeadClick's memorandum in support of its own summary judgment motion [ECF No. 295], under Second Circuit law, a defendant may only be held liable for allegedly deceptive statements that the defendant has either personally published or which are attributed to it. There is no "aiding and abetting" liability under Section 5 of the FTC Act. The U.S. Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*[10] and the admissions of two FTC Commissioners confirm that there is no legal claim for "aiding and abetting" a violation of Section 5(a)(1) the FTC Act. And Second Circuit case law has established the "bright line" test by which a primary violation requires publication of or attribution within the deceptive advertising.

In this case, Plaintiffs can prove neither. They finally concede what they have known since long before the institution of this lawsuit, namely, that the precise news format advertisements that are at issue in this case were created by third-party publishers and were widely in use before LeadClick signed its first contract with LeanSpa. Instead, they rehash the numerous allegations in the Complaint about the deceptive marketing practices of the LeanSpa defendants, add in misstatements about unrelated aspects of LeadClick's business, and jump to

---

(immunity for failure to "block, screen, or otherwise prevent the dissemination" of third-party advertisements).

[10] 511 U.S. 164 (1994).

the conclusion that LeadClick is "responsible."  But none of these supposedly "undisputed" assertions comes close to meeting the "bright line" test, and they are nothing more than an entirely irrelevant attempt to create "aiding and abetting" liability.

This litigation brings to light precisely the type of claim that the Second Circuit cautioned about in the 2010 *PIMCO* decision,[11] in which it reaffirmed that a defendant commits a primary violation only by crossing the bright-line test of making a misrepresentation that is publicly attributable to that defendant:  "Anything short of such conduct is merely aiding and abetting …"[12]  Because Plaintiffs' claims fail the bright-line test, they must be dismissed.

### 2.    Even If Plaintiffs Had a Viable Legal Theory, Factual Disputes Preclude Summary Judgment

Even if Plaintiffs were able to pursue "aiding and abetting" liability, or some other undisclosed and hypothetical legal theory, there are significant factual disputes that would prevent entry of summary judgment.  As set out in the accompanying Local Rule of Civil Procedure 56(a)2 statement, LeadClick strenuously disputes Plaintiffs' characterizations of the record evidence, and denies many of Plaintiffs' factual contentions.  Plaintiffs' factual contentions are irrelevant and immaterial because they do not bear upon the "bright line" rule for liability.  But in the event that the Court adopts an alternative theory of liability that makes Plaintiffs' contentions relevant and material, summary judgment still cannot be granted because these contentions are disputed.

A full recitation of these factual disputes is precluded by page limitations, but it is clear that Plaintiffs have taken great liberties in characterizing the record evidence.  Moreover, in

---

[11] *See Pac. Inv. Mgmt. Co. LLC. v. Mayer Brown LLP* ("PIMCO"), 603 F.3d 144, 161 (2d Cir. 2010).
[12] *PIMCO,* 603 F.3d at 153.

many instances, Plaintiffs have intentionally failed to note the existence of clear and unambiguous contrary evidence.

For example, Plaintiffs contend that "LeadClick presented the LeanSpa product offers to affiliates to place on their fake news sites to be advertised."[13]  That contention is simply false. LeadClick **did not** provide publishers with any content about the LeanSpa products or offers.  In support of their contention, Plaintiffs cite to No. 98 of their statement of facts, which in turn cites to testimony of former LeadClick employee Richard Chiang.[14]  But Mr. Chaing did not testify that LeadClick distributed LeanSpa advertising content.  Instead, in describing the potential resources of the Hitpath software system, Mr. Chaing testified that the system permitted, but did not require, merchants to provide advertising content for publishers to use.[15]  But LeanSpa did not utilize this aspect of the Hitpath software system, and did not distribute advertising content through LeadClick.  Publisher Andrew Davidson confirmed this fact in his testimony:

> **Q.**  **Now, is it true that in some affiliate networks, not the ones we're talking about here, but you say you worked with Netflix and other people like that who are affiliates, in some affiliate networks the merchant will actually give content or creative for the publishers to use, right?**
>
> A.   Yes.
>
> **Q.**  **So, for example, Netflix might give -- transmit somehow, give someone some banner ads or some pictures of their logo that says Netflix so that the publishers can use that, correct?**
>
> A.   Yes.

---

[13] Pls.' Mem. at 29.
[14] Plaintiffs' Local Rule 56(a)1 Statement ("Pls.' Statement") at ¶ 98.
[15]      FTC:          Now, what exactly does a publisher download from the offer library?
      Mr. Chiang:   So what could be downloaded are creatives. That's one *potential* thing. Creatives would be like banners or whatever that -- whatever the -- creative assets that are made available to them by the advertiser…
**PX 22** (Chaing 38:20 - 39:1 (emphasis added)).

**Q.    And have you seen that where there are portions of an affiliate network portal where you could go in and grab creative and pull it down?**

A.    Yes.

**Q.    In this instance with the fake news sites, did any of your affiliate networks give you creative so that you could create the fake news sites?**

A.    I mean, I've seen some affiliate networks give kind of samples, but nothing -- nothing in this case that I would say offhand that I would really -- that was used on these sites anyway.

**Q.    The thing that the affiliate network gives you though is URL so that you could direct traffic to the right spot, right?**

A.    Yes.

\* \* \* \*

**Q.    And other than that, did the LeadClick people give you anything that helped you design or run those fake news sites?**

MR. LUBETZKY: Object to form.

A.    No.

**PX 56** (Davidson 191:23-193:12).

Similarly, Plaintiffs inaccurately attempt to assert that LeadClick "screened" publisher advertisements and "approved of the fake news format."[16]  That is simply not true, and is completely implausible.  With hundreds of affiliate publishers who act freely and independently control their own servers, it would be impossible for LeadClick to actually examine and regulate publisher pages.[17]  More fundamentally, only a merchant—not LeadClick—could specify what types of advertising could be used for the merchant's offer.[18]  Thus, as the testimony makes clear,

---

[16] Pls.' Mem. at 29.
[17] *See* **PX 48** (Olsen 34:24-35:25 (describing publisher ability to change website look every minute)).
[18] **PX 48** (Olsen 35:6-20).

it was up to merchants to either approve or disapprove of the use of news format landing pages; any review undertaken by LeadClick was simply to pre-screen submissions for compliance with the merchants' "regulations":

> In this case if there was any reviewing that was being done by myself or LeadClick, it was not -- we were not the sole entity responsible for reviewing pages. Any reviewing that was done on my part was intended only to weed out pages which had not fully complied to the advertiser's regulations to the best of my ability to perceive. Any pages that I found to be fully compliant were then always sent to the advertiser for final approval. So when -- in effect, we were not required to review any pages. What the actual situation was was that the advertiser was -- wanted to review and approve all pages. However, it facilitated the process for me personally and for others in LeadClick to prescreen applicants prior to sending them to the advertiser.[19]

In other misguided efforts to support their broad and legally improper "aiding and abetting" claim, Plaintiffs contend that LeadClick conspired with defendant Boris Mizhen to "manipulate" his traffic levels and "evade merchant monitoring programs."[20]  These contentions, and the entire section of the Memorandum dedicated to this topic,[21] are wholly irrelevant and should be stricken.  This is not a case in which Plaintiffs allege that LeadClick "aided and abetted" or otherwise assisted the LeanSpa defendants; instead, the operative complaint narrowly asserts that LeadClick is responsible for certain misrepresentations made by third-party publishers.  Plaintiffs cannot now change their theory of liability, and any contentions regarding assistance to Mizhen and the LeanSpa defendants are completely irrelevant.

In a bizarre twist, and with a clever sleight of hand, Plaintiffs seek to add a brand new theory of liability based on LeadClick's nascent "media buying" business.   Although their Complaint charged LeadClick with responsibility for the content news sites used by publishers in

---

[19] **PX 48** (Olsen 39:16-40:5).
[20] Pls.' Mem. at 2, 30 (citing Pls.' Statement at ¶¶ 169-183).
[21] *See* Pls.' Mem., Section D.6, at 19-22.

the company's affiliate marketing program, for the first time, Plaintiffs have asserted that a completely different aspect of LeadClick's business is responsible for "luring" consumers to the publishers' news sites and for "amplifying" their deceptive quality.[22]   This newly-revealed legal theory fails without question for several reasons.

First, raising a novel "aiding and abetting" legal argument for the first time at summary judgment is utterly improper.[23]   There is not a single reference to this media buying business in the Complaint which, instead, only mentions LeadClick's affiliate marketing business.[24]   Without notice that this portion of its operations was at issue, LeadClick neither engaged an appropriate expert nor developed any affirmative discovery directed at "media buying."   In fact, discovery closed on March 17, 2014, over two months ago, yet Plaintiffs are, for the first time, raising this argument at the summary judgment stage.[25]   Despite having in its possession information about the existence of LeadClick's media buying operations while the FTC was investigating Andrew

---

[22] Pls.' Mem. at 17–19 (Part II.D.5), 29-30.

[23] *Fairbaugh v. Life Ins. Co. of N. Am.*, 737 F. Supp. 2d 68, 87 (D. Conn. 2010) (denying previously unpled claim raised for the first time in the plaintiff's motion for summary judgment); *Coudert v. Janney Montgomery Scott, LLC*, 3:03-CV-324 MRK, 2005 WL 1563325, at *2 (D. Conn. July 1, 2005) ("Claims that are entirely new—that is, *claims based new facts and new legal theories* with no relation to the previously pled claims—*are commonly rejected at the summary judgment stage* due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery") (citing *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985); *Harrison v. Nw. Orient Airlines, Inc.*, 677 F. Supp. 131, 135 (S.D.N.Y. 1987) (" [T]his theory of liability, suggested for the first time after joinder of issue on the pleadings, full discovery, and the entry of a pre-trial order, comes too late. . . . *I will not consider the suggestion now, in its role of a transparent effort to defeat that summary judgment to which the record developed on discovery entitles the defendant*.").

[24] *See generally* **DX 6** (Third. Am. Compl.); **PX 48** (Olsen 51:21–52:2 (mentioning LeanSpa was first "referred to eAdvertising from LeadClick's Media buying team.").

[25] *See* [ECF No. 264] (Order setting March 17, 2014, deadline for completion of discovery).

Davidson and his company back in 2010, Plaintiffs chose not to bring a claim against LeadClick on this ground and should be forbidden from doing so.

Second, the media buying business was "a completely separate piece [of LeadClick's business] than the affiliate network."[26]  Plaintiffs have already admitted, throughout this litigation, that references to the eAdvertising division of LeadClick were comments about LeadClick's affiliate network,[27] and at deposition used the terms "LeadClick" and "eAdvertising" interchangeably to refer to the affiliate network.[28]  Until now, Plaintiffs have made no attempt to define eAdvertising as *both* the affiliate marketing network and media buying business.  Now, Plaintiffs mention LeadClick's media buying activities rather flippantly, while entirely ignoring that media buying is unrelated to the underlying claims against LeadClick.

The record evidence is clear that although the media buying might have technically existed within the eAdvertising division of LeadClick, it was a completely separate business with specialized employees, separate contracts, customers and payment models.  As Mr. Chelew testified:

> **Q.     … Was this [media buying activity] part of the affiliate network business?**
>
> **MR. LUBTEZKY:   Let me object to form.**
>
> **BY MS. D'AMICO:**
>
> **Q.     You can answer it.**
>
> A.     No. eAdvertising -- the affiliate network
>          was a very simple model, and we were trying to use the
>          resources and the skill sets of the people in
>          eAdvertising to try to build different business
>          models.

---

[26] **PX 13** (Chelew 280:12–13).
[27] Pls.' Mem. at 4; Pls.' Statement at ¶¶ 15–17; **PX 22** (Chiang 11:24–12:13).
[28] *See e.g.*, **PX 65** (Redmond 10:22–24).

And so that was part of the process of trying
to get them to be more like our core side of the house
and do media placements through media buying.  So it was
a completely separate piece than the affiliate network.

Q.    **Did they have different contracts?**

A.    They had different contracts.  They had
different customers. They would have had different
relationships.[29]

As a media buyer, LeadClick acted as an agent for its customers to secure online

advertising space on popular websites including Yahoo.com, Weather.com, and About.com, at

which its customers could place advertisements, such as banner ads.[30]  In the media buying

business, these popular websites were well-established and their owners had already dedicated

this space to generate advertising revenue.[31]  Accordingly, as a media buyer, LeadClick exerted

no control over these websites.

Likewise, LeadClick did not control the customers for whom it was acting as an agent in

obtaining online advertising space,[32] and had no control over the content of the banner ads (or

any other type of advertising) which were created and controlled entirely by its customers.[33]

Perhaps this last point is most crucial: LeadClick did not create the content of creatives utilized

by its media buy customers. [34]  Neither in their Complaint nor in their motion do Plaintiffs make

any assertion that anything in those banner ads was false or misleading.  Thus, to the extent that

those banner ads were what "lured" consumers, responsibility for those ads rests solely on their

creators, not on the web site operators which provided space for the ads, or on LeadClick which

---

[29] **PX 13** (Chelew 279:16–280:17 (emphasis added)).
[30] **PX 56** (Davidson 31:24-32-32:21; 85:1-9; 196:16-197:23); **PX 48** (Olsen 6:8-18).
[31] **PX 56** (Davidson 124:1-18).
[32] **PX 56** (Davidson 196:16-197:23).
[33] **PX 56** (Davidson 31:24-32-32:21; 85:1-9; 196:16-197:23; 198:13-8)
[34] **PX 56** (Davidson 196:16-197:23 (Q: "And that creative that the consumer sees is all designed
and controlled by you and put on your ad server, right?" Mr. Davidson: "Yes."); 198:13-8).

obtained that space.  Simply put, no legal liability can be assigned to LeadClick for obtaining ad space to Mr. Davidson or any other of LeadClick's media buying customers.

Third, assuming for the sake of argument that an inquiry into LeadClick's media-buying practices was relevant in this litigation—which LeadClick disputes—Plaintiffs' new theory would be precluded by the immunity of CDA Section 230.  Courts have universally held that online ad agencies are immune from liability for the deceptive acts of their customers,[35] and that there can be no liability for providing links to deceptive advertising.[36]

For example, in *Goddard v. Google*,[37] a consumer enrolled in a deceptive web-based program selling ringtones and other mobile subscription services after clicking on ads that Google arranged to place on its website.  The consumer sought to hold Google liable for its complicity in this scheme, alleging that Google knew of the fraudulent scheme and aided the online merchant by placing these ads on its site.  The Court dismissed the claims, recognizing that Google was entitled to CDA Section 230 immunity for the online deception of its advertising customers.  Likewise, in *Jurin v. Google Inc.*,[38] a plaintiff sued Google for its role in

---

[35] *See, e.g.*, *Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D. Cal. 2009) (CDA Section 230 precluded aiding and abetting claims by consumers who were tricked into online purchases after clicking on Google ads); *Jurin v. Google Inc.,* 695 F. Supp. 2d 1117 (E.D. Cal. 2010) (CDA Section 230 immunity for providing online space for advertisements and links);  *Parts.com, LLC v. Yahoo! Inc.,* No. 3:13-cv-01078-JLS-WMC, 2013 BL 339124 (S.D. Cal., Dec. 4, 2013) (CDA Section 230 dismissal of claims for permitting display of ads).

[36] *See e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 692 (S.D.N.Y. 2009) (CDA 230 protects defendant from liability for linking to objectionable files hosted on third-party websites); *Parker v. Google, Inc.,* 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), aff'd, 242 Fed. Appx. 833 (3d Cir. 2007), cert. den., 552 U.S. 1156 (2008)(CDA 230 immunity for providing links to objectionable material); *Vazquez v. Buhl,* Case No. 35319, 2014 WL 1795574, at *11 (Conn. App. Ct. May 13, 2014) (linking to defamatory statements is immaterial because the defendant played no role in the composition of those statements).

[37] 640 F. Supp. 2d 1193 (N.D. Cal. 2009).

[38] 695 F. Supp. 2d 1117 (E.D. Cal. 2010).

providing advertising space for a "Sponsored Link" advertisement on Google's results page.  As the Court described in finding immunity under CDA Section 230 for Google:

> Defendant does not provide the content of the "Sponsored Link" advertisements. It provides a space and a service and thereafter charges for its service.

The same is true of LeadClick, which likewise is entitled to the protection of CDA Section 230.

In the same vein, courts have made it clear that CDA 230 immunizes a company, such as LeadClick, which is alleged to have arranged "links" to deceptive web pages.[39]  A recent opinion from the Connecticut Court of Appeals[40] considered a situation in which the plaintiff sued CNBC.com for providing links to a defamatory website and urging viewers to read it.  The plaintiff asserted the CNBC's actions "amplified," "endorsed," and "adopted" the defamatory statements.  The Court, considering the language and purpose of CDA 230, found that the statute provided immunity:

> It is immaterial whether the defendant amplified, endorsed, or adopted the defamatory statements, because the defendant played no role in their composition.[41]

The same is true here.  Any claim that LeadClick's media buying activities "amplified" publishers' deceptive news sites is barred by CDA Section 230.

In summary, there are significant factual disputes about the so-called "undisputed facts" that Plaintiffs filed in support of their motion.  If the adoption of a novel theory of liability renders those issues relevant and material, summary judgment is still precluded by these factual disputes.

---

[39] *See* footnote 36, *supra.*

[40] *Vazquez v. Buhl,* Case No. 35319, 2014 WL 1795574, at *11 (Conn. App. Ct. May 13, 2014).

[41] *Id.,* at 14.

3.      **Plaintiffs Are Not Entitled To Summary Judgment on the Issues of Materiality and Consumer Reliance**

As Plaintiffs concede, liability under Section 5 of the FTC Act requires proof that an advertisement is deceptive, material, and relied upon by consumers.[42]  Plaintiffs are not entitled to summary judgment because there are legitimate factual disputes about each of those three legal issues.

To succeed on the "deception" element, Plaintiffs must demonstrate that a representation "is likely to mislead consumers acting reasonably under the circumstances."[43]  But that inquiry is a uniquely factual one that should not be decided on summary judgment.  Instead, the district court must "consider the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading."[44]  Thus, the Court must determine whether the narrow claims asserted against LeadClick—namely the "news" style format and the "comment section"—were reasonably likely to mislead reasonable consumers against the "mosaic" of  other unrelated and overwhelming representations being made to the consumers, including misrepresentations about product efficacy, about "free trials," about "nominal fees," and about "easy returns."

Here, Plaintiffs baldly contend that the news format was deceptive.  But yet they concede that these news sites were "commonplace" in the industry for many years, and provide no evidence or study demonstrating that reasonable consumers, saturated by these sites, would have believed that these were sites sponsored by legitimate news outlets.  Indeed, the evidence submitted by Plaintiffs suggests strongly to the contrary.  According to the declaration of Joanne

---

[42] Pls.' Mem. at 27–28.
[43] *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2nd Cir. 2006).
[44] *FTC v. Commerce Planet, Inc.*, 878 F.Supp. 2d 1048, 1063 (C.D. Cal. 2012).

Zak of the Better Business Bureau, over 1,100 consumers complained about LeanSpa, filling out forms that described the "nature of their grievance."[45] But those complaints "related generally to unauthorized charges that consumers incurred after they had purchased online purported trial samples of LeanSpa weight-loss products and could not cancel recurring product shipments."[46] Only a small handful of consumers even mentioned the news style format of advertising, and even those who did sought relief about LeanSpa's billing practices, not about the news format sites. At a minimum, this question presents a factual issue that cannot be decided on summary judgment.

Similarly, Plaintiffs must prove that the narrow representations were material. But they have failed to do so here. Instead, they contend, without factual support, that whether a statement is from an independent news source or an advertiser is "obviously important, and thus, material to consumers."[47] But that contention is not "obvious" and it is also undercut by Plaintiffs' own evidence. In this situation, there were numerous unrelated misrepresentations of greater import and significance; thirteen of the causes of action in Plaintiffs' Complaint itemize the deceptive marketing activities of the LeanSpa defendants—misrepresentations about free trials, billing terms, guarantees and refunds, and product efficacy—which overwhelmed any subtle suggestion that resulted from fake news sites.[48]

---

[45] *See generally* **PX 84** (Zak Decl.) (consumer complaints regarding LeanSpa largely related to customer service issues and purportedly unauthorized credit card charges).
[46] **PX 84** (Zak Decl. at ¶¶ 6, 8).
[47] Pls.' Mem. at 32.
[48] *See* **DX 6** (Plaintiffs' Third Amended Complaint makes the following allegations solely against the LeanSpa defendants:
Count 1: LeanSpa Defendants' misrepresentation that trial offers are free or risk-free;
Count 2: LeanSpa Defendants' failure to disclose terms and conditions of continuity program;
Count 3: LeanSpa Defendants' misrepresentations regarding guarantees and refunds;

Against this backdrop, it is not at all "obvious" that consumers would care one way or another about the format of one of the webpages on which consumers clicked before landing at the LeanSpa site where misrepresentations were made. Indeed, the immateriality of the news sites is confirmed by Plaintiffs' own evidence. FTC investigator Michael Marino reviewed the FTC's database of consumer complaints about LeanSpa.[49] He summarized what he termed "the relevant narrative portions" of the consumer complaints as follows:

> consumers complained that they (a) ordered what they thought was a trial product in which all they would have to pay was a low shipping and handling fee, (b) had difficulty cancelling the program or could not cancel it altogether, (c) were charged approximately $79.99, sometimes repeatedly, for products they did not want, and (d) had difficulty obtaining a refund or partial refund, in some instances even if they returned the product.[50]

Notably absent from this listing is any mention of news site advertisements, which strongly suggests that any such advertising was irrelevant and immaterial to consumers. Again, at a minimum, the question of materiality is a factual issue that cannot be decided on summary judgment.

For the same reason, the issue of consumer reliance cannot be decided in the summary judgment context. As demonstrated by consumer complaints, the cause of consumer harm was

---

Count 5: LeanSpa Defendants' false and unsubstantiated product claims;
Count 6: LeanSpa Defendants' unauthorized electronic fund transfers from consumers' banks;
Count 7: LeanSpa Defendants' trial-offer representations;
Count 8: LeanSpa Defendants' trial-offer representations;
Count 9: LeanSpa Defendants' failure to disclose cancellation procedures and costs;
Count 10: LeanSpa Defendants' failure to disclose cancellation procedures and costs;
Count 11: LeanSpa Defendants' misrepresentations about full refunds;
Count 12: LeanSpa Defendants' misrepresentations about full refunds;
Count 15: LeanSpa Defendants' improper debiting of consumer bank accounts;
Count 16: LeanSpa Defendants' improper debiting of consumer bank accounts).
[49] *See generally* **PX 80** (Marino Decl.).
[50] **PX 80** (Marino Decl. ¶ 13).

clearly the unsavory billing and return practices of the LeanSpa defendants, not any implied representations resulting "news format" advertisements.   This reality is amply demonstrated by the compelling fact that consumers who never saw any news site advertising suffered precisely the same harm as those who did.  Consumer Nelson clearly had no exposure to any news-style advertising, yet still suffered the same injury as other consumers from LeanSpa's debit card charges, refusal to cancel, and difficult refund process.[51]  Simply put, there is no causal link between the "news" style advertising and consumer harm.

        While it is certainly true that there are instances in which reliance may be "presumed," this is not one of them, and the cases cited by the FTC are inapposite.  All of those cases involve a single set of material misrepresentations made by merchants or advertisers that "strike at the heart of a consumer's purchasing decision,"[52] and those representations indisputably led directly to consumer injury.  As a result, reliance could be presumed.  But this is a different case.  In this instance, consumers were misled by the material independent and overbearing claims of "free trials," easy returns, and product efficacy—irrespective of whether they even viewed a "news" format site.  It makes no sense to "presume" that consumers materially relied on the "news" style endorsement, especially when consumer evidence demonstrates the contrary.  And, at a minimum, LeadClick is entitled to rebut this presumption.[53]

---

[51] *See* **PX 152** (Consumer Decl., Nelson Decl., FTC-LS000795-796 at 795).
[52] *Federal Trade Comm'n  v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1206 (10th Cir. 2005) (citing *Federal Trade Comm'n v. Kitco of Nev., Inc.,* 612 F. Supp. 1282, 1292 (D. Minn.1985).
[53] *FTC v. Figgie, Int'l.*, 994 F.2d 595, 606 (9th Cir. 1993) (citing *FTC v. Kitco of Nev.,* 612 F. Supp. 1282, 1293 (D. Minn. 1985)).

The present case bears a striking similarity to *FTC v. Commerce Planet, Inc.*, cited in Plaintiffs' Memorandum.[54]  In that case, the FTC sued online merchant Commerce Planet which, like LeanSpa, sold a product with a "free trial" period followed by recurring monthly billing ranging from $29.95 to $59.95.  The FTC allege that Commerce Planet deceptively marketed OnlineSupplier as a free auction kit on its website without adequately disclosing the program's negative-option plan, which required consumers to affirmatively cancel their membership or otherwise incur a monthly charge to their credit card.  Commerce Planet ultimately obtained over $45 million from over 500,000 consumers.

Commerce Planet contended that consumer confusion arose from the acts of independent third-party publishers who used unapproved advertisements.  But the Court rejected the notion that affiliate marketing was the cause of consumer injury:

> While third-party marketers may have increased traffic to the sign-up pages by, for example, use of unapproved email creatives, consumers still had to view and utilize the sign-up pages to order OnlineSupplier. **Any confusion caused by the email creative would have been countered by representations about the product on the landing and billing pages.** There is no evidence in the record that consumers ordered OnlineSupplier directly from third-party marketing materials or that third-party marketers were responsible for the sign-up pages. While affiliate fraud undoubtedly hurt Commerce Planet, it is unclear if it hurt consumers.[55]

That statement is particularly poignant when applied in the present case.  The overwhelming evidence here shows that LeanSpa, like Commerce Planet, was the cause of consumer injury, and that any affiliate marketing confusion "would have been countered by representations" on LeanSpa's own website.

---

[54] 878 F. Supp. 2d 1048 (C.D. Cal. 2012); Pls.' Mem. at 27.
[55] 878 F. Supp. 2d 1048, 1077 (C.D. Cal. 2012)(emphasis added).

In summary, Plaintiffs' motion must be denied because Plaintiffs are clearly not entitled to summary judgment on the issues of deceptiveness, materiality, or consumer reliance.

**4.      Plaintiffs' Motion Must be Denied Because They Do Not Seek Summary Judgment on LeadClick's Affirmative Defenses**

Although Plaintiffs seek entry of judgment against LeadClick in an amount over $11 million, Plaintiffs completely fail to address LeadClick's affirmative defenses.  This procedural deficiency, alone, requires denial of plaintiffs' motion for summary judgment.[56]

In this case, LeadClick has asserted seventeen separate affirmative defenses [ECF No. 255], all of which would preclude, in whole or in part, judgment against LeadClick.[57]  Prominent among those affirmative defenses is the immunity protection granted by CDA Section 230.[58] Because Plaintiffs concede that none of these defenses can be resolved on summary judgment, Plaintiffs' motion must be denied.

**5.      Plaintiffs' Motion Must be Denied Because Monetary Relief is Legally Improper Absent an Injunction.**

Plaintiffs' motion seeks judgment ordering LeadClick to "disgorge its ill-gotten gains in the amount of $11,935, 415."[59]  But as described in detail in LeadClick's motion for summary judgment,[60] the power to order repayment of funds for consumer redress is a type of ancillary

---

[56] *See, e.g., Winbourne v. E. Airlines,* 632 F.2d 219 (2nd Cir. 1980) (summary judgment order reversed due to district court's failure to consider affirmative defenses).
[57] *See* **PX 81** (LeadClick's Ans. to Third Am. Compl. at 24-28 (Affirmative Defenses)).
[58] **PX 81** (LeadClick's Ans. to Third Am. Compl. at 25 (Second Affirmative Defense)).
[59] Pls.' Mem. at 39.
[60] ECF No.295, Section IV.C.

relief to effectuate a permanent injunction.[61]  Accordingly, such monetary relief is not proper unless and until a permanent injunction is entered.

In this instance, Plaintiffs have neither moved for nor obtained an injunction against LeadClick.  Rather, Plaintiffs have spent extensive time and resources successfully enjoining the activities of the LeanSpa defendants in this case[62] and the activities of publishers in other cases,[63] seemingly conceding that there was no valid reason to seek an injunction against LeadClick, a defunct affiliate program.  This concession continues in the present motion, where Plaintiffs do not seek any injunctive relief against LeadClick, apparently acknowledging that such relief is inappropriate, and could not possibly be granted on summary judgment.

Rather, this case is the rare case that is not a "proper case[]"  under the FTC Act because it fails the test for the propriety of a permanent injunction under *United States v. W.T. Grant*.[64] Without an appropriate permanent injunction, plaintiff's ability to seek equitable monetary relief likewise vanishes.  Accordingly, plaintiffs' summary judgment motion for monetary relief should be denied for this reason as well.

---

[61] *FTC v. Medical Billers Network, Inc.,* 543 F. Supp. 2d 283, 323–324 (S.D.N.Y. 2008) (citing *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (emphasis added)).
[62] *See* ECF Nos. 3, 21, 22, 23, 24, 27,  32, 36, 119, 120, 122, 139, 177, 195, 196, 244, 267, 274 (Temporary Restraining Order and Permanent Injunction proceedings); ECF No. 274 (granting permanent injunction)
[63] *See e.g.*, *FTC v. Circa Direct, LLC, et al.,* Case No. 1:11-cv-02172-RMB-AMD, (D. N.J. Oct. 17, 2011), [ECF No. 55] (Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief).
[64] *See* 345 U.S. 629 (1953).

## III.    CONCLUSION

For the above reasons, Plaintiffs' summary judgment motion rests on fatally-flawed logic and simply fails to demonstrate an entitlement to summary judgment as a matter of law.  Based on the factual record, LeadClick, rather than the Plaintiffs, is entitled to summary judgment, and the Court should deny Plaintiffs' motion.

Dated: May 27, 2014                                  Respectfully submitted,

**K&L GATES LLP**

_/s/ David A. Bateman_
Paul F. Hancock (ct10718)
Elisa J. D'Amico (phv05670)
_Admitted pro hac vice_
K&L GATES LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 3900
Miami, FL 33131
Phone: (305) 539-3300
Fax: (305) 358-7095
paul.hancock@klgates.com
elisa.damico@klgates.com

David A. Bateman (phv06426)
_Admitted pro hac vice_
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Phone: (206) 370-6682
Fax: (206) 370-6013
david.bateman@klgates.com

David I. Monteiro (phv06205)
*Admitted pro hac vice*
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, TX 75201
Phone: (214) 939-5500
Fax: (214) 939-5849
david.monteiro@klgates.com

Walter P. Loughlin (Conn. #372525)
224 Sharp Hill Road
Wilton, CT 06897
Phone: (212) 536-3900
Fax: (212) 536-3901
walter.loughlin@klgates.com

***Attorneys for LeadClick Defendants***.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing LeadClick Defendants'

Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, on behalf of

the LeadClick Defendants, with the Clerk of the Court this 27th day of May, 2014, by using the

CM/ECF system, which will send a notice of electronic filing to all counsel on the attached

service list.

*/s/ David A. Bateman*
DAVID A. BATEMAN

# SERVICE LIST

## CASE NO. 3:11-cv-1715 (JCH)

Darren H. Lubetzky
Savvas S. Diacosavvas
Bevin Murphy
FEDERAL TRADE COMMISSION-NY
Northeast Region
1 Bowling Green, Suite 318
New York, NY 10004
Telephone: (212) 607-2829
Facsimile: (212) 607-2832/2822
Email: dlubetzky@ftc.gov
ddulabon@ftc.gov
sdiacosavvas@ftc.gov

John B. Hughes
U.S. ATTORNEY'S OFFICE-HN
157 Church Street, 23rd Floor
New Haven, CT 06510
Telephone: (203) 821-3802
Facsimile: (203) 773-5373
Email: john.hughes@usdoj.gov
**Counsel for Plaintiff, Federal Trade**
**Commission**

Matthew K. Beatman
ZEISLER & ZEISLER, P.C.
558 Clinton Avenue, PO Box 3186
Bridgeport, CT 06605-0186
Telephone: (203) 368-4234
Facsimile: (203) 367-9678
Email: mbeatman@zeislaw.com

**Counsel for Receiver**

Jonathan J. Blake
Matthew F. Fitzsimmons
Phillip Rosario
CONNECTICUT OFFICE OF THE ATTORNEY
GENERAL
110 Sherman Street
Hartford, CT 06105
Telephone: (860) 808-5400
Facsimile: (860) 808-5593
Email: jonathan.blake@ct.gov
matthew.fitzsimmons@ct.gov
phillip.rosario@ct.gov

**Counsel for Plaintiff, State of Connecticut**

David T. Grudberg
Kurtis Z. Piantek
CARMODY & TORRANCE - NEW HAVEN
195 Church St. 18th floor
PO Box 1950
New Haven, CT 06509-1950
203-777-5501
Fax: 203-784-3199
Email: dgrudberg@carmodylaw.com
kpiantek@carmodylaw.com

David N. Wynn
Mark A. Angelov
Michael S. Cryan
ARENT FOX LLP
1675 Broadway, 31st Floor
New York, NY 10019
212-484-3900
Fax: 212-484-3990
Email: wynn.david@arentfox.com
angelov.mark@arentfox.com
cryan.michael@arentfox.com

**Counsel for Relief Defendant**
**Angelina Strano**

LEADCLICK DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

Bryan C. Altman
Michael T. Smith
THE ALTMAN LAW GROUP
6300 Wilshire Boulevard
Suite 980
Los Angeles, CA 90048
323-653-5581
Fax: 323-653-5542
Email: bryan@altmanlawgroup.net
msmith@altmanlawgroup.net

Edward Wood Dunham
WIGGIN & DANA
One Century Tower
265 Church Street P.O. Box 1832
New Haven, CT 06508-1832
203-498-4400
Fax: 203-782-2889
Email: edunham@wiggin.com

William I. Rothbard
LAW OFFICES OF WILLIAM I. ROTHBARD
1217 Yale St., Suite 104
Santa Monica, CA 90404
310-453-8713
Fax: 310-453-8713
Email: bill@rothbardlaw.com

**Counsel for Defendants, LeanSpa, LLC,
NutraSlim, LLC, NutraSlim U.K. LTD, and
Boris Mizhen**

James T. Cowdery
Thomas J. Murphy
John P. D'Ambrosio
COWDERY, ECKER & MURPHY
280 Trumbull Street
22nd Floor
Hartford, CT 06103
860-278-5555
Fax: 860-249-0012
Email: jcowdery@cemlaw.com
tmurphy@cemlaw.com
jdambrosio@cemlaw.com

Garret Rasmussen
Jonathan Direnfeld
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1152 15th Street, NW
Washington, D.C. 20005
202-339-8400
Fax: 202-339-8500
Email: grasmussen@orrick.com

**Counsel for Defendant, Richard Chiang,
individually**

Paul F. Hancock
Elisa J. D'Amico
K&L GATES LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 3900
Miami, FL 33131
Phone: (305) 539-3300
Fax: (305) 358-7095
Email: paul.hancock@klgates.com
elisa.damico@klgates.com

Walter P. Loughlin
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Phone: (212) 536-3900
Fax: (212) 536-3901
Email: walter.loughlin@klgates.com

David A. Bateman
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Phone: (206) 370-6682
Fax: (206) 370-6013
Email: david.bateman@klgates.com

David I. Monteiro
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: (214) 939-5500
Fax: (214) 939-5849
Email: david.monteiro@klgates.com

**_Counsel for Relief Defendant,_**
**_CoreLogic, Inc._**