UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, et al., | : | CIVIL ACTION NO. |
| | : | 3:11-CV-1715 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LEANSPA, LLC, et al., | : | MARCH 5, 2015 |
| Defendants. | : | |

**RULING RE:  MOTION IN LIMINE TO EXCLUDE EXPERT REPORT
AND TESTIMONY (Doc. No. 290), AND MOTIONS FOR SUMMARY
JUDGMENT FILED BY THE FEDERAL TRADE COMMISSION AND
THE STATE OF CONNECTICUT (Doc. No. 292), AND LEADCLICK
MEDIA, INC. (Doc. No. 294) AND CORELOGIC, INC. (Doc. No. 299).**

## I.    INTRODUCTION

This case arises out of the use of fake news websites to market products over

the internet.  On August 28, 2013, the plaintiffs, the Federal Trade Commission (the

"FTC") and the State of Connecticut, filed their Third Amended Complaint for Permanent

Injunction and Other Equitable Relief (Doc. No. 246) (the "Complaint") against individual

defendants Boris Mizhen and Richard Chiang, as well as entity defendants LeanSpa,

LLC, NutraSlim, LLC, and NutraSlim, U.K., Ltd. (collectively, "LeanSpa"), and LeadClick

Media, Inc. and LeadClick Media, LLC (collectively, "LeadClick").  The Complaint also

makes claims against two relief defendants, Angelina Strano ("Strano") and CoreLogic,

Inc. ("CoreLogic").  The Complaint alleged that LeadClick represented (1) that "objective

news reporters have performed independent tests demonstrating the effectiveness of

[LeanSpa's products]" and (2) that "comments following these 'news reports' express

the views of independent consumers," when no such news reporters had performed

independent tests and the comments following the reports did not express the views of

1

independent consumers.  Compl. ¶¶ 82–83; 122–23.  The plaintiffs also alleged that CoreLogic received "funds that are proceeds of . . . [LeadClick's] unlawful acts and practices," even though it had no legitimate claim to those funds and would be unjustly enriched if it were not required to disgorge them.  Id. ¶¶ 141–42.

The claims against Mizhen, Strano, LeanSpa, and Chiang were resolved in Stipulated Orders (Doc. No. 274 (addressing the claims against Mizhen, Strano, and LeanSpa) (the "LeanSpa Stipulated Order")), (Doc. No. 286 (addressing the claims against Chiang) (the "Chiang Stipulated Order")).  This Ruling addresses only the plaintiffs' claims against LeadClick and CoreLogic.

CoreLogic and LeadClick filed a Motion in Limine (Doc. No. 290) to exclude the testimony and expert report of Thomas P. Van Wazer.  The plaintiffs filed a Motion for Summary Judgment (Doc. No. 292) against LeadClick and CoreLogic, arguing that LeadClick violated the Federal Trade Commission Act (the "FTCA") and the Connecticut Unfair Trade Practices Act ("CUTPA") and that CoreLogic must "disgorge the ill-gotten gains it obtained from LeadClick."  LeadClick also filed a Motion for Summary Judgment (Doc. No. 294) of its own, arguing that:  it cannot be liable for the alleged FTC Act or CUPTA violations; it is immune from liability under Section 230 of the Communications Decency Act; and, the monetary relief sought by the plaintiffs would be improper.  Finally, CoreLogic also filed a Motion for Summary Judgment (Doc. No. 299), arguing that it is not liable as a relief defendant because LeadClick is not liable as a conduct

defendant, it had a legitimate claim to all money that it received, and it was not the immediate recipient of the money transferred from LeadClick as moot.[1]

For the reasons that follow, plaintiffs' Motion for Summary Judgment (Doc. No. 292) is granted, LeadClick's Motion for Summary Judgment (Doc. No. 294) is denied, CoreLogic's Motion for Summary Judgment (Doc. No. 299) is denied, and the defendants' Motion in Limine (Doc. No. 290) is terminated as moot.

## II.    FACTUAL BACKGROUND[2]

The instant Motions concern the relationships among LeadClick, LeanSpa, and online promoters of LeanSpa's products.  Amidst the various disagreements over characterizations, there is agreement on the material facts.[3]  The parties' Rule 56(a) Statements, and the evidence cited therein, establish as undisputed the following.

### A.    Facts Related to the Claims Against LeadClick

LeanSpa sold purported weight-loss and colon-cleanse products under various brand names.  See Pls.' 56(a)2 Statement (Doc. No. 315-1) ¶ 9.  LeanSpa used a number of means to sell its products.[4]    Relevant here, LeanSpa marketed and sold its

---

[1]  LeadClick also filed a Motion for Leave to File a Response to Plaintiffs' Notice of Supplemental Authority (Doc. No. 329).  The court grants that Motion.

[2]  The parties submitted separate Rule 56(a) Statements for each motion for summary judgment.  Because the Motions all relate to the same underlying facts, the court draws from all of them.  The court generally cites to Rule 56(a)2 Statements to show the underlying 56(a)1 Statement and the response to that Statement.

[3]  LeadClick objects to a number of asserted facts on the ground that "any factual assertions that do not fall within th[e] narrow 'bright line' test are irrelevant and immaterial."  See Defs.' Rule 56(a)2 Statement (Doc. No. 316) at 2.  Because the court does not apply this bright line test, these objections are overruled.

[4]  The plaintiffs alleged that LeanSpa itself engaged in illegal conduct in the ways that it marketed and sold its products.  See generally Compl.  The court more fully laid out these allegations in its Ruling

products through websites it owned and operated.  Pls.' Rule 56(a)2 Statement ¶ 9.  It also hired LeadClick,[5] so that its products could be advertised on LeadClick's affiliate marketing network.  See Def.'s Rule 56(a)2 Statement ¶¶ 53–54.

> 1.    LeadClick's Business

"LeadClick had two categories of business, 'core' and 'eAdvertising.'"  Id. ¶ 9. "The 'core' side of LeadClick's business generated customer leads (contact information for potential customers) for LeadClick's clients to contact in order to sell a product."  Id. ¶ 11.  LeadClick also operated an affiliate marketing network for online advertising through its eAdvertising division.  Pls.' Rule 56(a)2 Statement ¶ 4.  "Affiliate marketing is a very common practice of Internet-based advertising."  Id. ¶ 5.  It involves one entity compensating others for their efforts at marketing the goods or services of an online retailer.  Id.  The entities engaging in marketing efforts are referred to in the industry as "publishers" or "affiliates," and the online retailers that are having their goods or services promoted are referred to as "merchants."  Id.  An affiliate network "acts as an intermediary bridging and servicing relationships with multiple merchants and affiliates." Defs.' Rule 56(a)2 Statement ¶ 13.  "Affiliate networks gather 'offers,' which are the products and services sold by various merchants, and recruit affiliate marketers to drive

---

Re: Motions to Dismiss.  See F.T.C. v. LeanSpa, LLC, 920 F. Supp. 2d 270, 273 (D. Conn. 2013).  On January 7, 2014, those claims were resolved in a Stipulated Order.

[5] LeadClick Media, LLC, is the successor to LeadClick Media, Inc., and it is a subsidiary of CoreLogic, Inc.  Id. ¶ 1.  First American Corporation ("First American") acquired LeadClick Media, Inc. through various corporate transactions.  Id.  On June 1, 2010, First American reincorporated and changed its name to CoreLogic, Inc.  Id.  LeadClick, Inc., was an indirect subsidiary of CoreLogic until January 2011, when it became a direct subsidiary.  Id.

On or before September 30, 2011, CoreLogic closed LeadClick's affiliate marketing network and terminated its employees.  Id. ¶ 2.  CoreLogic then transformed the non-operational LeadClick Media, Inc. into LeadClick Media, LLC, which is a current subsidiary of CoreLogic, albeit one that has never had any operations.  See id. ¶ 3.

Internet traffic to those offers on merchants' websites." Id. ¶ 14.  By gathering a variety of merchant offerings, such a network is desirable because it "allows publishers to more easily find and participate in advertising for particular merchants" which, in turn, "allows online merchants to reach more publishers and thereby a larger audience."  Pls.' Rule 56(a)2 Statement ¶ 7.

Affiliates promote merchants' goods or services in various ways, including e-mail marketing, banner advertisements, and search-engine placement.  Id. ¶ 6.  They also create their own webpages to advertise merchants' businesses.  Id.  Of course, critical to any affiliate marketing technique is a "technical mechanism by which an interested consumer's 'click' on a publisher's advertisement can be tracked and routed to a merchant's website."  Id.  For this reason, LeadClick contracted with "WebApps, LLC to use WebApp's proprietary, affiliate marketing software platform called HitPath."  Defs.' Rule 56(a)2 Statement ¶ 18.  HitPath allowed LeadClick's eAdvertising Network "to track the flow of traffic from each individual affiliate's marketing website to each individual merchant's website."  Id.  ¶ 19.

In support of the eAdvertising Network, LeadClick employed affiliate managers to manage relationships with affiliates.  Id. ¶ 22.  Similarly, it employed account managers to manage relationships with merchants.  Id. ¶ 23.  In 2010 and 2011, eAdvertising had three affiliate managers.  See id. ¶ 24.  Among other things, affiliate managers were tasked with finding new affiliates.  See id. ¶ 93.  They also researched affiliates and the products that such affiliates advertised.  See id. ¶ 94.  In order to bring in new affiliates, the affiliate managers would communicate with publishers to inform them of current offers being run.  See id. ¶ 95.  When publishers were interested in joining the

eAdvertising Network, they had to apply, and LeadClick would then decide which publishers to accept.  See id. ¶ 97.  Even after a publisher was accepted as an affiliate of eAdvertising, LeadClick restricted the particular merchant offers available to certain affiliates.  See id. ¶ 99.

>   2.   The Relationship between LeanSpa and LeadClick

In August 2010, an eAdvertising account manager contacted Mizhen, the CEO of LeanSpa, to tell him that LeanSpa would be a great fit for the eAdvertising network. See Defs.' Rule 56(a)2 Statement ¶ 84 (citing PX 45).[6]  LeadClick signed its first contract with LeanSpa on September 3, 2010.  See id. ¶ 53.  LeadClick and LeanSpa entered into ten contracts for a number of LeanSpa's products.  Id. ¶ 54.

The essential structure of the contracts between LeanSpa and LeadClick was as follows:  LeanSpa paid LeadClick a set amount – between $35 and $45 – each time a consumer enrolled in LeanSpa's free-trial program after having been directed to LeanSpa's website by a LeadClick affiliate.  Pls.' Rule 56(a)2 ¶ 12.  Thus, payments were made on a cost per action ("CPA") basis, with the "action" being a consumer's enrollment in LeanSpa's free-trial program.  See id.; Defs.' Rule 56(a)2 Statement ¶ 37.

When an action that triggered payment from LeanSpa to LeadClick occurred, LeadClick became obligated to pay the affiliate whose website drove the consumer to LeanSpa's website.  See Pls.' Rule 56(a)(2) Statement ¶ 12; Defs.' Rule 56(a)2 Statement ¶ 37.  LeadClick kept between 10 and 20 percent of the money owed by

---

[6] The court cites plaintiffs' Exhibits in Support of their Motion for Judgment as PX.

LeanSpa on a given action, and it paid the rest to the affiliate.  See Defs.' Rule 56(a)2 Statement ¶ 38; Pls.' Rule 56(a)(2) Statement ¶ 12.[7]

>3.      Fake News Sites

In promoting LeanSpa products through the eAdvertising Network, some affiliate marketers used "fake news sites."  See Defs.' Rule 56(a)2 Statement ¶ 109–11.  At the time, these fake news sites were fairly common in the affiliate marketing industry, and they had been in use for some time before LeanSpa hired LeadClick.  See Pls.' Rule 56(a)2 Statement ¶¶ 19, 25; Defs.' Rule 56(a)2 Statement ¶¶ 133–35.  Characteristic of these fake news sites were: claims of independent testing and analysis; statements about weight loss results; comments that appeared to be offered by independent consumers; the name of a reporter; and logos of genuine news organization.  See Defs.' Rule 56(a)2 Statement ¶¶ 110–11 (citing PX 59, 60, 61).  In fact, there was no such independent testing, independent consumer comments, or association with news organizations.  See id.

While the parties fiercely dispute the legal implications of LeadClick's conduct with respect to fake news pages, there appears to be little dispute as to what, in fact, LeadClick's conduct was, and any dispute between the parties in this regard is not material to the court's legal analysis.  Both before and during its business relationship with LeanSpa, certain LeadClick employees knew that fake news sites were common in the affiliate marketing industry.  See id. ¶¶ 132–40.  LeadClick required affiliates to

---

[7] The parties dispute some of the details of LeadClick's arrangements with LeanSpa or the affiliates.  For example, the parties disagree whether the consumer's action triggering payment from LeanSpa constituted a "sale."  See Defs.' Rule 56(a)2 Statement ¶ 57.  The parties also dispute what percent of LeanSpa's payment to LeadClick that LeadClick kept and when affiliates were entitled to payment from LeadClick.  See Pls.' Rule 56(a)2 Statement ¶ 12.  However, these disputes are immaterial.

apply in order to join its eAdvertising Network, and it would then decide which of the applicants to accept.  See id. ¶ 97.  Despite this knowledge and the ability to deny applicants, see id. ¶¶ 97, 132–40, LeadClick hired affiliates who used fake news pages to promote LeanSpa.  See, e.g., id. ¶¶ 109–11.  At least some LeadClick employees were aware that affiliates were using fake news pages on eAdvertising.  Id. ¶¶ 134–37.  LeadClick staff occasionally discussed fake article pages, fake news pages, or "news style" pages among themselves and with affiliates and merchants.  Id. ¶¶ 138, 142–45.  On some occasions, LeadClick allowed or, at least, failed to object to the use of fake news pages.  See id. ¶¶ 137–40.[8]

In certain regards, LeadClick employees' knowledge of fake news sites was more specific than a mere general awareness of their existence.  For example, some fake news sites paired "Step 1" and "Step 2" products, which together comprised the weight loss program being reviewed by the supposed news reporter.  See id. ¶ 136.  "LeadClick employees referred to 'Step 1' and 'Step 2' when discussing product pairings on affiliates' websites."  Id. ¶ 137.  LeadClick staffs' references to Step 1 and Step 2 were made in conversations with LeanSpa and with affiliates.  See id.  In one instance, Mizhen instructed Chiang to have eAdvertising affiliates use a certain Step 1 and Step 2 product pairing.  See id. (citing PX 22, Chiang Dep. 58:7–60:8; PX 30, Chiang Ex. 8).  In another, a LeadClick employee and an affiliate discussed the affiliate's Step 1 and Step 2 product pairing.  See id. (citing PX 111, at LCM22108, 22110); see also id. (citing PX

---

[8] LeadClick argues that the ultimate decision to use fake news pages to advertise was made by merchants like LeanSpa.  See Defs.' Rule 56(a)2 Statement ¶ 140.

112, at LCM 21589–91 (affiliate and affiliate manager discuss LeanSpa offers and Step 1 and Step 2 product pairing)).

Further, LeadClick employees sometimes suggested that affiliates change certain aspects of their websites.  <u>See id.</u> ¶ 104.[9]  In one instance, a LeadClick employee told an affiliate marketer that he could not mention anything about a free trial, and the LeadClick employee made a suggestion about how to state the degree of weight loss experienced by using a product.  <u>See id.</u> ¶ 103 (citing PX 68, Redmond Ex. 7, at LCM19403–04).  In another instance, a LeadClick employee sent ingredient information about one of LeadClick's products to an affiliate, informing the affiliate that the information could be used on his page.  <u>See id.</u> (citing PX 106, at LCM20190–98); <u>see also id.</u> (citing PX 107, at LCM19560 (suggesting that the affiliate include information on page about the benefits of one of LeanSpa's product's ingredients)).  On one occasion, after state action against another network, an affiliate manager checked in with an affiliate to make sure his webpage was "set up good [sic]," without any "crazy miss leading [sic] info."  <u>See id.</u> (citing PX 64, Davidson Ex. 13 at FTC-LS-493396–97).  The affiliate manager agreed that it would be a "good idea" for the affiliate to remove references to the webpage being a news site, and the affiliate manager suggested that he could "just add advertorial."  <u>Id.</u>

---

[9] LeadClick admits that LeanSpa provided requirements for affiliate marketers' advertisements, that LeadClick "provided these requirements to affiliates," and that "it reviewed proposed advertisements for compliance with LeanSpa's requirements."  Defs.' Rule 56(a)2 Statement ¶ 103.  It also admits that one of its affiliate managers, Quentin Redmond, "discussed immaterial changes in a website utilized by [an] affiliate . . . to make the website clearer."  <u>Id.</u>  LeadClick denies that it "had any role whatsoever in creating, designing or publishing any of the allegedly deceptive content of any affiliate 'news site.'"  Other than an affiliate manager stating that he did not know whether he had provided feedback to publishers, LeadClick points to no evidence rebutting the plaintiff's evidence cited in paragraph 103 of its 56(a)1 Statement.  <u>See</u> Defs.' Rule 56(a)2 Statement ¶ 103 (citing PX 65 90:14–17).

LeadClick also engaged in "media buying," which entailed purchasing advertising

space for its merchants and affiliates.  See id. ¶¶ 150–67.  Indeed, when LeadClick

contacted Mizhen to solicit business from LeanSpa, the account manager referred to

LeadClick's media buying as a way to "generat[e] quality traffic in very lucrative

placements."  See id. ¶ 167 (citing PX 45 at LCM 28646).[10]  As part of its media buying

effort, LeadClick approached media sellers, including genuine news outlets, and

negotiated the purchases of media space for banner ads.  See id. ¶¶ 158, 161.  After

LeadClick purchased media space, it would resell such space to others, including

affiliate publishers, at a profit.  See id. ¶ 159.  Some of this media space contained

banner advertisements linking to fake news pages that promoted LeanSpa's products.

See id. ¶¶ 151, 157.  "Sometimes LeadClick identified fake news sites as destination

pages for the banner advertisements when negotiating with media sellers," and

"sometimes it identified the destination webpage by emailing the media seller a

compressed version of the affiliate's page" or by providing the web address for the

destination page  Id. ¶¶ 152–54.[11]  When it resold media space to affiliates, in at least

some cases, it withheld the identity of the media seller.[12]  See id. ¶ 160.  At certain

times, including late 2010 and early 2011, LeadClick spent between $1 and $2 million

---

[10] LeadClick denies that this supports an inference that it "touted" its media buying capabilities, but it does not deny the fact that this e-mail was sent or its contents.  See Defs.' Rule 56(a)2 Statement ¶ 167.

[11] LeadClick states that the "[d]estination pages for any advertisements were identified, created and within the sole control of LeadClick's customer-advertiser, not LeadClick."  See Defs.' Rule 56(a)2 Statement ¶¶ 152–53.  However, it cites no evidence in support of that statement, id., and therefore the plaintiffs' statements are admitted.  D. Conn. L. R. Civ. Pro. 56(a)1–3.

[12] It is unclear whether LeadClick disputes this fact.  Although it does not explicitly admit to plaintiff's Rule 56(a)1 Statement ¶ 160, it seems to only specifically deny that the term "'blind advertising' is . . . a generally accepted industry term."  Defs.' Rule 56(a)2 Statement ¶ 160.

on media buying per month.  See id. ¶ 162.  Media space was purchased in units of 1,000 displays, and LeadClick typically "paid in the order of $4 or less per 1,000 showings."  See id. ¶¶ 163–64.

In addition to LeadClick's activities related to affiliate marketing, plaintiffs also argue that LeadClick's role in helping LeanSpa to overcome its financial woes contributed to a violation of Section 5 and CUTPA.  VISA placed LeanSpa in one of its merchant monitoring programs because of the amount of charges that were being disputed by consumers.  See id. ¶ 50.  These disputed charges are known as "chargebacks."  See id.  Three United States-based banks terminated LeanSpa's merchant accounts and stopped processing sales for LeanSpa because of its excessive level of chargebacks.  See id. ¶ 51.  Certain LeadClick officials "understood that credit card associations monitor chargeback rates and that merchants were subject to a chargeback ceiling of 1% of sales."  Id. ¶ 170.  Some officials at LeadClick knew that LeanSpa was having issues with chargebacks.  See id. ¶ 171.  Indeed, Mizhen communicated to LeadClick "what need[ed] to be done in order to 'outgrow [LeanSpa's] last month's chargebacks."  See id. ¶ 172 (quoting PX 48, Olsen Dep. 102:9–11).[13] LeadClick admits that it "upon occasion made additional publishers aware of LeanSpa campaigns in response to LeanSpa requests for higher traffic levels."  Id. ¶ 174.[14]

---

[13] LeadClick denies plaintiffs' statement that LeadClick "adjusted the amount of Internet traffic it generated for LeanSpa through the eAdvertising Network, at LeanSpa's request, for the admitted purpose of diluting LeanSpa's chargeback ratio."  However, it supports this denial solely with a citation to Jaime Olsen's testimony, which includes Olsen's explanation of an instance in which Olsen understood LeanSpa to be in breach of the chargeback ratio because Mizhen had contacted him after arriving at a "certain number of sales per day that he thought would allow him to dilute his chargeback ratio enough such that he would no longer be in breach."  See id. ¶ 172 (quoting PX 48, Olsen Dep 102:17–103:11).

Further, Chiang, a Vice President at LeadClick who oversaw eAdvertising and its staff, knew that First Bank of Delaware ("FBOD") was LeanSpa's credit card processing bank.  See id. ¶¶ 25–26, 177–78.  Mizhen informed Chiang that FBOD would no longer service LeanSpa's merchant account, temporarily in January 2011 and permanently in April 2011.  See id. ¶ 178.  Mizhen eventually asked Chiang for assistance with offshore credit processing.  See id. ¶ 179 (citing PX 22, Chiang Dep. 106:2–107:7).  Chiang agreed to help Mizhen find a new credit card processor and, after searching through his contacts, he introduced alternate processors to Mizhen.  See id. ¶¶ 180–82.  Mizhen ultimately replaced FBOD with CCHain Process, which was an offshore processor that Chiang had introduced to him.  Id. ¶ 182.

Despite these issues, LeanSpa eventually became LeadClick's top producer.  Id. ¶ 66.  LeadClick's billings to LeanSpa increased from over $30,000 in September 2010 to over $2,000,000 in December 2010.  Id. ¶ 62.  However, as LeadClick's billings increased, LeanSpa's debt to LeadClick grew.  Id. ¶¶ 59, 63–65.  Because of this growing balance, "LeadClick's finance director recommended that LeanSpa 'be immediately shutoff or go on prepay-plus payment plan.'"  Id. ¶ 59.  LeadClick made efforts to collect the balance that LeanSpa owed it in order to make money for itself.  Id. ¶ 61.  Despite these efforts, LeanSpa owed LeadClick $6.4 million by March 2011 and around $10 million by June 2011.  Id. ¶¶ 63–64.  LeadClick continued to conduct business with LeanSpa in order to collect payments from it.  Id. ¶ 66.  Ultimately, from September 2010 through June 2011, LeadClick billed LeanSpa $22 million in business,

---

[14] While LeadClick denies that it, "on a regular basis, actively recruited more affiliate marketers to the LeanSpa campaigns when Mizhen reported an immediate need to surge traffic in order to reduce his chargeback ratio by month's end," it cites no evidence in support of its denial.  See id. ¶ 174.

but LeanSpa only paid $11.9 million of it.  Id. ¶ 68.  Despite the fact that LeanSpa's debt

to LeadClick grew, LeadClick continued to satisfy its contractual obligations to affiliate

publishers.  See id. ¶¶ 204–06.  In September 2011, CoreLogic decided that LeadClick

should sue LeanSpa for the unpaid amount, and the business relationship between

LeadClick and LeanSpa ended.  Id. ¶ 208.

> B.    Facts Related to the Claim Against CoreLogic[15]

At the end of August 2011, LeadClick closed its bank account at Mechanics Bank

and withdrew the entire balance as a cashier's check in the amount of $4,067,203.75.

FTC Rule 56(a)2 Statement (Doc. No. 309) ¶ 1.  Days later, LeadClick deposited the

check into its account at Bank of America, N.A. ("BOA"), and CoreLogic's cash

management system transferred the balance of LeadClick's BOA account to a bank

account held by CoreLogic US, Inc. ("CLUSI") through an automatic sweep.  Id. ¶¶ 1–2.

Later that day, CoreLogic's cash management system automatically swept an amount,

which included the $4.1 million originally in LeadClick's account, from CLUSI's BOA

account to another BOA account held by CoreLogic.  Id. ¶ 2.

These transfers were related to CoreLogic's decision to bring LeadClick into its

shared services program.  Id. ¶ 4.  "'Shared services' refers to a program of

consolidated back-office functions across related companies. . . .  In a shared services

program, a single team handles administrative functions for all the other companies[.]"

Id. ¶ 7.  These shared service programs "are common among large companies with

subsidiaries because of the advantages they provide," such as allowing subsidiaries to

focus on their business operations without having to duplicate administrative functions,

---

[15] Only the FTC made a claim against CoreLogic.  See Compl., Count Eighteen ¶¶ 141–43.

decreasing subsidiaries' expenses due to efficiencies and economies of scale, and enhancing the consistencies of operations and recordkeeping.  Id. ¶ 8.  Specifically, CoreLogic's shared services for LeadClick and other subsidiaries that were formerly part of CLUSI's predecessor included various accounting functions such as accounts payable and accounts receivable.  See id. ¶¶ 9–11.

LeadClick began integrating into the shared services program in October 2010. Id. ¶ 15.  As was customary for CoreLogic, "the accounts payable transition occurred first, beginning in January 2011, and the accounts receivable process transitioned several months later, beginning in July 2011."  Id. ¶ 16.  "LeadClick's and CoreLogic's understanding and agreement from the outset of the shared services transition was that CoreLogic would use its treasury funds to pay LeadClick's invoices during this transition period, but that CoreLogic would eventually begin collecting LeadClick's receipts into its treasury funds as well, thereby recouping those prior advances."  Id. ¶ 18.

"CoreLogic advanced approximately $16 million to LeadClick from January 2011 through August 2011."  Defs.' Rule 56(a)2 Statement ¶ 196.  "By the end of August 2011, LeadClick had transferred a total of $8.2 million back to CoreLogic through the cash management system."  FTC Rule 56(a)2 Statement ¶ 22.  "There was no agreed upon repayment schedule or repayment deadline, no security for those advances, no written loan agreement, and no interest due in connection with the funds CoreLogic provided to LeadClick in 2011."  Defs.' Rule 56(a)2 Statement ¶ 200; see also FTC Rule 56(a)2 Statement ¶ 39 ("Companies generally do not charge interest on intercompany balances created by shared services activity in commercial practice.").

14

In late September 2011, CoreLogic's Board of Directors voted to cease LeadClick's operations.  FTC Rule 56(a)2 Statement ¶ 32.  "The decision to close LeadClick's Mechanics Bank account was unrelated to and independent of the later decision to close LeadClick."  Id. ¶ 34.

In 2008, the predecessor-in-interest to CLUSI "entered into a promissory note and loan agreement with LeadClick under which [CLUSI's predecessor] agreed to lend LeadClick up to $15.7 million on a revoloving basis."  Id. ¶¶ 49–50.  As of August 2011, LeadClick still owed CLUSI $8 million in principal under that note and agreement.   Id. ¶ 51.

## III.    STANDARD

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In Re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  "[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F .3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

**IV.    DISCUSSION**

The instant Motions require the court to address the following issues: (1) LeadClick's liability under the FTCA and CUTPA; (2) immunity under Section 230 of the Communications Decency Act; (3) the plaintiffs' ability to obtain remedies under Section 13(b) of the FTCA; and (4) CoreLogic's liability as a relief defendant.

A.    Liability Under The FTCA and CUTPA

The plaintiffs argue that LeadClick engaged in deceptive marketing practices in violation of Section 5 and CUTPA.  Pls.' Mem. Supp. Summ. J. (Doc. No. 304) at 29. LeadClick argues that it did not directly violate the FTCA or CUTPA and that there is no aiding and abetting liability under that statute.  See Defs.' Mem. Opp. (Doc. No. 312) at 6; Defs.' Mem. Supp. (Doc. No. 295) at 15.[16]

Section 5 of the FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  The tests for determining liability for deception under Section 5 of the FTCA and CUTPA are virtually identical, and they are both well-established.[17]  "To prove a deceptive act or practice under § 5(a)(1), the FTC must show three elements: [1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstance, and [3], the representation, omission, or practice is material."  F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 63 (2d Cir. 2006) (internal quotation marks omitted); Caldor, Inc. v. Heslin, 215 Conn. 590, 597 (1990) (noting that "federal courts have determined that an act or practice is deceptive if three requirements are met," and stating those elements).

---

[16] The plaintiffs do not argue that LeadClick aided and abetted the deception of others.

[17] The plaintiffs do not pursue an unfairness theory.

16

1.      The Fake News Sites Were Deceptive

The court first addresses whether, based on the undisputed evidence, the fake news sites used to promote LeanSpa products were "likely to mislead consumers acting reasonably under the circumstance" as a matter of law.  The court first addresses whether the fake news sites made the representations alleged by the plaintiffs, and then whether those claims are deceptive.

i.      Claims Made by the Sites

To determine whether an advertisement makes a certain claim, a court may look to the representation itself or to extrinsic evidence.  See F.T.C. v. Bronson Partners, LLC, 564 F. Supp. 2d 119, 125 (D. Conn. 2008).  "If an advertisement makes a claim expressly, then extrinsic evidence is not necessary."  Id. (citing Kraft, Inc. v. F.T.C., 970 F.2d 311, 318 n.4 (7th Cir. 1992)).  "Even if an advertisement makes a claim by implication, extrinsic evidence is not always necessary."  Id. at 126.  Specifically, extrinsic evidence is not necessary where a claim is clear from the face of the advertisement.  See id. 127–28.

Here, the plaintiffs have submitted exhibits that LeadClick admits are "typical" of fake news sites.  See Defs.' Rule 56(a)2 Statement ¶ 110; PX 59, 60, 61.  The exhibits cited by the plaintiffs – plaintiffs' Exhibits 59, 60, and 61 – clearly show logos of genuine news outlets.  The exhibits are formatted like news articles, including a picture of the purported reporter.  Indeed, in all three exhibits, a caption under the picture of the reporter reads, "Julie investigates the Acai Berry diet to find out for herself if this super diet works."  Moreover, the articles state, "[W]e here at [purported news station] are a little skeptical and aren't sure that we've seen any real proof that these pills work for

17

weight loss.  So we decided to put these products to the test.  What better way to find out the truth than to conduct our own study?"  The article then goes on to describe a week-by-week analysis of the reporter's results in using LeanSpa products, and concludes, "After conducting our own personal study we are pleased to see that people really are finding success with it (myself included :) )."

Thus, the fake news page format expressly claims that a reporter is conducting independent tests of the products.  Because this claim is expressly made and, as a result, is clear from the face of the fake news format, no reasonable jury could conclude that the fake news sites were not making claims of independent testing.

Regarding the purportedly independent consumer comments, Exhibits 59, 60, and 61 all contain a "Comments" section.  While there is no express statement that the comments are made by independent consumers, the implication is so clear that no reasonable jury could conclude otherwise.  For example, the first comment in each of the exhibits states,

> My friends and I have all been waiting for the hca cleanse diet to hit the news.  Atleast [sic] 5 of us have all done the diet (costing us upwards of $300+) and we all lost a bunch of weight.  This stuff truley [sic] is incredible and has changed all of our lives.  Good luck to everyone who takes advantage of this wonderful opportunity.

There can be no genuine dispute about whether the fake news pages are formatted to convey that the comments are provided by independent consumers.

### ii.    The Deceptiveness of the Claims

In determining whether a representation or practice is likely to mislead consumers, courts are to consider the overall, common sense impression resulting from a representation.  <u>See, e.g.</u>, <u>F.T.C. v. Stefanchik</u>, 559 F.3d 924, 928 (9th Cir. 2009)

("Deception may be found based on the 'net impression' created by a representation."). "It is . . . necessary . . . to consider the advertisement in its entirety and not to engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately."  F.T.C. v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963).

More specifically, the Supreme Court has ruled "that it is a deceptive practice to state falsely that a product has received a testimonial from a respected source."  F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 389 (1965).  Indeed, deception results simply from the fact that "the seller has told the public that it could rely on something other than his word." Id.  Summary judgment is appropriate where there is no evidence that testimonial-style advertising is genuine.  See F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1228 (D. Nev. 2011) ("Defendants fail to present any admissible evidence raising a genuine issue of material fact that any of the non-celebrity testimonials are genuine or accurate. FTC therefore is entitled to summary judgment on count six."), aff'd in part, vacated in part on other grounds, 763 F.3d 1094 (9th Cir. 2014).

Here, LeadClick admits that the "claims of independent analyses and tests, weight loss results, and consumer comments" were fake.  See Defs.' Rule 56(a)2 Statement ¶ 111.  LeadClick presents no evidence that any independent reporter tested LeanSpa products or that the consumer comments were provided by independent consumers.  Therefore, the claims made by the fake news sites were deceptive as a matter of law.

2.      The Misrepresentations Were Material

"A material misrepresentation is one that involves information that is important to consumers, and that is therefore likely to affect a consumer's choice of or conduct regarding a product."  Bronson Partners, LLC, 564 F. Supp. 2d at 135 (internal quotation marks omitted).  Courts may presume certain "types of claims to be material, including any express claim, or implied claims where there is evidence that the seller intended to make the claim."  Id. (internal quotation marks omitted).  Underlying this presumption is an assumption that "the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising."  Id.

As discussed, the claim of independent investigation was made expressly, so it can be presumed material.  See id.  Similarly, the claim that the comments were provided by independent consumers is so strongly implied that it is essentially express, so it can also be presumed material.  LeadClick provides no evidence to rebut these presumptions.  Finally, and more importantly, even with the presumption of materiality aside, no reasonable juror could find that claims of independent testing – by consumers or reporters – were not important to consumers' choice.

LeadClick argues that whether a claim is materially misleading is a "uniquely factual [inquiry] that should not be decided on summary judgment." LC Opp. Pls.' Summ. J. (Doc. No. 312) at 16.  According to LeadClick, the court should instead consider "whether the narrow claims asserted against [it]—namely the 'news' style format and the 'comment section'—were reasonably likely to mislead reasonable consumers against the 'mosaic' of other and overwhelming representations being made to the consumers, including misrepresentations" made by LeanSpa.  Id.  However, the

plaintiffs correctly point out that one material misrepresentation is not excused by the existence of another misrepresentation.  See Colgate-Palmolive Co., 380 U.S. at 391 ("[W]e fail to see why respondents should be sheltered . . . with respect to one deceptive practice merely because they also engaged in another.").  Indeed, an advertisement's material misrepresentation violates Section 5 where it generates a consumer's interest, even if the consumer becomes fully informed before ultimately purchasing the advertised product.  See, e.g., Resort Car Rental Sys., Inc. v. F.T.C., 518 F.2d 962, 964 (9th Cir. 1975) ("The Federal Trade Act is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); Exposition Press, Inc. v. F.T.C., 295 F.2d 869, 873 (2d Cir. 1961) ("The law is violated if the first contact is secured by deception, even though the true facts are made known to the buyer before he enters into the contract of purchase.").  If full information does not save a deceptive claim from violating Section 5, neither does an additional deceptive claim.

### 3.    Representation, Omission, or Practice

The last issue concerning FTCA and CUTPA liability is whether LeadClick can be liable for its conduct related to the fake news sites, despite plaintiffs' concession that LeadClick did not create the fake news sites and plaintiffs' claim that the deception in this case resulted from claims made by the fake news sites.  See Compl., Counts 4 (violation of the FTCA) and 13 (violation of CUTPA); Pls.' Reply 1 ("Plaintiffs never said LeadClick . . . created [fake news sites] for the affiliates.").[18]

---

[18] At oral argument, the plaintiffs described their theory in terms of agency principles, under which LeadClick's liability is determined by its control and knowledge of the affiliate marketers' activities.

21

A defendant is liable under the FTCA for its own conduct, even where that conduct relates in some way to the conduct of third parties.  See, e.g., F.T.C. v. Neovi, 604 F.3d 1150 (9th Cir. 2010) (holding defendant liable for legitimizing, "creat[ing] and deliver[ing] checks without proper verification," despite having "reason to believe that a vast number of checks were being drawn on unauthorized accounts").  Further, "[u]nder the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations." F.T.C. v. Five-Star Auto Club, 97 F. Supp. 2d 502, 507 (S.D.N.Y. 2000); see also Goodman v. F.T.C., 244 F.2d 584, 592 (9th Cir. 1957) ("[C]ourts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized.").  Indeed, in certain cases, a seller may be held responsible even when the "salespersons were what might have been considered at common law independent contractors." Goodman, 244 F.2d at 591.

Courts have held individual defendants liable for a corporation's conduct where they "(1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices." F.T.C. v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008) (citing F.T.C. v. Crescent Publ'g Group, Inc., 129 F. Supp. 2d 311, 324 (S.D.N.Y.2001); F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 574 (7th Cir.1989)).  While this test has generally been applied to individual defendants, at least one Circuit Court has applied it in the context of an entity defendant, ruling that an entity defendant was liable for the misrepresentations made by third-party telemarketers.  See F.T.C. v. IAB Mktg. Associates, LP, 746 F.3d 1228, 1233 (11th Cir. 2014).  The court

sees no reason why this test should apply to individual defendants but not to corporate entities.

Regarding the second element, it is undisputed that LeadClick employees knew that fake news sites were being used to promote LeanSpa products on the eAdvertising Network.  See Defs.' Rule 56(a)2 Statement ¶¶ 133–37.

Regarding the first element, participation or control in an entity's unlawful activity can be shown by a defendant's "involvement in business affairs" or "role in the development of corporate practices."  F.T.C. v. Ross, 897 F. Supp. 2d 369, 382 (D. Md. 2012) aff'd, 743 F.3d 886 (4th Cir. 2014).  Authority to control an entity can be evidenced by the "ability to review and approve advertisements," among other things. Id.  "[D]irect participation can be demonstrated through evidence that the defendant developed or created, reviewed, altered and disseminated the deceptive marketing materials."  Id. at 383.

While LeadClick fiercely disputes that it "participated in the acts or had the authority to control" the affiliate marketers, no reasonable jury could deny that LeadClick both participated in, and had the authority to control, the affiliate marketers conduct in so far as it related to the fake news sites.  Specifically, LeadClick's affiliate managers were tasked with scouting for new affiliates.  See Defs.' Rule 56(a)2 Statement ¶ 93. Affiliate managers "routinely gathered information about affiliates," and they would solicit affiliates to join eAdvertising.  See id. ¶¶ 94–95.  Thus, LeadClick solicited and hired affiliate marketers using fake news sites to advertise LeanSpa's products.  See id. ¶¶ 93–95, 97, 109, 133–35, 138.  Notably, "[a]ffiliate marketers had to apply to join the eAdvertising Network, and LeadClick would decide which to accept."  See id. ¶ 97.

Indeed, "the standard contract that governed LeadClick's relationship with its affiliates"[19]

states:

> All websites, newsletters, companies, or individuals need official approval
> from eAdvertising before they can become a member of the Publisher
> Program.  Only websites and newsletter that have been reviewed and
> approved are permitted to use the programs.  eAdvertising reserves the
> right to withhold or refuse approval on any website, newsletter, company,
> or individual for any reason, whatsoever.

Defs.' Rule 56(a)2 Statement ¶ 131 (citing PX 25).  Although LeadClick asserts that, "in

practice, affiliate marketers were not required to submit their 'websites' for approval

unless [it] specifically requested to see the page," id., it does not deny that it had the

authority to review pages.  Indeed, after the FTC began suing affiliate marketers in April

2011 for using fake news sites, see id. ¶ 147, LeadClick started to screen fake news

pages by removing their ability to advertise certain products without approval from the

merchant.   See id. ¶ 148.  This evidence establishes that, as a matter of law, LeadClick

had the authority to control the affiliate marketers' use of fake news pages, and

LeadClick cites to no evidence from which a reasonable jury could infer otherwise.

　　　LeadClick's assertion that merchants like LeanSpa had ultimate authority to

approve or disapprove of the use of fake news sites is not particularly relevant to

LeadClick's liability:  LeadClick had the authority to not hire affiliates using fake news

---

[19] LeadClick denies that the document cited by the plaintiffs is its "standard contract with its
affiliate marketers" because it was "updated 01/04/08," which is before the time period relevant to this
suit.   See Defs.' Rule 56(a)2 Statement ¶ 131.  However, this is the very same document that LeadClick
described as "the standard contract that governed [its] relationship with its affilaites" in its Memorandum in
Support of its Motion to Dismiss (Doc. No. 156).  Defs.' Mem. Supp. Mot. Dismiss 5–6; Affirmation of
Walter Loughlin, Ex. A (Doc. No. 157-2); see Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001) ("[A]
party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier
sworn testimony without a satisfactory explanation of why the testimony is changed.").  Moreover,
LeadClick does not cite to any other contract which a juror could infer was, in fact, the contract governing
its relationship with affiliates.

sites, to instruct them not to use such sites after hiring them, and to remove them if they continued to do so.  Just as LeanSpa would be liable for approving requests to advertise with fake news sites, LeadClick, as LeanSpa's agent, is liable for its own decision to effectuate that decision.  See Restatement (Third) Of Agency § 7.01 (2006) ("An agent is subject to liability to a third party harmed by the agent's tortious conduct . . . .  [A]n actor remains subject to liability although the actor acts as an agent."); see also Defs.' Rule 56(a)2 Statement ¶ 140 (citing PX 116) (LeadClick appears to argue that its affiliate manager told an affiliate that "News Style landers are totally fine" in order to keep LeanSpa's offers).

Not only did LeadClick have the authority to control its affiliates' web pages, it also participated in the deception.  For example, LeadClick purchased advertising space on genuine news sites and sold it to affiliates advertising with fake news sites.[20]  See Defs.' Rule 56(a)2 Statement ¶¶ 151,[21] 158–59.  In doing so, it provided a way for consumers to browse directly from a genuine news site to a fake one.  Id. ¶ 151. Indeed, it is clear that LeadClick knew it was creating such a bridge between genuine

---

[20] LeadClick argues that it was unfairly surprised by this argument.  While it is true that "claims based new facts and new legal theories with no relation to the previously pled claims—are commonly rejected at the summary judgment stage due to the prejudice to the defendant," Coudert v. Janney Montgomery Scott, LLC, No. 3:03 CV 324 MRK, 2005 WL 1563325, at *2 (D. Conn. July 1, 2005) aff'd., 171 Fed. App'x 881 (2d Cir. 2006), the court disagrees that LeadClick's media buying is unrelated to plaintiff's original theory.  LeadClick's purchasing of ad space on genuine news pages and selling that space to an affiliate marketer running a fake news page directly related to plaintiffs' original theory:  it enhanced the deceptiveness of the fake news pages' representation that it was a genuine, independent news page. See Compl. ¶¶ 82– 83, 122–23.

[21] LeadClick denies that it "arranged" banner ad placements, but to support that denial it only cites to evidence of Davidson denying that a particular fake news site – which was linked from a banner ad – was his.  LeadClick cites no evidence to dispute other testimony cited by plaintiff, including an affiliate's explanation of how eAdvertising's media buying activity would allow an affiliate to obtain ad space linking a consumer from a genuine news site to a fake news site.  See Defs.' Rule 56(a)2 Statement ¶ 151 (plaintiffs citing PX 93:5–99:15).

and fake news sites because, on some occasions, LeadClick would identify fake news

pages "as destination pages for the banner ads when negotiating with media sellers,"

and sometimes it "identified the destination webpage for the banner ads by emailing the

media seller a compressed version of the affiliate's" fake news page.  Id. ¶¶ 152–53.[22]

 LeadClick also discussed product pairings that appeared on the fake news sites.

See id. ¶¶ 136–37.  Specifically, the fake news pages contained a purported reporter's

test of a two-step product combination.  See id. ¶ 136; see also PX 59–61 (showing

examples of the fake news pages).  LeadClick participated in the fake news sites'

deception by, for example, "implementing a rule that publishers pair . . . [LeanSpa]

products with other [LeanSpa] products" and going "through all the publishers that

[were] running [a LeanSpa] offer and then tell[ing] them that they needed to run the new

step 2."  PX 22, Chiang Dep. 59:22–60:8 (cited in Pls.' Rule 56(a)1 Statement ¶ 137,

which was admitted by LeadClick.).

 No reasonable jury could find that LeadClick did not have the authority to control

affiliates' use of fake news pages or that LeadClick did not participate in the deception.

Thus, LeadClick violated Section 5 of the FTCA and CUTPA as a matter of law.

 B. LeadClick Is Not Immune From Liability Under the CDA

 Section 230 of the CDA states that "[n]o provider or user of an interactive

computer service shall be treated as the publisher or speaker of any information

provided by another information content provider."  47 U.S.C. § 230(c)(1).  LeadClick is

"entitled to immunity under the CDA if (1) [it] is an interactive computer service provider

---

[22] LeadClick denies that it identified any advertisements, but it cites no evidence in support of that denial.  See Defs.' Rule 56(a)2 Statement ¶¶ 152–53.

or user; (2) plaintiffs' claims are based on 'information provided by another information content provider'; and (3) plaintiffs' claims would treat it as the 'publisher or speaker' of such information."  F.T.C. v. LeanSpa, LLC, 920 F. Supp. 2d 270, 275 (D. Conn. 2013); see also F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1196 (10th Cir. 2009); Universal Comm'cn Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007).  "If it fails to satisfy any one of three, it is not entitled to immunity."  Accusearch, 570 F.3d at 1196.  Based on the undisputed facts, LeadClick fails to meet the second element as a matter of law.

"An interactive computer service that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content."  Accusearch, 570 F.3d at 1197.  The CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  "[A] service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content,"  Accusearch Inc., 570 F.3d at 1199, or "'contributes materially to the alleged illegality of the conduct,"  Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1168 (9th Cir. 2008).  Further, "there may be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development')."  Accusearch Inc., 570 F.3d at 1197.

The degree to which an entity must be involved in the creation of the content to make that entity "responsible" is somewhat unclear.  On one hand, "it is well established that notice of the unlawful nature of the information provided is not enough to make it

27

the service provider's own speech." <u>Universal Commc'n Sys., Inc.</u>, 478 F.3d at 420.  On

the other hand, courts have held entities to be information content providers when the

nature of the service provider's product virtually requires, or makes extremely likely, that

users will create unlawful conduct.  <u>See, e.g.</u>, <u>Accusearch Inc.</u>, 570 F.3d at 1199

("Acquisition of this information would almost inevitably require someone to violate the

[law] or to circumvent it by fraud or theft."); <u>Roommates.Com, LLC</u>, 521 F.3d at 1175

("[Defendant] both elicits the allegedly illegal content and makes aggressive use of it in

conducting its business. . . .  [Defendant's] work in developing the discriminatory

questions, discriminatory answers and discriminatory search mechanism is directly

related to the alleged illegality of the site.").  Thus, in <u>Accusearch</u>, the Tenth Circuit held

that the defendant was an "information content provider" under the CDA, as opposed to

a "provider of neutral tools," when it "solicited requests for confidential information

protected by law, paid researchers to find it, knew that the researchers were likely to

use improper methods, and charged customers who wished the information to be

disclosed."  <u>Id.</u> at 1201.  In <u>Roommates.Com</u>, the Ninth Circuit held that a website,

which allowed users to post and search for rooms for rent, was an information content

provider when it required users to answer questions that often involved discriminatory

answers and then used that information to create a search mechanism that could be

used in a discriminatory way.  521 F.3d at 1175.  Similarly, in <u>Doctor's Associates, Inc.</u>

<u>v. QIP Holder LLC</u>, a court in this district held that a jury could find that defendants were

information content providers where they "actively solicited disparaging representations

about [the plaintiff] and thus were responsible for the creation or development of the

offending contestant videos."  No. 3:06-CV-1710 (VLB), 2010 WL 669870, at *24 (D.

Conn. Feb. 19, 2010).

No reasonable jury could deny that LeadClick was an "information content

provider."  LeadClick solicited and hired the affiliate marketers to advertise LeanSpa's

products, knowing that affiliates used fake news pages.  Defs.' Rule 56(a)2 Statement

¶¶ 93–95, 97, 109, 133–35, 138.  LeadClick continued paying Davidson and other

affiliates running fake news pages for their referrals to LeanSpa's website.  See Defs.'

Rule 56(a)2 Statement ¶ 114.  LeadClick communicated with LeanSpa and with

affiliates running fake news pages regarding which products should be advertised as

the "Step 1" and "Step 2" products purportedly under independent investigation.  See

Defs.' Rule 56(a)2 Statement.  LeadClick also screened advertisements according to

merchants' preferences.  See Defs.' Rule 56(a)2 Statement ¶¶103, 131, 148.

LeadClick's media buying also materially contributed to the unlawful nature of the

fake news sites by providing affiliates running fake news sites with a way to direct

consumers from genuine news sites to fake news sites.  See id. ¶ 151.  The alleged

deception in this case is the representation that independent testing was being

conducted by genuine news reporters; LeadClick's media buying contributed to that

deception by providing consumers with yet another reason to think that the news site

was genuine.  See id. (citing PX 119).

C.   Remedy

The plaintiffs seek relief under Section 13(b) of the FTCA.  LeadClick raises a

number of issues regarding the plaintiffs' requested monetary remedies.  Specifically,

LeadClick argues that: (1) legitimate factual disputes exist regarding consumer reliance;

(2) monetary relief is improper absent an injunction; and (3) the disgorgement amount is zero because the money it retained from its affiliate network activities has been paid out to affiliates.

    1.    Reliance

LeadClick first asserts that there are genuine factual disputes regarding the issue of consumer reliance and that reliance should not be presumed.

> Proof of reliance by the consumer upon the defendants' misrepresentations is a traditional element of recovery under common law fraud actions. Section 13 of the FTC Act differs from a private suit for fraud, however. Section 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers. Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section.

F.T.C. v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993) (quoting F.T.C. v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1293 (D. Minn. 1985)).  The plaintiffs may raise a presumption of reliance by showing that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."  F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1206 (10th Cir. 2005).ddistr

The plaintiffs are entitled to a presumption of reliance in this case.  The court has already concluded that the first element was met.  See Part IV.A., supra.  The fake news sites were widely disseminated as they were distributed over the Internet and referred thousands of customers to LeanSpa's websites.  See Defs.' Rule 56(a)2 Statement ¶ 112–13; see also F.T.C. v. RCA Credit Servs., LLC, 727 F. Supp. 2d 1320, 1336 (M.D. Fla. 2010) ("Defendants disseminated their false representations to anyone who visited their website or called their telephone number.").  Indeed, LeadClick makes

no argument that the fake news sites were not widely disseminated.  Finally, the third prong is met because consumers enrolled in LeanSpa's trial program.  <u>See</u> Defs.' Rule 56(a)2 Statement ¶ 113.[23]

With the presumption of reliance established, the burden shifts to LeadClick to offer evidence for a jury to conclude that the presumption has been rebutted.  LeadClick has offered no such evidence here.

2.    Equitable Authority

LeadClick contends that the FTC is unable to obtain monetary relief in this case based on the grant of equitable authority under Section 13(b) of the FTCA.  LeadClick argues that "the FTC's federal court enforcement and litigation authority is predicated solely on the language in § 53(b) providing that 'in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.'"  LC Mem. Supp. Summ. J. (Doc. No. 295) at 35 (quoting 15 U.S.C. § 53(b)).  According to LeadClick, this is not a "proper case" because there is no prospect that it will operate in the future and, as a result, the FTC would be unable to obtain a permanent injunction. <u>Id.</u>

However, LeadClick's argument overlooks the fact "that courts have consistently held that 'the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.'"  <u>F.T.C. v. Bronson Partners, LLC</u>, 654 F.3d 359, 365 (2d Cir. 2011) (quoting <u>F.T.C. v. Gem Merch. Corp.</u>,

---

[23] LeadClick argues that a consumer's enrollment in LeanSpa's program is not properly considered a purchase.  That argument is without merit: consumers obtained LeanSpa's product according to the terms that LeanSpa offered.

87 F.3d 466, 468 (11th Cir. 1996)).  Indeed, "[c]ourts have inherent equitable powers to grant ancillary relief . . . when there is no likelihood of recurrence."  F.T.C. v. Evans Products Co., 775 F.2d 1084, 1088 (9th Cir. 1985); see also F.T.C. v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1211 n.27 (N.D. Ga. 2008) ("Even if the primary injunctive relief is not requested, the court is still entitled to grant other equitable remedies.") aff'd, 356 Fed. App'x 358 (11th Cir. 2009); In re Evans Products Co., 60 B.R. 863, 867 (S.D. Fla. 1986) ("[T]he district court's power under § 13(b) to exercise the full range of equitable remedies, including rescission and restitution, is not diminished by the fact that primary injunctive relief might not be granted.").[24]

Because Section 13(b) "carries with it the full range of equitable remedies," Bronson Partners, LLC, 654 F.3d at 365, the FTC can obtain monetary relief regardless of the absence of a permanent injunction.[25]

### 3.    Disgorgement Amount

LeadClick next asserts that "the FTC can only recover as equitable monetary relief the amount of money that LeadClick retained from its affiliate network activities, namely the amount received from LeanSpa and not distributed to LeadClick's publishers.  However, that amount is zero."  LC Mem. Supp. Summ. J. 37–38.

LeadClick's argument is without merit because LeadClick received the money sought by the plaintiffs from LeanSpa.  "[I]t is well established that defendants in a

------

[24] Further, this approach is consistent with the Second Circuit's interpretation of the statute enabling the Securities and Exchange Commission to bring actions in federal court, which – like Section 13(b) of the FTCA – only explicitly refers to injunctive relief.  See Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2d Cir. 1971) ("[W]e do not read § 21(e) as restricting the remedies which the SEC can pursue to injunctive relief.").

[25] The parties do not appear to make any argument regarding remedies under CUTPA.

disgorgement action are not entitled to deduct costs associated with committing their illegal acts." F.T.C. v. Bronson Partners, LLC, 654 F.3d 359, 375 (2d Cir. 2011) (internal quotation marks omitted).  "[A]lthough [defendants are] not liable for consumer payments that never reached them, 'the district court should determine the amount of the . . . total billings that the [defendants receive] . . . , without deducting monies paid by the [defendants] to other parties." Id. (quoting F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 68 (2d Cir. 2006)).  In Verity, the liable defendants were required to turn over all the money that it received from consumers, even though it was obligated to pass some of that money onto an innocent third party.  See Verity Int'l, Ltd., 443 F.3d at 68.  However, the liable defendants did not have to disgorge money that it had never received – money that was paid directly to innocent third parties.  See id.

Here, LeadClick must disgorge the amount of consumer payments it received from LeanSpa as a result of its affiliate marketing activities in connection with LeanSpa. LeadClick admits that it received payments totaling over $11.9 million from LeanSpa. See Defs.' Rule 56(a)2 Statement ¶ 68; see also PX 151.  LeadClick's attempt to deduct money it paid to its affiliates is without merit, because LeadClick actually received the money – the "unjustly received consumer funds" – from LeanSpa.  LeadClick may have chosen to pay affiliate marketers before it received money from LeanSpa, but that does not alter the fact that LeadClick received the money.  This is unlike the arrangement in Verity to which LeadClick attempts to analogize, because LeadClick is not being forced to disgorge money that it never actually received.  See Verity Int'l, Ltd., 443 F.3d at 68. Rather, because LeadClick received the funds from LeanSpa, it must disgorge those funds "without deducting monies paid by [the defendants] to other parties."  Id.; see also

Bronson Partners, LLC, 654 F.3d at 375 ("The district court properly assessed Bronson's unjust gains as $1,942,325, the amount Bronson received in revenues.").

    D.    <u>CoreLogic's Liability as a Relief Defendant</u>

    The court next considers whether CoreLogic must disgorge the money that it received from LeadClick as a result of the August 2011 transfer.

    "Federal courts may order equitable relief against a person who is not accused of wrongdoing. . . where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." <u>S.E.C. v. Cavanagh</u>, 155 F.3d 129, 136 (2d Cir. 1998); <u>see also</u> <u>S.E.C. v. Colello</u>, 139 F.3d 674, 676 (9th Cir. 1998) ("[B]road equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong.")  "The ill-gotten gains must be linked to the unlawful practices of the liable defendants." <u>F.T.C. v. Bronson Partners, LLC</u>, 674 F. Supp. 2d 373, 392 (D. Conn. 2009) <u>aff'd,</u> 654 F.3d 359 (2d Cir. 2011).  The FTC has the burden to show that the funds are ill-gotten.  <u>See id.</u>  "[R]elief defendants who have provided some form of valuable consideration in good faith in return for proceeds of fraud are beyond the reach of the district court's disgorgement remedy." <u>Commodity Futures Trading Comm'n v. Walsh</u>, 618 F.3d 218, 226 (2d Cir. 2010); <u>see also</u> <u>Bronson Partners, LLC</u>, 674 F. Supp. 2d at 392 ("A relief defendant can show a legitimate claim to the funds received by showing that some services were performed in consideration for the monies.").

34

Because the court grants summary judgment for the plaintiffs as to the LeadClick's conduct, the funds that CoreLogic received from LeadClick are, as a matter of law, ill-gotten.  Thus, the first element has been established as a matter of law.

The second element – whether CoreLogic has a legitimate claim to the funds – presents a more difficult question.  As stated above, CoreLogic has a legitimate claim if it provided "valuable consideration in good faith" in exchange for money transferred by LeadClick.  Walsh, 618 F.3d at 226.  Thus, there are two issues: (1) whether CoreLogic provided "valuable consideration" in exchange for LeadClick's money and (2) if it did, whether it did so in good faith.

1.Valuable Consideration

The parties agree that CoreLogic advanced over $13 million to pay LeadClick's invoices in 2011.  See FTC Rule 56(a)2 Statement ¶ 19; Defs.' Rule 56(a)2 Statement ¶ 196.  CoreLogic argues that these cash advances constituted "'valuable consideration' for the money LeadClick later transferred to CoreLogic."  CL Mem. Supp. Summ. J. (Doc. No. 300) at 19.  However, as the FTC points out, for the advances to constitute valuable consideration, they must have been made as part of a bona fide creditor-debtor relationship.  See S.E.C. v. McGinn, Smith & Co., 752 F. Supp. 2d 194, 215 (N.D.N.Y.) ("Such uninformed, casual, and informal transactions in the amounts at issue here corroborate the conclusion that there was no consideration and no contractual relationship which would entitle [the relief defendant] to repayment as an arm's length, disinterested creditor."), order vacated in part on other grounds on reconsideration sub nom. S.E.C. v. Wojeski, 752 F. Supp. 2d 220 (N.D.N.Y. 2010) and aff'd on other grounds sub nom., Smith v. S.E.C., 432 Fed. App'x 10 (2d Cir. 2011); S.E.C. v.

35

Founding Partners Capital Mgmt., 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009) ("There has been a debtor-creditor relationship between Sun Capital and Stable–Value based on written agreements since 2001. This constitutes a sufficient legitimate ownership interest to preclude treating Sun Capital as a relief defendant."); S.E.C. v. Better Life Club of Am., Inc., 995 F. Supp. 167, 182 (D.D.C. 1998) ("[T]here was never any actual loan agreement between Lawson and Taylor, and therefore there is no evidence that the gift was anything but gratuitous. For this reason, there are no material questions of fact as to this issue, and the $7500 given to Lawson is subject to disgorgement."), aff'd sub nom. U.S. S.E.C. v. Better Life Club of Am., Inc., 203 F.3d 54 (D.C. Cir. 1999).

Moreover, ownership itself does not create a legitimate claim to the proceeds of an owned entity if those proceeds originally come from unlawful activity. See S.E.C. v. Aragon Capital Advisors, LLC,, No. 07-CV-919 FM, 2011 WL 3278907, at *19–21 (S.D.N.Y. July 26, 2011) ("[A] debtor-creditor relationship constitute[s] a sufficient legitimate ownership interest in the CD proceeds. In contrast, in this case the [relief defendants] made equity contributions to Aragon, not loans, and therefore were not creditors of the partnership." (internal citations and quotation marks omitted)); cf. S.E.C. v. AIC, Inc., No. 3:11-CV-176, 2013 WL 5134411, at *17 (E.D. Tenn. Sept. 12, 2013) ("[I]t would be inappropriate to allow those who violate the securities laws to retain the benefit of their fraudulent acts by transferring the funds to a subsidiary or subsidiaries, which in turn generate revenue for the parent through legitimate means."). Therefore, if CoreLogic's advances to LeadClick were essentially investments made in the hopes of future returns – and its collection of revenue from LeadClick is essentially return on that investment – then CoreLogic does not have a legitimate claim to the $4 million transfer

36

of funds from LeadClick.  Conversely, if CoreLogic's advances were bona fide loans,

then CoreLogic does have such a legitimate claim.

This issue has not been discussed extensively in the context of relief defendant

liability.  Fortunately, however, courts are faced with determining whether a transaction

should be characterized as debt or equity in other contexts.  See In re AutoStyle

Plastics, Inc., 269 F.3d 726, 750 (6th Cir. 2001) (setting out factors in the bankruptcy

context); Roth Steel Tube Co. v. C.I.R., 800 F.2d 625, 630 (6th Cir. 1986) (identifying

factors in the tax context).[26]  Factors include:

> (1) the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date and
> schedule of payments; (3) the presence or absence of a fixed rate of
> interest and interest payments; (4) the source of repayments; (5) the
> adequacy or inadequacy of capitalization; (6) the identity of interest
> between the creditor and the stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing from outside
> lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which
> the advances were used to acquire capital assets; and (11) the presence
> or absence of a sinking fund to provide repayments.

AutoStyle, 269 F.3d at 749–50.  The factors are to be considered in context, and the

more a transaction appears to involve an arm's length negotiation, the more likely it is a

debt transaction.  See id.

Here, no reasonable jury could find that CoreLogic's advances were bona fide

loans extended to LeadClick.  CoreLogic advanced funds to LeadClick "as part of its

corporate policy to fund any ongoing business."  Defs.' Rule 56(a)2 Statement ¶ 195.

---

[26] CoreLogic argues that the FTC's reliance on bankruptcy law's AutoStyle factors is
inappropriate because "equitable subordination is a remedy only available in a bankruptcy proceeding."
CR Reply Supp. (Doc. No. 19) at 14.  However, the court is not engaging in equitable subordination:  it is
simply borrowing the test from bankruptcy law to determine whether CoreLogic has a legitimate claim to
the transfer from LeadClick.

CoreLogic does not dispute the following:  "there was no agreed upon repayment schedule or repayment deadline, no security for those advances, no written loan agreement, and no interest due in connection with the funds CoreLogic provided LeadClick in 2011."  Id. ¶ 200.  While CoreLogic denies that "LeadClick's obligation to repay CoreLogic was dependent on LeadClick's future business collections and revenues," it admits that, "pragmatically, LeadClick's ability to repay was dependent on LeadClick's future business performance and collections."  Id. ¶ 201; see also In re Official Comm. Of Unsecured Creditors for Dornier Aviation (N. Am.), Inc, 453 F.3d 225, 231 (4th Cir. 2006) ("[T]he essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied.").  These undisputed facts destroy any basis for a reasonable jury to find an arm's length transaction that would occur in a bona fide loan agreement.[27]

### 2.   CLUSI's Claim to Repayment

Finally, CoreLogic argues that CLUSI had "a strong and independent claim to repayment from LeadClick:  CLUSI . . . was the payee on a promissory note and loan agreement for a $15.7 million line of credit [CLUSI's predecessor] had extended to LeadClick in 2008."  CL Mem. Supp. Summ. J. 33.  According to CoreLogic, because LeadClick's money was transferred to a CLUSI account before it reached a CoreLogic account, CLUSI's legitimate claim to the money requires the FTC to prove that "CoreLogic had no right to payment from CLUSI."  Id.

---

[27] The court need not rely on Mr. Van Wazer's report and opinion to determine on the undisputed record before it that CoreLogic's advances to LeadClick were not bona fide loans as a matter of law. Therefore, the court terminates the defendants' Motion in Limine as moot.

The court disagrees.  LeadClick deposited the $4.1 million in a bank account that it owned and, on the same day, CoreLogic's cash management system automatically swept that money, first into a CLUSI bank account and then immediately into a CoreLogic account.  See FTC Rule 56(a)2 Statement ¶¶ 1–3; see also CL Mem. Supp. Summ. J. 33.  The funds transferred from LeadClick were not used to pay down the promissory note.  See CL Mem. Supp. Summ. J. 33; CL Reply (Doc. No. 319) at 4; see also PX 71, Balas Dep. 81:25–84:18 (noting that the last payment on the promissory note was in August 2010).  Notably, it was CoreLogic's system that was controlling the destination of the money and that caused the transfer from LeadClick.  See FTC Rule 56(a)2 Statement ¶ 3 ("Through CoreLogic's cash management system, [funds] from CLUSI's bank account . . . transferred through an automated sweep to a bank account held by CoreLogic.").  Because CoreLogic controlled the destination of the funds and ultimately ended up holding them, the fact that they briefly passed through an account held by CLUSI is irrelevant.  See Walsh, 618 F.3d at 225 ("A relief defendant is a person who holds the subject matter of the litigation." (emphasis added)); Cf. In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d 52, 58 (2d Cir. 1997) (stating that, in the context of avoided transfer in a bankruptcy, "[e]very Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability, declining to find 'mere conduits' to be initial transferees").  Thus, no reasonable juror could find that CLUSI received money to which it had a legitimate claim.

**V.      CONCLUSION**

For the foregoing reasons, the court: (1) GRANTS the plaintiffs' Motion for

Summary Judgment (Doc. No. 292); (2) DENIES LeadClick's Motion for Summary

Judgment (Doc. No. 294); (3) DENIES CoreLogic's Motion for Summary Judgment

(Doc. No. 299); (4) TERMINATES the defendants' Motion in Limine (Doc. No. 290) as

moot; and GRANTS the defendants' Motion for Leave to File a Response (Doc. No.

329).

**SO ORDERED**.

Dated at New Haven, Connecticut, this 5th day of March, 2015.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge