```
1                    UNITED STATES DISTRICT COURT.

2                      DISTRICT OF CONNECTICUT

3    _____
     FEDERAL TRADE COMMISSION,    )
4    ET AL                        )
                    Plaintiffs. )  NO: 3:11cv1715(JCH)
5                                 )
     vs.                          )  January 30, 2015
6                                 )
     LEANSPA, LLC, ET AL          )
7                  Defendants. )
     _____
8                                    141 Church Street
                                     New Haven, Connecticut
9

10            ORAL ARGUMENT

11
     B E F O R E:
12              THE HONORABLE JANET C. HALL, U.S.D.J.

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF   :      DARREN H. LUBETZKY
     FEDERAL TRADE COMMISSION    KAREN GOFF
15                              Federal Trade Commission
                                Northeast Region
16                              1 Bowling Green
                                Suite 318
17                              New York, NY 10004

18   FOR THE STATE OF CT        JONATHAN J. BLAKE
                                Connecticut Office of the
19                              Attorney General
                                110 Sherman St.
20                              Hartford, CT 06105

21   FOR THE DEFENDANT

22   LeadClick Media            DAVID BATEMAN
     Corelogic                  PAUL HANCOCK
23                              ELISA D'AMICO
                                K&L Gates, LLP- Lex, NYC
24                              599 Lexington Avenue
                                New York, NY 10022

25
```

1          THE COURT:  Good morning, everyone.  We're here this

2     morning in the matter of the Federal Trade Commission and the

3     State of Connecticut versus LeanSpa, LLC, Case Number

4     311CV1715.  If I can have appearances please, starting with

5     the plaintiff.

6          MR. BLAKE:  Jonathan Blake, Assistant Attorney

7     General for the State of Connecticut.

8          MR. LUBETZKY:  Darren Lubetzky.

9          THE COURT:  You are going to have to speak up.  You

10    will come to the podium.

11         MR. LUBETZKY:  Darren Lubetzky for the Federal Trade

12    Commission.

13         MS. GOFF:  Karen Goff for the Federal Trade

14    Commission.

15         MR. HANCOCK:  Paul Hancock.  I am here representing

16    the lead defendant Corelogic in regard to the FTC's claim.

17    My partner David Bateman to my right is representing

18    Leadclick in the claim brought by both plaintiffs for the

19    conduct claimed against Leadclick.  Elisa D'Amico who is

20    sitting next to Mr. Bateman.  Thomas Graver who is the deputy

21    general counsel at Corelogic.  He's here as the corporate

22    representative.

23         THE COURT:  Yes.  Good morning to all of you.  First

24    of all, I hate to upset you all as we first begin, but

25    apparently there was some miscommunication between myself and

1    my law clerk.  You folks dutifully asked how would the judge

2    do this.  Apparently he communicated I will allow you a

3    20-minute oral argument, then have the rest of the 45 minutes

4    on each side for questions.  If my law clerk spoke on my

5    behalf and he said that to you, that's what we'll do.  He

6    also tole me he conveyed, if you repeat your brief that will

7    be unacceptable.  Since I'm not happy about the 20 minutes.

8    I have never done a 20-minute oral argument.  I never had the

9    Assistant AG who is particularly here today, but his

10   colleagues will tell you I don't do that.  I have a lot of

11   questions for both sides, and I find that good lawyers, which

12   I assume you all are, are perfectly able to work in all their

13   arguments in answer to my questions.  Unless you are trying

14   to run from an argument, in which case that's what I'm trying

15   to find out, but if you want to make a 20-minute opening,

16   that's fine.  Understand we won't get through all of the

17   questions I have but understand if I have a question and I

18   don't have an answer, that might not be good for the side who

19   hasn't answered my question.  You will think I will make a

20   mistake, but I will make it.

21           MR. HANCOCK:  We have no objection to proceeding

22   with you asking.  We're here to answer your questions.  We

23   prefer that.

24           The one request we do have is that there are

25   separate claims here by separate plaintiffs.  Corelogic is

1   only a relief defendant brought by one of the defendants.  We

2   would like to divide the time between the Leadclick argument

3   and Corelogic argument.

4        THE COURT:  I have actually identified the questions

5   I have for each of the defendants.  I think on the

6   plaintiff's side I'm probably heavily FTC.  I don't know how

7   you folks want to the divide up what you are doing.  I don't

8   have unless I get an odd ball answer to one of my first few

9   questions, it seems to me your arguments are very similar.

10  You are on the same page.

11       MR. BLAKE: The State's argument is identical to the

12  FTC.  So the State would gladly cede all of its time to the

13  FTC.  If you have questions specific to us, we'll answer

14  them.

15       THE COURT:  I have one that's specific to you.  Let

16  me ask that of Attorney Blake.  In your memorandum you

17  included the standard for unfairness.  I'm talking about

18  unfairness and deceptive as the phrase is used in the

19  statute.  You included that standard, but you never really

20  apply it.  You don't discuss it.  You don't say here the

21  evidence shows that this is on fairness, et cetera.  Is it

22  fair for me to conclude that you are only pursuing a

23  deception theory?

24       MR. BLAKE:  That's correct.  The count in the

25  complaint relating to Leadclick is deception, not unfairness.

1          THE COURT:  Looked that way.  I wanted to be clear.

2    That's fine.

3          Attorney MR. LUBETZKY, I think you will have to come

4    to the podium.  I do have a lot of questions.  I want to be

5    sure that the Terri and I both hear you.  If you use the

6    microphone, we'll hear you.  If you wish to make some opening

7    points, if you want to make the 20-minute argument, I'm very

8    sorry about the confusion.

9          MR. LUBETZKY:  My name is Darren MR. LUBETZKY and

10   support the plaintiff and the State of Connecticut's motion

11   for summary judgment against Leadclick and the FTC's motion

12   for Corelogic.

13         THE COURT:  If you can pull the mic closer.

14         MR. LUBETZKY:  I'm here to answer your questions.

15   We can start with your questions.

16         THE COURT:  I really want to ask about something to

17   be sure that I understand what your theory is or your claim

18   is.  You are only pursuing a direct claim and a deception

19   claim under Section 5.  Is that fair to say or is that

20   correct?

21         MR. LUBETZKY:  That's correct.

22         THE COURT:  You are making no unfairness claim under

23   the FTC Act?

24         MR. LUBETZKY:  That's correct.

25         THE COURT:  You are not claiming that Leadclick

1    aided and abetted the deception of another?

2         MR. LUBETZKY:  That's not our theory.

3         THE COURT:  I think you were clear in the brief.

4    The defendant spends a lot of time on that, so I just wanted

5    to be sure.

6         Leadclick in its reply, I'll go to its motion,

7    accused you of not setting forth a clear standard for direct

8    liability for deception.  Could you tell me why they are

9    wrong?  What is that standard?

10        MR. LUBETZKY: Your Honor, we cited -- the standard

11   under well established FTC case law is that an entity or

12   person hires, controls someone else who makes a

13   misrepresentation, a deceptive act, they are liable.  That's

14   a direct violation of the FTC Act and the best authority that

15   I think is a squarely applicable is the FTC Neovi against

16   QChex, the Ninth Circuit case.

17        THE COURT:  Let me stop you there.  I want to make a

18   mark so I have what you described as the standard.  Neovi is

19   an unfairness case, isn't that right?

20        MR. LUBETZKY:  That's correct, your Honor.  The

21   Neovi case actually cites to a line of deception cases under

22   the FTC Act.  Mainly FTC versus Bay Area Business Council,

23   that's the Seventh Circuit case, 2005 case.  In that case,

24   the defendants were a group of interrelated companies and the

25   principals were purported to sell credit cards when, in fact,

```
 1   were selling stored value cards.
 2        THE COURT:  Can you tell me which page they rely on
 3   this?  For what purpose are they relying on what you call
 4   deceptive cases?
 5        MR. LUBETZKY:  I do not have the jump cite.  I
 6   believe the jump cite is --.
 7        THE COURT:  Do you remember the names of the cases.
 8        MR.  LUBETZKY:  The case that I cited to the FTC
 9   versus Bay Area Business Council.
10        THE COURT:  I see that.
11        MR. LUBETZKY:  424 F.3d, 627.  Seventh Circuit case.
12   That's a deception case.  In that case, the defendants were
13   found to have violated Section 5 for misrepresentations by a
14   telemarketing company that they hired.  Telemarketing company
15   is subject to a separate FTC enforcement action.  The Neovi
16   case cited the FTC versus Bay Area Business Council case for
17   the simple proposition that a single violation may have more
18   than one perpetrator.
19        THE COURT:  I don't have all of my copies of my
20   cases out here.  As I read Neovi for the citation of that
21   case, it seems to be citing that case for the principle that
22   multiple defendants can be liable under Section 5 for a I
23   suppose in that case, a deception, and I don't know that that
24   tells me that this circuit in the Neovi case, I think was the
25   Ninth, thinks that unfairness is the same as deception or
```

1   tested the same way.  Congress had to have meant something

2   different when it said we're going to prevent unfair conduct

3   and prevent deceptive conduct.

4         MR. LUBETZKY:  The elements of unfairness and

5   deception are different.

6         The elements of a deception claim are that there's a

7   misrepresentation that's likely to mislead a consumer acting

8   reasonably and that the misrepresentation is material.  The

9   fairness standard is where an act causes substantial consumer

10  injury, that's unavoidable without significant countervailing

11  benefits.

12        The principle that applies with equal force under

13  the FTC Act same Section 5, if you control someone else, then

14  you are liable for that person's misrepresentation in the

15  form of an agency.

16        THE COURT:  In effect, you are the entity that made

17  the deceptive statement.

18        MR. LUBETZKY:  In our reply brief, we cite a list of

19  cases.  They are telemarketing cases.  Usually this arises

20  when you have a bunch of companies, they hire a third party

21  telemarketing entity.  The telemarketing entity makes the

22  misrepresentation.  Those cases hold that the companies that

23  hired the telemarketer are directly liable under a deception

24  case and the FTC Act.  The case that we cite in our reply is

25  FTC Medical Billers Network, a Southern District of New York

1    case.  It is cited in the footnote 4 for our reply brief to

2    motion for summary judgment.

3         THE COURT:  Let me ask this question.  Would QChex

4    have been liable in Neovi had the FTC pursued a deception

5    theory?  If so, why don't you plead it is deception?  As in

6    that case, why don't you plead it as unfairness?

7         MR. LUBETZKY:  In the Neovi case, in that case the

8    called QChex.  The defendant managed their website that

9    created and delivered unverified checks that were abused by

10   conartists that basically stole consumers' information or

11   illegally obtained consumers' information to withdraw an

12   unauthorized check.

13        The illegal act was the unauthorized use of the

14   consumers' information.  Not a misstatement or

15   misrepresentation to consumers so it fits naturally to the

16   unfairness element, but under FTC cases where you cite

17   starting with the FTC Medical Billers Network --.

18        THE COURT:  Let me go back to the QChex, it seemed

19   to me that on your theory, if I'm a principle sort of

20   controlling someone, in the QChex case there's a couple of

21   things that it seems to me that you can say what they did was

22   not only unfair but also deceptive.  I think the court was

23   particularly concerned that it turned a blind eye to the

24   fraudulent business that was made possible because of the

25   step it took, which it took this step after the deceptive or

1    fraud or whatever that went on from the people who provided

2    this.  The information that made the checks bogus.  They

3    acted after that with turning a blind eye to the fact that it

4    was the bad information, false, fraudulent, bogus.  Here I

5    guess the fake news sites weren't made by the Leadclick and

6    they weren't made possible by Leadclick, were they?  Or would

7    you argue they were?

8            MR. LUBETZKY:  I think that's absolutely not true.

9    I believe that Neovi is on all fours actually with our

10   situation here.  In that like QChex, Leadclick set up,

11   managed a system that was rooted in deception with fake news

12   sites.

13           THE COURT:  Did it turn a blind eye to the

14   fraudulent business made possible by its engaging these

15   advertisers?

16           MR. LUBETZKY:  The behavior is even more egregious.

17   Not only turned a blind eye.

18           THE COURT:  Where is that evidence?

19           MR. LUBETZKY:  There's discussions between the

20   Philly managers.  There's emails that we cite.

21           THE COURT:  I think there's one manager.  I will get

22   to when the defendants are up at the podium that may be

23   helped somebody fix a fake site.

24           MR. LUBETZKY:  No.  It is much more pervasive.

25   There's a document marked Exhibit 116.  It is cited, in our

1    statement of facts at 140 where a Leadclick manager --

2              THE COURT:  What are you saying.  116?

3              MR. LUBETZKY:  Our Exhibit 116.  That's where the

4    document is found.

5              THE COURT:  I want to be able to go back and look at

6    them.

7              MR. LUBETZKY:  The Philly manager Anderson.  There's

8    only two or three Philly managers in the group.

9              THE COURT:  I think you conceded that the affiliates

10   created the fake web pages, correct?

11             As where QChex created the fake check.  It is not on

12   all fours.  It is flipped.

13             MR. LUBETZKY:  We disagree.  QChex created the

14   software that was abused by the conartists. The illegal act

15   there was stealing and obtaining illegally the consumer

16   information that Q Check had nothing to do.

17             THE COURT:  Right but QChex using the software makes

18   a check that's bogus because it relies on the stolen

19   information, and the Court found there that whether you call

20   it conscious avoidance in the Second Circuit or turning a

21   blind eye in the Ninth, that they, in effect, you impute

22   fraudulent or knowledge element that you would need to have

23   it seems to me and then QChex did something.  They made that

24   fake check.

25             MR. LUBETZKY:  Here's what Leadclick did.  They

1    sought out, recruited affiliates.  They know they were using

2    the fake news sites.

3            THE COURT:  Where's the proof they knew they were

4    using fake news sites?

5            MR. LUBETZKY:  We cite to the deposition testimony

6    of Richard Chiang and Jimmy Olsen and Quentin Redmond that

7    said the fake news sites were pervasive within the network.

8            THE COURT:  Can you ask the colleague or when you

9    sit down, you are going to want to the listen to the

10   argument, somebody to find for me either which paragraph of

11   the 56(a)(1) I will find that cited to or where I can --

12           MR. LUBETZKY:  The statement of facts 131 through

13   145 is where our evidence is cited.

14           THE COURT:  That's your 56(a)(1) statement, right?

15           MR. LUBETZKY:  We have testimony, we have

16   admissions from the Leadclick folks that the fake news sites

17   were prevalent within its network.  We have contemporaneous

18   emails from the affiliate manager Ana Anderson and Quentin

19   Redmond two main managers that say, hey, the new style

20   landers are totally fine.

21           Plaintiff's Exhibit 139 the other affiliate manager

22   jokes with an affiliate about people still falling for the

23   fake news sites.  And then there's an exhibit which the

24   evidence is indisputable and overwhelming that Leadclick's

25   network was used that was -- that its generation online

1    travel to LeanSpa was primarily done through fake news sites.

2            THE COURT:  Nobody is going to deny that.  I don't

3    know.  Overwhelming evidence.  I will go back and look at 131

4    to 144 and the evidence cited, but I don't recall there being

5    overwhelming evidence.

6            MR. LUBETZKY:  It is not only where there's

7    testimony, emails they are referring, actually joking about

8    how people are falling for the fake news sites and one

9    document Jamie Olsen, who is the client manager, manages

10   relations with Boris Mizhen, reaches out to another client in

11   March 2011, where he says all are landing pages are fake news

12   sites.

13           THE COURT:  His position remind me?

14           MR. LUBETZKY:  Excuse me.  That's an email.  That's

15   a contemporaneous email.  I will give you the actual PX.

16   There's more evidence.  We cite to correspondence between

17   Leadclick people and the affiliates.  This is Statement of

18   Facts 98, 99, 136 to 137 where they are discussing which

19   products are going to be featured as step one, step two.  We

20   can show you the video that the fake news sites are displayed

21   with two prices step one and step two, where they are

22   essentially deciding which products to appear on the fake

23   news sites.

24           THE COURT:  Is it your view that someone directly

25   violates the FTCA or the CUTPA simply by making it more

1    likely the consumers are exposed to deceptive representations

2    of others?

3              MR. LUBETZKY:  If you can repeat that.  I apologize.

4              THE COURT:  In your view, does someone directly

5    violate either act simply by making it more likely that a

6    consumer will be exposed to deceptive representations of

7    others?  In other words, doesn't make the fake statement,

8    doesn't make the fraudulent statement, doesn't make the

9    deceptive statement but makes it more likely that the

10   consumer will be exposed.

11             MR. LUBETZKY:  I want to answer your question right

12   directly our standard is that if an entity controlled someone

13   and made a misrepresentation that is deceptive or would

14   likely mislead someone, then they are directly liable under

15   the FTC Act.

16             THE COURT:  That's what I'm asking a slightly

17   different question.  I'm not saying the person -- and that

18   someone makes a misrepresentation.  What if the person isn't

19   controlling the other person, but they do something that

20   makes it more likely that the consumer is exposed to the

21   deceptive statement of that other person?

22             MR. LUBETZKY:  If the person does not control

23   someone else that makes the misstatement.

24             THE COURT:  They do something that makes it more

25   likely that statement will deceive a consumer.

1          MR. LUBETZKY:  If their own act is a misstatement,

2    they are primarily liable under the FTC Act.

3          THE COURT:  No.  If you want to go stand on the

4    corner over here and tell people you have a lure that's going

5    to cure their ails.  You ask me to drive you over to the

6    corner that you want to stand on.  I made it more likely you

7    are going to reach consumers on the corner that I have taken

8    you there.  I'm not your boss, not a coconspirator, not a

9    co-employee.  You asked me for a ride.  Have I made it more

10   likely?  Am I liable because I made it more likely?

11         MR. LUBETZKY:  If I understand that fact solution,

12   they would not be liable.  I don't believe they would be

13   liable under the FTC Act.

14         THE COURT:  If a person doesn't know that the other

15   person he's assisting like on my driving you.  It is a

16   terrible analogy.  But my driving you, I don't know you are

17   going to make a deceptive statement when you get there.  I'm

18   not going to be liable for that, am I, even though I'm

19   helping you?

20         MR. LUBETZKY:  That's correct, your Honor.  The

21   standard here.  If you look at the <u>FTC Medical Billers</u>

22   <u>Network</u>, <u>FTC versus Bay Area Council</u>, <u>FTC versus AME Travel</u>.

23   We cite a whole host of cases.  There's two basic elements.

24   You have to have control and knowledge.  Knowledge is

25   basically turn a blind eye.  We believe that the evidence

1    that I cited actually it is not a situation like in Neovi

2    where there's a web operator that sets up a system and turns

3    a blind eye where there's random fraud.  We believe that the

4    evidence quite clearly shows that Leadclick set up a system,

5    managed it, knew that it was being rooted in deception

6    other --.

7            THE COURT:  Is there evidence that they knew

8    anything when it turned to these affiliates and said look at

9    we're helping LeanSpa so we're hiring you to do something?

10   Did it know they were going to create fake sites?

11           MR. LUBETZKY:  Yes.

12           THE COURT:  Can you tell me what I look at?

13           MR. LUBETZKY:  I will refer you back to the

14   statement of the facts 131 to 145 where they knew -- they

15   reached out.  They recruited affiliates and part of the way

16   they did that was they looked at what affiliates were

17   promoting some of the dye products and when they saw the web

18   had the new style like channel 7 url's.  There's also

19   additional evidence in the statement of facts 151 to 165

20   where Leadclick also arranged the banner ad placements on the

21   third party website that would link to affiliate fake sites.

22   These are in statement of fact 151 to 165.  Perhaps I can

23   show you a video to explain.  A video would show the media

24   buyer activity that we discuss that goes to the fake news

25   sites that goes to LeanSpa, but they would go to L.A. Times

1    and say we want to buy ad space in L.A. Times and resell that

2    ad space to the fake news sites and the affiliate would put

3    up a banner.

4           THE COURT:  The affiliate put up the banner.

5           MR. LUBETZKY:  In the communication we submitted,

6    there's emails from Leadclick where they are emailing fake

7    news websites to the media buyer.  In PX 119 to Weather

8    dot-com where they said we don't do fake news sites.

9           THE COURT:  PX 119.

10          Wexton Warner is that the defendant?

11          MR. LUBETZKY:  It is an employee of Leadclick.

12          THE COURT:  If I adopt a bright line test and

13   applied it here, would you concede that Leadclick would not

14   be liable?  That's a hypothetical.

15          MR. LUBETZKY:  If you applied the bright line test

16   that we're advocating?

17          THE COURT:  Yes.

18          MR. LUBETZKY:  About the control and knowledge?

19          THE COURT:  Yes.

20          MR. LUBETZKY: Leadclick is indisputably liable under

21   the evidence.

22          THE COURT:  Under an agency they are?

23          MR. LUBETZKY:  Yes.

24          THE COURT:  They did not make the false statement.

25   I have Wright versus Ernst and Young, a defendant must

1     actually make a false or misleading statement in order to be

2     liable.  This is 10b obviously.

3             MR. LUBETZKY:  Before you distinguish the SEC cases,

4     there's a factual issue here.  We agree that the fake news

5     sites were not originated by Leadclick.

6             THE COURT:  That's good.

7             MR. LUBETZKY:  And our point is that create and

8     develop are obviously legal terms under the CDA, but what

9     Leadclick did was, not only recruited affiliates that were

10    using the fake news sites, they paid for them to repeat using

11    the same deceptive device.  They coordinated with the

12    affiliates to basically enhance that deceptiveness.  The

13    whole fake news site is entirely deceptive.  There's

14    discussions with the affiliates about the fake news

15    sites which, one, products appear on the fake news sites and

16    two which buzz words to use.

17            THE COURT:  When we started this, you said to me you

18    are liable under deceptive practices under your act if an

19    entity or person makes a declaration or makes a statement.

20    To be liable the person has to engage in a deceptive act.

21    Has to make a deceptive statement, right?

22            MR. LUBETZKY:  Yes.

23            THE COURT:  Everybody concedes that the fake news

24    sites were deceptive.  That's the first thing I think we all

25    agree on.  And the second thing I think we agreed on is that

1    the Defendant Leadclick did not make the deceptive sites.

2         MR. LUBETZKY:  We do not agree.

3         THE COURT:  So you tell me how they were the entity

4    making the deceptive statements i.e.,the fake news site.

5    We're going around here.

6         MR. LUBETZKY:  The fakes news sites originated we

7    don't know where.  It was re-created by affiliates that put

8    up on their websites, okay, and we agree --

9         THE COURT:  Zak makes the fake news site.  You can

10   sue Zak under Section 5 for deceptive act, right?

11        MR. LUBETZKY:  Yes.  If Zak makes it and you hire

12   him to make it, you pay for him to make it, then you discuss

13   with him let's use these buzz words to make it more effective

14   than you're directly liable.

15        THE COURT:  If I say to Zak I know you created these

16   things on the web, I don't know how to do it.  Would you make

17   these fake websites for me.  I will ask the defendant.  I

18   hope they agree with me.  I made a deceptive act.  He's the

19   tool.  I'm the real actor.  What happens if I say to Zak.  I

20   want to advertise a product.  I want to hire you, the

21   affiliates, to go out and do that on the web.  I don't

22   advertise on the web.  I don't know how to do it.  I don't

23   know how to create an ad or whatever so you guys go out and

24   do that.  You tell Zak go do that.  And Zak goes out and he

25   makes a fake news site.  So far have I done anything that

1   makes me liable when I just asked him to create an ad for a

2   product.  I didn't tell him to make it fake.

3         MR. LUBETZKY:  I don't think so but that's not the

4   evidence in this case.

5         THE COURT:  I'll take baby steps.  What makes me

6   liable?  I have to be the one who made the statement, right?

7         MR. LUBETZKY:  If you control someone to make a

8   statement.

9         THE COURT:  If I tell Zak go out and make a fake

10   statement, I'm liable.  I have to ask the defendants if they

11   want to the argue with me about that, we'll be here a long

12   time, and it won't be good for them.  Tell me where -- I

13   guess you have already cited a lot.  All of things you told

14   me to go look at the evidence in 131 to 145, the 151 to 165

15   that evidence in the 56(a)(1) of those paragraphs, that's

16   where I'm going to find Leadclick telling the affiliates make

17   a fake website?

18         MR. LUBETZKY:  What you are going to find is you are

19   going to find evidence that Leadclick employees were

20   searching for affiliates to bring traffic to its clients, and

21   during that process, they understood and were aware that

22   those affiliates were using fake news sites, then you are

23   going to find evidence when they reached out to affiliates,

24   PX 116 statement of fact 114 Leadclick Philly manager says

25   new style totally fine implicitly condoning.

1          THE COURT:  What does 116.

2          MR. LUBETZKY:  Where the Leadclick manager says new

3     style landers were totally fine. That's a fake news site.

4     She's saying the fake news sites were totally fine to use.

5          THE COURT:  How do I know that new style landers is

6     a fake news site?

7          MR. LUBETZKY:  It is a reasonable conclusion given

8     that we know that the fake news sites used fabricated new

9     styles fabricated news stories.

10          THE COURT:  You said news stories?

11          MR.  LUBETZKY: Fabricated news websites.

12          THE COURT:  I thought you said new style.

13          MR. LUBETZKY:  I don't have the document in front of

14     me. PX 116.

15          THE COURT:  What's the exhibit.

16          MR.  LUBETZKY:  PX 116.

17          THE COURT:  New style landers are totally fine equal

18     sign bracket.  What does equal sign and backward bracket

19     mean?

20          MR. LUBETZKY:  I'm trying to find the exhibit.  I'm

21     not sure.  I mentioned how the affiliate managers Leadclick

22     would scout out the publishers where they knew there were

23     using the fake websites.  That's Plaintiff's Exhibit 26.

24          THE COURT:  I will not dig through exhibits.

25          What's a lander.  Lander in this business.

1          MR. LUBETZKY:  It is a reasonable interpretation

2     likely interpretation a news still lander is fabricated news

3     sites that are at issue in this case.

4          THE COURT:  Did Leadclick aid and abet deception?

5          MR. LUBETZKY:  Leadclick directly participated in

6     the deception.

7          THE COURT:  You don't think they are liable for the

8     aiding and abetting.

9          MR. LUBETZKY:  They directly participated in this.

10          THE COURT:  So you don't they think they aided and

11     abetted?

12          MR. LUBETZKY:  No.

13          THE COURT:  That's fine.  Can you give me any cases

14     in which a defendant was held directly liable for the

15     deception under either of the acts when the defendant was not

16     the one making, adopting or contributing to the deceptive

17     quality?  I know you gave me Neovi, the Quick Check.

18          MR. LUBETZKY:  Bay Area Council.

19          THE COURT:  I think you also relied on I don't know

20     Magui.

21          MR. LUBETZKY:  Also a deception case.

22          THE COURT:  That's a deception case, but they made

23     the deceptive statement.  The opinion says it turns on Magui

24     misrepresenting that Dally was involved.

25          MR. LUBETZKY:  I think the most opaline cases are

1    the cases I cited.  I think FTC <u>Neovi</u> is directly on case.

2    It is an unfairness count.  It is a difference without a

3    significance.

4          THE COURT:  I guess the problem I'm having is

5    most -- I don't want to generalize too broadly.  Certainly

6    <u>Neovi</u>, the <u>QChex</u> case, and other deception cases you find

7    liability when the defendant passed that deception on to

8    somebody else.  Here I mean you are saying it is Leadclick

9    who made the deceptive statements because they were running

10   these affiliates and knew they were deceptive but nothing

11   comes back to the Leadclick like a lot of these cases do.

12         MR. LUBETZKY:  Other than money.  They are paying

13   the affiliates --

14         THE COURT:  I mean by way of making an act.  Once

15   they hire an affiliate and the deceptive statement gets made

16   in i.e., in the news banner thing, fake sites, Leadclick,

17   other than getting paid, they are not doing anything more

18   than the one piece of evidence where I think one of their

19   managers directed some change in content.

20         MR. LUBETZKY:  Change in content is a lie.

21         THE COURT:  That's pretty bad.

22         MR. LUBETZKY:  No small deal.

23         THE COURT:  But that is only evidenced one.

24         MR. LUBETZKY:  It is pervasive.

25         THE COURT:  Pervasive?

1          MR.  LUBETZKY: Yes.

2          THE COURT:  Maybe I missed your evidence.  After

3    they hired an affiliate and the affiliate makes the fake

4    site, you are telling me there's pervasive evidence in the

5    record that Leadclick is directing the affiliates to change

6    the content of the ad and banners and how to tweak them or

7    whatever and then saying go with God, no publish them.

8    That's what you are telling me?

9          MR. LUBETZKY:  Let me be clear.  The evidence is

10   that there's constant communication with affiliate managers

11   and the affiliates of which projects should be featured in

12   step one and step two.  That's reasonably what should be

13   placed on the fact news site.

14         THE COURT:  You're my web guru.  I hire you to get

15   me on the web on certain pages and get my product out there.

16   I have two products.  I have a cream and I have a liquid.

17   We're not doing well on the cream.  You have to change your

18   site.

19         MR. LUBETZKY:  In conjunction with other evidence

20   that Leadclick knew that the affiliates were using the fake

21   new sites, they are discussing with affiliates which products

22   should be featured in the step one and step two which is

23   which offers should you run.  An example of the type of

24   commence.

25         THE COURT:  Let me interrupt you.  Is there any

1    evidence of a Leadclick employee sitting on his computer with

2    a link that he's clearly opened up and saying oh, I don't

3    like this, you have to talk about the three doctors who said

4    this is the miracle cure.  It says two doctors.  He says you

5    have to make it three.

6            MR. LUBETZKY:  There's no evidence about changing

7    the doctors or about that.  The evidence I was referring to

8    were there's communications and an example there's an IM chat

9    PX 64 between Quentin Redmond, who is affiliate manager, and

10   Andrew Davidson.  Let me back up.  The LeanSpa sales in the

11   advertising network largely concentrated to a handful of

12   affiliates.  20 affiliates accounted for about 90 percent of

13   the Leadclick sales, about four affiliates accounted for

14   about half of the Leadclick sales ran through the EI network.

15   This is through we have a declaration of Kent Kelly

16   summarized the data from impact.  Number four, puts this in

17   context.  The fourth highest is Quentin Redmond, excuse me.

18   Andrew Davidson so what PX 64 IM chat between Quentin Redmond

19   and Andrew Davidson a type of communication about what type

20   of offers to run as well as at one point in March of 2011,

21   when Corelogic is in trouble with the Florida AG, there's

22   discussion between the affiliate Andrew Davidson should I

23   move the photo picks and Quentin Redmond, the Leadclick

24   employee, said advertorial and you should be cool.

25            THE COURT:  Ad what?

1          MR.   LUBETZKY:   The word Advertorial.   That's a

2  disclaimer no one can see on top.

3          Going back, your Honor, and I think I mentioned

4  before a point here is that the Leadclick employees knew that

5  its affiliates, the people it hired, were running fake news

6  sites.   I want to emphasize one of the best documents is PX

7  48.   I think I referenced this document Jamie Olson is the

8  account manager for LeanSpa references that all her offers

9  are through the fake news sites.   I don't have the exact

10  language.   That's PX 48.

11          THE COURT:   In several places in your memo, you list

12  a bunch of ways in which you claim that the Leadclick engaged

13  in deceptive acts.   Your opposition to Leadclick's motion,

14  for example, in 3 to 4, you identify about nine different

15  things you claim they did.   I would like not have to read

16  those to you.   Is there anything -- one is soliciting Mizhen

17  to do business.   One is generating Internet traffic to

18  LeanSpa websites.   One is knowingly targeting and recruiting

19  affiliates using fake news sites to market.   Four is

20  restricting particular merchant offers available to each

21  affiliate.   Five is advising affiliates on changes to

22  content.   Six is pairing LeanSpa's office with affiliates who

23  advertise using fake news sites.   Seven is arranging ad space

24  on genuine news outlets for banner ads linking to fake news

25  sites. Eight was collaborating with Mizhen to try to evade

1    merchant monitoring programs and nine was finding a offshore

2    payment processor for LeanSpa's account when its account was

3    terminated at a U.S. bank.  Is there anything else that you

4    claim was deceptive or is that list exhaustive?

5              MR. LUBETZKY:  I believe those are the types of

6    acts.

7              THE COURT:  Types is does make it exhaustive.

8              MR. LUBETZKY:  I believe that covers it.  I didn't

9    quite hear.

10             THE COURT:  Page 3 to 4 of your reply.

11             MR. LUBETZKY:  I believe that covers it, your Honor.

12             The COURT:  Let's assume hypothetically there was

13   never any fake news pages.  Affiliates did what they did but

14   they didn't use fake news pages, would Leadclick had done

15   anything deceptive under either of the statutes?

16             MR. LUBETZKY:  If there was no fake news sites?

17             THE COURT:  Yes.

18             MR.  LUBETZKY: There would be no deceptive

19   statements.  Correct.  Our count is on the fake that --

20             THE COURT:  Fake news sites were used.

21             MR. LUBETZKY:  Yes.

22             THE COURT:  I know you spent a lot of time arguing

23   that there's evidence in the record to show that the

24   Leadclick employees knew that what was being done was a fake

25   news site for the product they push through to the affiliate

1    to advertise.  They were involved in approving or altering

2    those sites or suggesting changes.

3         The first thing I would like to do is ask you let's

4    assume they knew fake websites were being used, but they

5    didn't direct anybody to do anything with respect to them.

6    They said I want you to go out and place my product on the

7    Web?

8         MR. LUBETZKY:  We have Neovi basically.  You have

9    control plus a blind eye, it's a violation of FTC Act.

10        THE COURT:  Did Leadclick going beyond that, did

11   they contribute on the aspects of the fake news pages that

12   made them deceptive.  In other words, the fake news

13   pages refer to a product, there was a product. That's what

14   Leadclick told these people to advertise was this product,

15   but did they contribute to the fakeness of this web page?

16        MR. LUBETZKY:  It is our position the example by

17   adding certain buzz words.  You will see in our complaint we

18   have Exhibit A that's an earlier version with fake news

19   sites.  They highlight Acai Berry ingredient.  In March 2011,

20   you will see the fake news site discussing the garcinia

21   ingredient.  February 2011, there's evidence that acai had a

22   bad name.  It was attached to a scam.  There's discussions

23   between Leadclick people and the affiliates about using the

24   garcinia as a buzz word.  That's PX 66 and 105.  That's

25   evidence with respect to changing the content of what's

1  appeared on the fake news site.

2          Our broader point, your Honor, even assuming there

3  was no evidence that Leadclick made no suggestions on what

4  should be on the fake news sites, the fact that they

5  knowingly paid affiliates to repeat the name of the fake news

6  site is a violation of the FTC Act.  It is control and

7  knowledge.  Quite frankly, it is exactly on all fours with

8  the AccuSearch case.  I understand that's an unfairness case.

9  That's exactly what happened.  AccuSearch you had a website

10 that's paying researchers or third party weekend vendors,

11 whatever you want to call them, paying them to knowingly know

12 they would illegally obtain consumers' telephone records.

13         THE COURT:  Why don't you sue them for unfairness?

14         MR. LUBETZKY:  We believe under the black letter law

15 control and knowledge they were directly participated in

16 deceptive act.

17         THE COURT:  Does it matter the step one, step two

18 product periods were coming from LeanSpa?  You talked about

19 the step one and step two and Leadclick dealing with the

20 affiliates about it. Does it matter that they didn't create

21 that.  They passed it on?

22         MR. LUBETZKY:  Which product should be featured step

23 one, step two.  There's communication suggested by Leadclick.

24         THE COURT:  Let's say --

25         MR. LUBETZKY:  That's the essence of the fake news

1    site.  The whole point of the fact news site is to make

2    people --

3              THE COURT:  But Leadclick didn't originate that.  It

4    came from LeanSpa.  They are passing it on.  The same way if

5    I'm an advertising agent advertising Colgate Palmolive

6    products.  I hire somebody, put this in the New Haven

7    Register and write me an ad. If we get sales from this coupon

8    offer, you will get X dollars for it and I don't look at that

9    ad and it is a fake ad.

10             MR. LUBETZKY:  I don't want to get too much in this.

11   There's a little more in the evidence.  There's discussion

12   between Leadclick and Weisman which products should be in

13   step one because there's reasons why it went to -- I think

14   generally we'll agree with that.

15             THE COURT:  You argue that part of the conduct at

16   issue here is that Leadclick's conduct with respect to the

17   charge back and payment processor issues, the problems that

18   LeanSpa was having that that contributed to Leadclick

19   violation of Section 5.  Is that your argument?  Maybe it

20   isn't.

21             MR. LUBETZKY:  The argument is that by working with

22   the Leadclick to try to conceal its chargeback levels,

23   allowed basically to conceal the deceptive results of the

24   fake news sites.

25             THE COURT:  That sounds an awful like they aided and

```
1    abetted and continued the fraudulent scheme.
2            MR. LUBETZKY:  It is one part of their conduct.  It
3    is relevant for not only their contribution to the fake news
4    site scheme to allow it to continue but also showed this
5    isn't a mutual conduit here.
6            THE COURT:  You are saying that the conduct is
7    actionable insofar as it prolonged the existence of the fake
8    sites.
9            MR. LUBETZKY:  It allowed the fake news sites to
10   continue.
11           THE COURT:  Are you arguing that conduct alone would
12   be violative of the deceptive aspect of Section 5?
13            MR. LUBETZKY:  Our evidence that Leadclick
14   coordinated with Mizhen on the chargebacks.
15           THE COURT:  If that's the only evidence.
16           MR. LUBETZKY:  That's control and knowledge.  They
17   controlled Leadclick.
18           THE COURT:  Where is the deceptive statement there?
19   If that was the only evidence, there's no evidence they knew
20   anything about what was on the web.  Wasn't a blind eye.
21   They went on vacation and they never checked.  All they ever
22   did was later on they helped Mizhen change banks or do
23   whatever they did about the processor.
24           MR. LUBETZKY:  Just so I understand, there's no fake
25   news sites.  The only conduct Leadclick did was worked with
```

1   Mizhen to try to lower his charge backs.

2        THE COURT:  Yeah, there's the fraudulent scheme

3   going on.  They don't do anything about that.

4        MR. LUBETZKY:  Nothing to do with affiliates, right.

5   Then you may have -- you wouldn't have our claim.  No fake

6   news sites.  You may have an aiding and abetting under for

7   whatever Mizhen's scheme was.

8        THE COURT:  Assume that I ruled in your favor on

9   Leadclick, how do I determine the amount that Leadclick is

10  liable for?  You seem to argue in your memorandum, you ask me

11  actually to disgorge $11,935,415.

12        MR. LUBETZKY:  We want what Bronson says in the

13  Second Circuit and BlueHippo in the Second Circuit.  The

14  court has broad equitable authority to disgorge whatever

15  ill-gotten gains a defendant got from a deceptive scheme.

16  Leadclick got $11.9 from LeanSpa.  No dispute about that. The

17  defendant argues they get to deduct the fees associated with

18  paying out its partners, the affiliates involved in the

19  deceptive scheme.  Bronson squarely rejects that notion in

20  the footnote in Bronson the last one in Bronson, you can

21  deduct the fees associated with committing the crime or the

22  expenses connected to the deception.

23        THE COURT:  Have you gone after the affiliates?

24        MR. LUBETZKY:  We have summoned them.

25        THE COURT:  Have you disgorged from them their

1    illegal gotten gains?  Is that double billing on the FTC's

2    part?

3              MR. LUBETZKY:  No.

4              THE COURT:  Why not?

5              MR. LUBETZKY:  Under the FTC law disgorgement, the

6    remedy of disgorgement serves a purpose.  One is to get

7    redress to injured consumers.  The second is deter violators.

8              THE COURT:  It is like treble damages in antitrust.

9              MR. LUBETZKY: The consumers lost 32 million here.

10   We're not going to get any where near full redress.

11             THE COURT:  You are doing pretty well, so far.

12             MR. LUBETZKY:  We're nowhere near 32 million, your

13   Honor.

14             THE COURT:  Does it matter say hypothetically

15   there's undisputed evidence that they did X, Y and Z.  I

16   don't find that.  I don't find anything but there's not any

17   evidence that they did what you claim they did that's A, B,

18   and C. Does it matter where the damage was caused or where

19   they made the money?  Is there a way to parse that out here

20   or is this one big ball of wax.  If I find that they ran and

21   pushed that ball of wax up the hill to create fraud, then

22   they are liable for all of.

23             MR. LUBETZKY:  If they control and knowledge of the

24   scheme and the evidence that we have where the vast majority

25   of the traffic to LeanSpa was through deceptive means which I

1    think we have.  I think the best evidence we have are the FTC

2    investigator Mike Marina who went through the foreign

3    websites and all the fake news sites.  But if Leadclick is

4    responsible for -- the bulk of its traffic was through

5    deceptive means and got paid 11.9 million, doesn't matter

6    what conduct contributed to the deceptive means.

7            THE COURT:  Now I want you to assume the opposite.

8    Assume I find that there's no material issue of fact and that

9    Leadclick did not control this and not liable under Section 5

10   for deceptive acts.  You seem to argue that I still could

11   rule in your favor against Corelogic.  Is that your view?

12           MR. LUBETZKY:  Our argument was and that is in

13   Corelogic's opposition, was that the Court has to find that

14   Leadclick has to make a factual finding that Leadclick

15   obtained ill-gotten goods from the deceptive scheme.  If

16   Leadclick raised some other procedural issues including

17   whether or not the court has the ability to disgorge and some

18   jurisdictional issues but if the Court found that Leadclick

19   obtained $11.9 million and for example, if, we don't believe

20   this is the case obviously, but if the Court found they

21   cannot order disgorgement because they can order a permanent

22   injunction.  That's one of Leadclick's arguments.  That

23   wouldn't prevent the court from issuing --

24           THE COURT:  Let me put it in a hypothetical.  Let's

25   assume you go to the corner and sell your snake oil.  I'm

1   ignorant.  I think you are going to lunch.  I have no idea

2   what you are doing.  When you finished, you ask me to pick

3   you up.  I pick you up, you say you drove me this far so I

4   will give you some money.  You give me money from selling

5   your snake oil.  When I get home or whatever, I go, I come

6   back to the courthouse for some reason.  I work for Zak.  So

7   I turn over my money to Zak.  The money you gave me.  Can you

8   get the money from Zak, not you.  The Connecticut AG can they

9   get it under CUTPA because you sold snake oil?

10          MR. LUBETZKY:  If I find that, I'm sorry.  If I find

11  that you got money that was derived from the deceptive

12  scheme, through the snake oil scheme, and our statute doesn't

13  allow us to get money from you --

14          THE COURT:  I have no knowledge.

15          MR. LUBETZKY:  No.  Because the equitable authority

16  doesn't allow me to get money from you without conduct.

17  That's their argument.  That's Leadclick's argument.  That we

18  don't have jurisdiction to get money from for whatever

19  reason.

20          THE COURT:  I'm not asking you about their argument.

21  Forget their argument.  Throw it in the river.  I'm asking

22  you about my hypothetical.

23          MR. LUBETZKY:  If you got money from the deceptive

24  scheme then you transfer those proceeds.

25          THE COURT:  To my parent cooperation.

1          MR. LUBETZKY:  To someone who did not have a

2     legitimate claim to the proceeds.

3          THE COURT:  Why didn't they?  I had to turn in money

4     because I used the company car.  I had to pay my supervisor

5     or my parent.  They have a right to be paid.

6          MR. LUBETZKY:  That's the issue that they claim.

7     They have a legitimate claim.  Does Zak have a legitimate

8     claim to the money that you gave him that's tied to the

9     deceptive scheme.

10          THE COURT:  Let's assume for now there's nothing

11     going on between me and Zak the parent company.  I have to

12     give him money.  I have to turn in money I make.  Can you get

13     this money from Zak because it originated through -- you

14     gained it through a deceptive practice?

15          MR. LUBETZKY:  Only if Zak has no legitimate claim

16     to that money.

17          THE COURT:  So if you were engaged in the deceptive

18     scheme.

19          MR. LUBETZKY:  I'm sorry.

20          THE COURT:  If you are engaged in the deceptive

21     scheme, you, and you give me the proceeds of that scheme, I

22     have no involvement in the scheme, I have no knowledge, I

23     think you are going to work every morning for the City of New

24     Haven and you are bringing home a paycheck and cashing it and

25     you are giving me the money.  Then I turn around and give it

1    to Zak.  You can still get it if it was a gift to Zak?  In

2    other words, I didn't owe any money to Zak.  I wanted to give

3    Zak money.  You meaning the government, can get it back from

4    the Zak because it originates as a fraudulent scheme even

5    though I have no knowledge of it and he has no knowledge of

6    it?  Is that your position?

7            MR. LUBETZKY:  If you are a conduit.  If I meant to

8    give to Zak and you had to carry it over to Zak and you

9    touched it.  If you are the Fed Ex person that carried it.

10   We can go over Zak.

11           THE COURT:  Even if Zak doesn't know about the

12   scheme?

13           MR. LUBETZKY:  As a relief defendant.  This is as a

14   relief defendant.  The court has --

15           THE COURT:  Why don't you sue Leadclick as a relief

16   defendant as well as a culpable defendant?

17           MR. LUBETZKY:  We did sue as a culpable defendant.

18           THE COURT:  Could you also sue them as a relief

19   defendant?  Maybe you wouldn't need to.  Strike that.

20           Doesn't the Bronson Partners case tell me -- I can't

21   find any circuit cases to tell me this.  Maybe you tell me

22   that's why I shouldn't follow Bronson but Bronson says the

23   ill-gotten gains must be linked to unlawful practices of the

24   liable defendants.  If that's the principle of law.  My first

25   question is that correct?  If it is the correct and on my

1   hypothetical I found Leadclick not liable, I don't understand

2   how you then can recover from Corelogic.

3        MR. LUBETZKY:  There's no case that's held --

4   there's some language.  You are citing some language that

5   says that.  There's no case that's held that's addressed the

6   situation where a Court has found that Company A liable under

7   the FTC Act and got no gotten gains and because of some

8   procedural defense like CBA or limit through jurisdictional

9   issue, we can't get the money from them and they gave the

10  money to Zak who has no the legitimate claim to it.  There's

11  no case directly on point to that.

12       THE COURT:  I appreciate you saying that.  We can't

13  find one.

14       MR. LUBETZKY:  There's no case going either way,

15  your Honor.

16       THE COURT:  If you had one, Zak would be out on the

17  corner with you selling the snake oil.

18       If it is Leadclick -- is it Leadclick's liability

19  that makes you able to get the ill-gotten gains from

20  Corelogic or is it LeanLeanSpa's liable?

21       MR. LUBETZKY:  It is a finding that the 11.9 million

22  that Leadclick got from LeanLeanSpa the factual finding that

23  was derived from the deceptive scheme.  That's it.  That's

24  the one factual finding and that's what allows us to go after

25  Corelogic.

1          THE COURT:  Does it require the finding that

2    Leadclick is liable for the deceptive practices that led to

3    them getting the 11 plus million dollars or not?

4          MR. LUBETZKY:  We say no.  There's no case on this.

5    There's no case that I mentioned that we could find on this.

6    We know that the -- excuse me.

7          The Court in this instance a public interest statute

8    has broad equitable flexible equitable powers to award

9    complete relief and under that broad principle with the

10   courts, there's no private controversy.

11         THE COURT:  Does it matter that the deceptive

12   practice relates back really to LeanLeanSpa?  It all began

13   with LeanSpa.  If there was never a LeanSpa, there never

14   would be a Leadclick that you are arguing engaged in

15   deceptive practice.

16         MR. LUBETZKY:  The money came from LeanSpa.  There's

17   two components to why consumers were victimized here and they

18   are somewhat related. They got duped by the fake news site

19   and that led them to a LeanSpa trial offer which was

20   obviously legitimized by the fact they thought it was being

21   supported by a trustworthy source and news station.  They

22   lost money by what we establish or what we say was

23   Leadclick's continuity program.

24         THE COURT:  So we have deception here that's

25   independent of LeanSpa's continuity program?

1          MR. LUBETZKY:   Separate.

2          THE COURT:   All 11.9 million came from that piece of

3     deception, not from the continuity program.   Is that fair?

4     Leadclick's 11 million?

5          MR. LUBETZKY:   If you look at the <u>BlueHippo</u> case

6     that we cited from the Second Circuit, the <u>BlueHippo</u> case

7     basically says that the consumers injured by

8     misrepresentation at the time it occurs and it affects the

9     consumer's subsequent buying actions so that's what happened

10    here.   That the moment a consumer saw a fake news site, it

11    affects their actions in whatever it does with Leadclick.

12    The fact that they got further deceived by LeanSpa, does not

13    insulate Leadclick or Leadclick's affiliates deceptive

14    statements.

15         THE COURT:   Is it any problem for you that the

16    affiliates that made the fake sites in your view in principle

17    part made and placed them, aren't defendants in the case?

18         MR. LUBETZKY:   There's no requirement that I'm aware

19    of that we're required to and quite frankly impossible to

20    name every single participant in the deceptive scheme.

21         THE COURT:   I think the answer is going to be no,

22    but do you know of any cases where the conduct defendant, the

23    person doing, I know you argue about the control and

24    knowledge, so it is going to be hard for you to answer, but

25    again assume I don't find Leadclick liable, do you know of

1    any cases where the conduct defendant, in this case, LeanSpa

2    or the affiliates who engaged in the two types of deception

3    that you described about is two or three steps removed from

4    the Corelogic type of defendant that you want to get money

5    from.

6            MR. LUBETZKY:  Corelogic is a relief defendant.  It

7    is not a liability defendant.

8            THE COURT:  I understand.  So it doesn't matter how

9    many steps there are.  You could trace money five or six

10   steps from a relief defendant.

11           MR. LUBETZKY:  If they are in good faith.  If they

12   are a good faith purchaser in between then we do not go after

13   someone who got money from a good faith purchaser.

14           THE COURT:  Are you arguing that Corelogic funded

15   Leadclick knowing the money was being used to coordinate fake

16   sites?

17           MR. LUBETZKY:  We're arguing at the time that

18   Corelogic received the four million from Leadclick in August

19   2011, it was on notice that the proceeds that Leadclick got

20   were from deceptive means, through fake news sites.  We have

21   two, and the evidence is Mr. Chiang's testimony.  Mr. Chiang

22   was the head of the advertise network.  Mr. Chiang testified

23   that the discussion of why the sales weren't up in the first

24   quarter of 2011.  If you look at the figures one and two

25   attached to the memorandum.  You can see two things.  LeanSpa

1    because of the Leadclick sales and sales goes up in 2011.

2    Chiang said he openly discussed the fake news site with the

3    Corelogic people including Mr. Livermore who was the head who

4    had oversight responsibility in early 2011.  We also cite --

5         THE COURT:  Remind me what does Mr. Livermore say?

6    Does he give an affidavit?

7         MR. LUBETZKY:  He says I don't recall.  We cite the

8    case law which is someone says I don't recall doesn't dispute

9    a fact.  We cite to Exhibit 4 to an email I believe in April

10   201 from Mary Secress who took over responsibility from

11   Mr. Livermore where she says that she reports to the

12   Corelogic officials that LeanSpa, which by the way is

13   virtually the sole customer of Leadclick, the top customer of

14   Leadclick had -- she indicates two things.  One that two

15   affiliates that were sued by the FTC had benefited LeanSpa.

16   The second thing was LeanSpa's merchant account, an accepted

17   that allows them so accept credit cards is frozen by First

18   Bank of Delaware.  Those two things put Leadclick on notice

19   that the proceeds that Leadclick got was from illicit

20   sources.

21        THE COURT:  I thought we were talking about

22   Corelogic.  Don't respond.  I will read what you spent two

23   minutes saying which completely went over my head. I don't

24   want to spend anymore time on it.

25        MR. LUBETZKY:  Corelogic is a --

1          THE COURT:  Suppose the 4.1 million dollars was in

2     fact a bona fide loan.  Assume it was a bona fide loan for

3     the purposes of this question it meets all the AutoStyle

4     factors.  Are you arguing the mere fact Corelogic knew the

5     money was derived from the fake news sites means they have to

6     turn it over?

7          MR. LUBETZKY:  Yes.  We cite the Walsh case and the

8     Constantin case.  They have to give value.  Bona fide

9     repayment.  They also have to take it in good faith.

10         THE COURT:  So they fail on the good-faith element?

11         MR. LUBETZKY:  Yes.  I meant to cite for of the good

12    faith Exhibit 4.  I apologize I wasn't clear on that, in

13    addition to Mr. Chiang's testimony.

14         THE COURT:  Are you assuming that all the money paid

15    to Leadclick from LeanSpa was the result of referrals from

16    fake news sites.

17         MR.  LUBETZKY: Yes.

18         THE COURT:  What would you like to for undisputed

19    evidence to support that?

20         MR. LUBETZKY:  Mr. Marino's declaration.  I believe

21    it is PX 95 where basically went through analysis and took

22    from the hip pack data the website that had the most

23    referrals and all the ones he's able to get archived websites

24    were had the fabricated, resembled a fake news site, as well

25    as testimony that I mentioned from Leadclick employees that

1    they understood and were aware that the fake news sites were

2    persuasive.  As well as the contemporaneous emails with

3    Leadclick that I mentioned before of evidence with the

4    affiliates discussing the fake news site.  I think all of

5    that evidence combined shows the fake news sites were

6    pervasive.

7            THE COURT:  I exhausted my questions and I think you

8    have exhausted your time.  Thank you very much.

9            My first question will be about Leadclick so whoever

10   wants to take that.

11           MR. BATEMAN: David Bateman.

12           THE COURT:  Am I correct that your argument

13   regarding Leadclick's liability under the acts is essentially

14   that, one, there's no aiding and abetting liability.  Two, in

15   order to determine whether conduct is a direct violation, I

16   should use the bright line test in Ernst & Young, Wright

17   versus Ernst & Young.  Under that test, you are not directly

18   liable because it didn't make or adopt the deceptive

19   representations.

20           MR. BATEMAN: I think that's exactly the analysis,

21   your Honor. I'm not sure you stated the last point exactly

22   right.  I think the last point is not whether we created or

23   adopted.  I don't think that's the bright line test.  As I

24   recall, it is whether we published, essentially created the

25   content or was attributed to us publicly.  I believe that's

1   the third part of the bright line test.  I think that comes

2   from the Ernst & Young case or the Pimco case is the most

3   recent Second Circuit case that talks about the bright line

4   test.  It is there I think the law firm was involved in

5   helping actually write up the document, but because the law

6   firm wasn't named in the document, nothing said anything

7   about the law firm, they made that the test, whether there

8   was attribution in the illegal conduct.

9        THE COURT:  What if the lawyer controlled what was

10  in the website and directed the people making the website?

11       MR. BATEMAN: If the person wrote it and published

12  it.

13       THE COURT:  No.  They didn't put the pen to paper.

14  Somebody else typed in the stuff, but later they saw it, they

15  encouraged it.  They said yes, put that on the web and by the

16  way, tweak it a little bit.

17       MR. BATEMAN: Agreed.  I think if you hire someone to

18  write -- if you are not a good typist. You hire someone to

19  type it for you, you give them the words, essentially that

20  would meet the bright line test.

21       THE COURT:  But I don't give them all the words.

22       MR. BATEMAN: If you give them the illegal words or

23  the actionable words.

24       THE COURT:  I say to you I want an ad on the web.  I

25  don't know how to do that.  I don't want to spend my time.

1    Here's the product.  You write it up.  You say put it here,

2    put it there.  If the ad said we have a product to say I'm

3    selling 29.95.  Please click here.  Fine.  None of us are

4    liable, right?

5         MR. BATEMAN: Right.

6         THE COURT:  If it says Dr. Oz or whoever of the day

7    fancy doctor says this is a great product, and it will cure

8    all of your ills, whatever else is fake about it or go read

9    this article on the New York Times how this product is the

10   best thing to ever happen so Zak's writing this ad.  He's the

11   one I have gone to.  I tell him I want him to push these

12   products.  Feature this product over that or push this word

13   or that word but I don't tell him to make it fake.  He makes

14   it fake.  He tells me.  Are you okay with this?  And I say

15   yes.  Go for it.  This is wonderful.

16        MR. BATEMAN: If he creates it.

17        THE COURT:  I haven't adopted by telling go for it.

18        MR. BATEMAN:  Not responsible.  Let me explain why.

19   I think what the FTC is moving to is what we think is an

20   agency theory.  We're talking about agency in the context of

21   an advertising network.  Advertising networks and incentive

22   advertising has been around for ever.  Affiliates have been

23   around for ever.  Before the Internet, when the Encyclopaedia

24   Britannica people would come to your house and would sell you

25   something, there were affiliates.  They said what they wanted

1    to say and the law has developed over the last 50, 60 years

2    those people are independent contractors and an affiliate

3    network and affiliate network manger is not responsible.

4            THE COURT:  Tell me the best case in the Second

5    Circuit.  Maybe one of your colleagues can scramble for it.

6            MR. BATEMAN:  I don't know.  Since the Internet

7    began, affiliate marketing has been since then.  The concept

8    here is that affiliates have always been independent

9    contractors.  They create whatever content, whatever they

10   want, and they're publishers.  That's why they are called

11   publishers.  They do their thing.

12           If we had hired someone to make that ad, it might

13   have been.  I don't know how to get to it.  If our people

14   said --

15           THE COURT:  I think the FTC is effectively arguing

16   that's what you did.  You knew what they were going to do.

17   You didn't hit the key strokes, but you directed them to do

18   the bad thing that makes this deceptive.

19           MR. BATEMAN:  That might be their argument, but the

20   facts are absolutely to the contrary.

21           THE COURT:  I have exhibits 145 to 161.

22           MR. BATEMAN:  May I explain why?

23           THE COURT:  Sure.  131 to 145.  I have a lot to look

24   at.

25           MR. BATEMAN:  You do.  May I explain the difference?

1        THE COURT:  Yes.

2        MR. BATEMAN:  These websites were not created in any

3   way by us.  These were made already.  By the time they hired

4   these people, they had their websites.  This is not something

5   we said Zak write up an ad for us.  Zak already had a site.

6   Zak already had a site that had deception on it.  He had the

7   site.  We brought him into our network as an advertiser.

8        THE COURT:  But if you, let's make you the

9   Leadclick.  You know that by hiring Zak, in effect, you are

10  letting him loose to go create deceptive havoc on the

11  consumer market.  You know that.

12       MR. BATEMAN:  I will say here's there already.  He's

13  doing it.

14       THE COURT:  Not with your product, your client's

15  product.

16       MR. BATEMAN:  He's doing it with that client's

17  product through another network so I would disagree. I think

18  he's there already.

19       THE COURT:  You are increasing it.

20       MR. BATEMAN:  Let's pretend that's true.

21       THE COURT:  You are increasing it.

22       MR. BATEMAN:  Absolutely.  I'm with you.

23       THE COURT:  I don't understand why you aren't

24  causing that statement to be made knowingly.

25       MR. BATEMAN:  The statement has been made.  It is

1    out there.  It is published.

2         THE COURT:  Not until you hire this person.  This

3    person hasn't made that statement for Leadclick.

4         MR. BATEMAN:  Yes, he has.

5         THE COURT:  So you if are the second guy out there

6    selling the snake oil, you're not liable because sorry people

7    buying the snake oil, it doesn't matter I'm selling 14 cases

8    a day on a corner in New Haven.

9         MR. BATEMAN:  None of those people are liable under

10   a direct liability.

11        THE COURT:  That's a different answer.

12        MR. BATEMAN:  If this had been pled a different way,

13   I might not standing in front of you arguing this way.

14        THE COURT:  Tell me what case would most comfort me

15   to conclude that despite all this deception and evidence you

16   don't deny all of the evidence.  I think you say it is on

17   rare and isolated occasions.  I will have to decide whose

18   characterization is correct by going back to all of this

19   evidence the plaintiff directs me to.  That, for example,

20   Redmond discussed changes in a website.

21        MR. BATEMAN:  Yes.

22        THE COURT:  You want me to find that because the

23   government chose to plead deceptive theory instead of

24   unfairness, you would agree this would be an unfair case?

25        MR. BATEMAN:  I haven't studied it enough.  I don't

1    want to take a position.

2         THE COURT:  You have to concede that.  If you don't,

3    we'll spend the rest of your time discussing it.

4         MR. BATEMAN: There's a test under the unfair is

5    about the value to the consumer. I think that economist might

6    find that the value of having an affiliate network offsets

7    the value -- the third part of the test under unfair.  I

8    think it might be.  I don't feel comfortable conceding it.

9         THE COURT:  Let's assume there is no value for the

10   of argument. It would be unfair.

11        MR. BATEMAN:  There would be an unfair in Washington

12   state and maybe under the state law, maybe under the FTC Act,

13   there would be unfair practice.

14        THE COURT:  I would assure you under CUTPA you would

15   find it.  You haven't seen anything that isn't unfair under

16   CUTPA.  I have several jury verdicts under my belt to that

17   effect.

18        MR. BATEMAN:  May I make a point about the factual

19   predicate that you just talked about.  Ms. Anison and

20   speaking about whether Leadclick actually.

21        THE COURT:  Redmond.

22        MR. BATEMAN:  Leadclick was agnostic about whether

23   people used these sites.

24        THE COURT:  I don't know you can say that.  Are we

25   going to spend all of your time digging through these?  In

1  the moment I flipped through 116,  he didn't seem agnostic.

2        MR. BATEMAN:  Let me address that.

3        THE COURT:  It is not agnostic.

4        MR. BATEMAN:  May I address it?

5        THE COURT:  You may.

6        MR. BATEMAN:  What happened with Ms. Anison, if you

7  look at the response to the PX number on that, you will see

8  the full thing quoted.  What she was doing she had been

9  contacted by one of the affiliates who said I want to run on

10  the network the new style landers.

11        THE COURT:  You will seen that.

12        MR. BATEMAN:  Agree.  She asks the guy who has the

13  relationship with the merchant, say it is the Boris or

14  LeanSpa or whoever that is.  They say what do you think.

15  This is your product.  Do you want to run this?  The merchant

16  decides and makes the rules about how these can be

17  advertised.

18        THE COURT:  So LeanSpa is a pipeline.

19        MR. BATEMAN:  It is.

20        THE COURT:  It is isolated and the untouched by the

21  deception that's occurring because it's contained in that

22  pipe.

23        MR. BATEMAN:  I will concede one more thing.  They

24  certainly knew in the world of online advertising that there

25  were people using these news sites.  I will call them fake

1     news site.

2          THE COURT:  It is not just people.  It was the

3     people they were hiring and getting money.

4          MR. BATEMAN:  They didn't think and I have to say

5     being in the industry, no one at the time thought these were

6     illegal.  They thought -- I'm serious.  These were like

7     advertorials that you saw in the middle of the magazine.

8     When you open up the magazine it talks about do business in

9     North Korea or Russia and has the same font and then there's

10    a little thing that says this is an advertorial.  That's how

11    people were justifying it then.

12         THE COURT:  Nothing in that advertorial was false?

13         MR. BATEMAN:  I'm not sure.

14         THE COURT:  I don't know but.

15         MR. BATEMAN:  The deception here is exactly no one

16    is accusing of saying anything false.

17         THE COURT:  They are.

18         MR. BATEMAN:  They are accusing us of -- using two

19    bits --

20         THE COURT:  They are saying you had knowledge and

21    control over what was said and what was said was deceptive.

22         MR. BATEMAN:  The deceptive parts are that it is the

23    news style lander which is what an advertorial is.  This news

24    style thing.  It would be the comments on the bottom.

25         THE COURT:  That was fake.

1          MR. BATEMAN:  I didn't.

2          THE COURT:  No fraudulent but deceptive.

3          MR. BATEMAN:  It was fake.  I have to say a jury or

4     a fact finder would find it deceptive.

5          THE COURT:  If it is going to be me, if there's

6     factual issues.

7          MR. BATEMAN:  I can see where you are headed with

8     this.

9          THE COURT:  They knew in the particular online

10    world, not the world in general, people out there selling

11    snake oil, they didn't realize that the people they are

12    hiring were selling snake oil.

13         MR. BATEMAN:  They absolutely knew that people were

14    running fake news site.  They didn't control that.  I take

15    issue with the idea they control it in any way.  I take issue

16    with the idea they had anything to do with the actionable

17    comment.

18         THE COURT:  When in 116 they say go for it, new

19    style lander fine.  I have the wrong word.  That's the gist

20    of what I read.  The affiliate is asking for permission is it

21    okay.

22         MR. BATEMAN:  They pass along the merchant's

23    instruction to them about what they are to do.  They do not

24    control in the agency sense.  These are independent

25    contractors.

1            THE COURT:  I hate doing this.  Who was the person

2    at Leadclick whose name I will look for?

3            MR. BATEMAN:  Ms. Anison.

4            THE COURT:  That's at Leadclick.  Who is the person

5    at LeanSpa?  I thought she told me she went to LeanSpa.

6            MR. BATEMAN:  She went to Jamie Olsen who is the guy

7    at Leadclick who had the relationship with LeanSpa.

8            THE COURT:  Let's back up.  You are telling me that

9    when the affiliate wrote to Leadclick and said is it okay if

10   we use fake news site, in effect that person at Leadclick

11   went to the boss who was the product manager.

12           MR. BATEMAN:  No.  The way Leadclick is divided,

13   there's people that work with the publishers and people that

14   work with the merchant.  The affiliate asks can I run this.

15   She says I don't know.  Let's find out from the merchant.

16   She goes to the guy that had the relationship with the

17   merchant. That's Jamie Olsen.  That's the communication you

18   will see there.

19           THE COURT:  Does Olsen write back to Anison?

20           MR. BATEMAN:  Yes.  Says yes, the merchant is okay

21   with this.

22           THE COURT:  Does he write to LeanSpa and say is this

23   okay?

24           MR. BATEMAN:  It is not LeanSpa.  They are talking

25   about a different product.

1          THE COURT:  I don't understand.  I'm completely

2    confused.  You are telling me that the affiliate asks

3    Leadclick can I do this and the first person he gets to at

4    Leadclick happens to be an affiliate.  She asks the person on

5    the product side, and the Leadclick employee tells the other

6    Leadclick employee go for it?

7          MR. BATEMAN:  Says this is what the merchant rules

8    are.  The merchant tells us what we can do.

9          THE COURT:  Why doesn't that make the Leadclick

10   liable?  They are authorizing the Leadclick to make a

11   deceptive statement.

12         MR. BATEMAN:  Not at all.  The test for agency.  If

13   agency still exists after Central Bank which I'm not sure

14   that it does, these cases that are cited are cases where

15   those three cases in the footnote 4 are not really very good

16   when you compare them to Central Bank.  I'm not sure it

17   survives the bright line test.  Assuming it does, agency you

18   have to prove control and right to control what you have to

19   prove is control and right to control the deceptive conduct.

20         THE COURT:  In this instance, in that email, the

21   affiliates are being controlled by Leadclick.

22         MR. BATEMAN:  Not controlled at all. Asking a

23   question about whether the merchant permits it.

24         THE COURT:  If I don't apply the bright line test,

25   does this violate the acts?

1          MR. BATEMAN:  I don't know what test you are going

2     to apply, then I have to the decide if it violates the acts.

3          THE COURT:  May be the fact finder should decide

4     whether the changes made by Redmond in a fake news site are

5     material or contributed to the deception.  Maybe that needs

6     to be found by a fact finder.

7          MR. BATEMAN:  That may be true.  But I think you are

8     asking me are they liable.  What other test are we going to

9     use?  If we don't use the bright line test, what are we going

10    to use?

11         THE COURT:  Direct control and direction.

12         I think it boils down what sounds like to me an

13    agency argument.  That in effect Leadclick was a principal

14    who knew and controlled what affiliates did.  Is that a fair

15    same of your position, sir?

16         MR. LUBETZKY:  That's correct, your Honor.

17         THE COURT:  That's the test.  Is there agency here

18    over the affiliates.

19         MR. BATEMAN:  Not in slightest.  First wasn't pled,

20    it wasn't the theory of the case, not in the brief, so I'm

21    glad to talk to you about it, but that's not the theory of

22    this case.

23         To have agency we start with what's the relationship

24    between these people.  There's an agreement between an

25    affiliate manager and the affiliate.  Independent contractor

1    agreement.

2              THE COURT:  Then I control.

3              MR. BATEMAN:  It is in the record.

4              THE COURT:  I control you.  I tell you.  I tell the

5    affiliate Zak what to do.  I approve what he suggests and I

6    change what he's doing.

7              MR. BATEMAN:  None of that's evidence.  That didn't

8    happen.

9              THE COURT:  Redmond changed a website.  116 knows it

10   is going to be fake.

11             MR. BATEMAN:  To a nondeceptive portion of the

12   website.

13             THE COURT:  Does he know the website is deceptive?

14             MR. BATEMAN:  He knows what the website is.  He does

15   not believe and I said this before, your Honor, no one there

16   believed this was deceptive.  Being in the industry myself I

17   think it is true.  No one thought that this was deceptive.

18   They thought it was common place.  That's neither here nor

19   there.

20             THE COURT:  I think it is neither here nor there.

21             MR. BATEMAN:  If we had an aiding and abetting case,

22   we would be talking about knowledge and those things but

23   we're talking about the bright line test.

24             THE COURT:  Let's assume that Central Bank doesn't

25   apply to the FTCA, the plaintiffs pursued an aiding and

1    abetting theory that clearly our Assistant General could have

2    applied.   Central Bank doesn't apply to the FTC.  Do you

3    agree that Leadclick aided and abetted deception here?

4              MR. BATEMAN:  I can't say that.  I don't know.

5              THE COURT:  Come on. Everything you put in front of

6    me and all that you have read they put in front of me, you

7    are going to stand there and tell me it is not aiding and

8    abetting?

9              MR. BATEMAN:  I would love to try that case.  I

10   think it would be okay.

11             THE COURT:  If you like to lose, you might try that

12   case.  You are not going to concede that?  I had a wonderful

13   colleague, that's much smarter than me, Judge Kravitz, that's

14   the public perception was, probably correctly so he was a lot

15   smarter than me, and he used to favor oral arguments because

16   he always got people to concede something in the oral

17   argument.  I'm going to stand here until I get you to concede

18   that because I do not understand how you can say they did not

19   aid and abet.  They had knowledge at some point these were

20   fact.

21             MR. BATEMAN: I will give you that.

22             THE COURT:  They clearly aided and abetted it.  They

23   caused it to happen.  They permitted it to happen.

24             MR. BATEMAN: Honestly, your Honor, I don't think

25   that's true.  I think it was happening.

1          THE COURT:  Your credibility quotient is diving and

2     it's going to be in your socks soon.

3          MR. BATEMAN:  I'm a huge fan of the affiliate

4     network, and I don't think by running an affiliate network

5     you aid and abet what an affiliate is doing.  I know you

6     don't like that.  I can see.

7          THE COURT:  You argue at some point in your

8     opposition it seems that you are suggesting because the media

9     buying was conducted by a separate division of Leadclick that

10    has some bearing on whether you are liable or whether that

11    makes you not liable.  I don't get that argument.

12         MR. BATEMAN:  May I say four things about media

13    buying?  First of all, our point on that was that this media

14    buying issue was never pled.  It is new.  Not in the

15    complaint and the complaint was amended three times.

16         THE COURT:  How about the fact that Leadclick

17    provided a way to directly connect the two types of sites?

18    There you go the aiding and abetting, right?

19         MR. BATEMAN:  If that was the aiding and abetting,

20    your Honor, Google would be out of business.  Google connects

21    everyone in the world.  Comcast connects everyone in the

22    world.

23         THE COURT:  Google doesn't have a client that's

24    selling the fake product to one of the sites.

25         MR. BATEMAN:  Boris Mizhen he advertised on

1    Google.

2           THE COURT:  Did Google go out and engage someone to

3    create fake websites?

4           MR. BATEMAN:  It is not that, your Honor.  You were

5    asking me is this occurring.

6           THE COURT:  I asked you about the connection between

7    the fake news site.

8           MR. BATEMAN:  That's what Google does.  It connects

9    people.

10          THE COURT:  Add to that the additional fact they in

11   effect assist the creation of that fake site.

12          MR. BATEMAN:  If you are asking me about the

13   connection, that's absolutely not part of liability.

14          THE COURT:  Doesn't it make it more likely for them

15   to believe that the fake news site was a genuine site?

16          MR. BATEMAN:  Not more likely to do it, it enhances

17   the traffic to it.

18          THE COURT:  Let's go back to the media buying.

19          MR. BATEMAN: Yes, I got distracted.  Four points on

20   media buying.

21          THE COURT:  I hope one of them answers my

22   questions.

23          MR. BATEMAN:  Does that have anything to do with it,

24   absolutely not.

25          THE COURT:  You seem to argue that the fact that

1    media buys was conducted by a separate division had some

2    bearing on your client's liability.

3            MR. BATEMAN:  That's non sequitur on our part.

4            THE COURT:  That's not the suggestion that you are

5    making.

6            MR. BATEMAN:  Our suggestion is this, if I may, at

7    best what media buy is aiding and abetting.  It gets more

8    people to the site.  It connects more people to the site.

9            THE COURT:  Isn't Neovi even unfairness case, isn't

10   it quite instructive for me as a district court on what

11   constitutes direct versus secondary liability?

12           MR. BATEMAN:  I think it couldn't be any further

13   aware as possible.  The guy published the checks.  They made

14   the checks.  If we made the website, if we made the fake news

15   site.

16           THE COURT:  After the fake news site was made, you

17   went out and hired them.  At some point you now they are fake

18   sites, then you help them by making changes to them.  Then

19   you help Mizhen to extend this scheme.

20           MR. BATEMAN:  I think if you look at QChex, if you

21   looked at that under Central Bank, that would disappear.  I

22   don't think there's anyway that would survive Central Bank if

23   it was a direct liability case under Section 5.

24           THE COURT:  But the court found in effect as a

25   matter of law that they knew what they were putting in the

1    check their created was fake.

2            MR. BATEMAN:  That's a fine test for the unfair

3    prong of Section 5.

4            THE COURT:  They made a deceptive statement and

5    passed it on to someone.

6            MR. BATEMAN:  They did, we didn't.

7            THE COURT:  Isn't that deception?

8            MR. BATEMAN:  No, not at all.

9            THE COURT:  I'm not trying to talk you about your

10   client.  I'm talking about QChex and what the Q check court

11   is saying.  You don't think that they would have found if

12   pled that it was also a deceptive act by QChex?

13           MR. BATEMAN:  Not under the bright line test, not at

14   all.

15           THE COURT:  Why not?

16           MR. BATEMAN:  They didn't have communication with

17   the customer, with the consumer.

18           THE COURT:  I thought that in QChex somebody stole

19   this information that makes the check bogus.  That

20   information is passed on to QChex who makes the bogus check,

21   who then in effect puts it in the check cashing system to be

22   cashed, knowing it is fake.  That isn't deceptive?

23           MR. BATEMAN:  Having published it, the publisher and

24   the creator have knowledge, yes, I think they would lose

25   under Section 5 of the bright line test.

1          THE COURT:  They would be help directly liable?

2          MR. BATEMAN:  Directly liable, yes.

3          THE COURT:  I go back.  Just like QChex -- QChex

4    didn't fraudulent obtain the input, the fake input.  Somebody

5    else stole that and gave it to them.  Lead click didn't

6    create as you keep arguing to me the fact news sites but like

7    QChex they were aware of this deceptive activity and

8    continued on, keep hiring these people, keep paying them for

9    what they were doing.  Why isn't that like QChex?

10         MR. BATEMAN:  The QChex deception.  If QChex was the

11   Section 5 case under the deceptive prong, the illegal act in

12   QChex is communicating that stuff to the customer.  QChex

13   delivering the stuff to the consumer knowing it is false.

14         THE COURT:  So the difference is and I said this to

15   the plaintiff.  The difference is if in this case you hired

16   an affiliate, they created an ad, then somehow turned it back

17   to Leadclick to work.

18         MR. BATEMAN:  We edit.  We do it we publish it.

19         THE COURT:  Seems to me you think the editing

20   wouldn't matter as long as you aren't the one publishing it.

21   That's your bright line test.

22         MR. BATEMAN:  The bright line test says we're the

23   author.  Some people call it that creator, the publisher.

24   Where Jake.  I don't think we are.  I don't think there's any

25   evidence to suggest we are.

1           THE COURT:  Why should I think that that Ernst &

2   Young applies here to the FTCA?  That's my dear friend Judge

3   Meskill wrote that opinion.  He passed a while ago.  It's 17

4   years old.  We haven't yet had it applied to an FTC Act

5   case.

6           MR. BATEMAN:  Two different questions there.  One is

7   does Central Bank prevent the FTC from doing an aiding and

8   abetting case.  I think we agree it does.

9           THE COURT:  I don't think the government concedes

10  that, but I think it doesn't matter they are not claiming

11  it.

12          MR. BATEMAN:  I would say the government conceded it

13  publicly.  FTC commissioners have.

14          THE COURT:  I don't care about that.  They are not

15  claiming it.

16          MR. BATEMAN:  They are not claiming it.  We're left

17  in the position that you have to the decide a rule of law.

18  What's the rule of law that distinguishes an aiding and

19  abetting case on one hand from a direct liability case on the

20  other hand.  I think that's where we are.  Our position is

21  that the courts have struggled with that over and over.  All

22  the circuits have struggled.

23          THE COURT:  Are there theories -- what's the word.

24  Mutually exclusive.  In Neovi couldn't the QChex company been

25  liable under the direct theory and the aiding and abetting

1   theory?

2           MR. BATEMAN:  In the old days, yes.

3           THE COURT:  Let's say our AG brings it under CUTPA,

4   couldn't he plead direct liability and aiding and abetting

5   and have both of those go to a fact finder?

6           MR. BATEMAN:  You could.  You are asking me why

7   should you apply the bright line test here.  I think the

8   answer is you have to apply some test.  All the circuits have

9   thought about this for a long time and say look, there's a

10  real problem here because I have to draw a line somewhere.  I

11  have to a create test and the only test that people have come

12  away with that makes any sense is this bright line test

13  saying either you are the speaker publisher or do something

14  else and all that other stuff is aiding and abetting.

15          THE COURT:  I think I asked you this and you fudged

16  on me.  If the plaintiff had pled direct unfairness claim,

17  would Leadclick be liable?  Didn't they engage in practices

18  that facilitated or contributed to an ill-intentioned theme.

19  That's language from the case that you the Neovi case, the

20  QChex case.

21          MR. BATEMAN:  If they had, yes, I said my only

22  problem with that, your Honor, is the third part of that

23  test.  And the third part of that test talks about economic

24  benefit and detriment.  I think that's an economic analysis.

25          THE COURT:  So you mean it fails on summary

1    judgement or they are going to lose no matter what.  It's

2    undisputed there's an economic benefit here that outweighed

3    the detriment?

4            MR. BATEMAN:  Yes.

5            THE COURT:  Using the fake news site?

6            MR. BATEMAN:  The issue is not fake news site.  It

7    is whether an affiliate.  I don't want you to endorse fake

8    news sites.  I'm not saying anything about the fact news

9    site.  I'm saying is an affiliate network responsible for

10   creating an unfair act, you have to look at that third point

11   and see is there economic benefit or not and that's an expert

12   issue we haven't prepared on.  I have to say that.  I haven't

13   looked at it.

14           THE COURT:  I'm in the middle of trying to get a

15   bench ruling out.  One of the issues was whether they would

16   amend their complaint post-trial under the rule to conform to

17   the evidence and all of that.  I'm wondering why can't I let

18   the FTC proceed on an unfairness claim here?

19           MR. BATEMAN:  We haven't doesn't discovery on that.

20   That's an expert issue.  You have to bring in experts to talk

21   about it.  It is an economic analysis that comes in.  This

22   complaint has been amended three times.  You were very clear

23   the last time.  We did eight months of discovery, set up the

24   case the way we wanted to and we're here before you.

25           THE COURT:  If facilitating actions that will

1    predictably injure a consumer is sufficient for direct

2    liability under the unfairness prong, why isn't facilitating

3    misrepresentations or fraud that will predictably deceive a

4    consumer also sufficient under the deceptive prong?

5          MR. BATEMAN:  The problem is this, your Honor.  The

6    FTC is a creator of the statute.  The statute could have been

7    written differently but it wasn't.  What it says when your

8    proposition there is aiding and abetting.  And if Congress

9    wanted to give the FTC aiding and abetting authority, they

10   could.  The FTC has asked for it.  Trying to get it.

11         THE COURT:  The QChex case admitted an unfairness,

12   presumably there's aiding and abetting to unfairness, too,

13   right?

14         MR. BATEMAN:  I'm sure.

15         THE COURT:  They use language like practices

16   facilitating or contributing to and they found that to be

17   direct liability under the unfairness prong.  I'm asking why

18   doesn't that language, that test, also work under deception

19   without making it aiding and abetting because the Neovi case,

20   the Ninth Circuit case doesn't find aiding and abetting

21   against QChex.  They found unfairness liability for people

22   who practice, facilitate or contribute to ill-intentioned

23   schemes if their injury was a predictable consequence which I

24   don't think we can argue about that.

25         MR. BATEMAN:  Those are all aiding and abetting.

1    Here the verbs in their brief facilitated, coordinated,

2    assisted.

3            THE COURT:  I'm giving you language from Neovi, the

4    Ninth Circuit case, that found direct liability under the

5    unfairness prong of the FTCA so why did the Ninth Circuit use

6    language like because they were ignoring your bright line

7    test?

8            MR. BATEMAN:  Bright line test didn't apply at all.

9            THE COURT:  Tell me the best what deception case

10   most supports your theory that Leadclick is not directly

11   liable.

12           MR. BATEMAN:  I think we only need the bright line

13   test.

14           THE COURT:  So Ernst & Young, a securities case.

15           MR. BATEMAN:  The Pimco that came afterward.

16           THE COURT:  Pimco is an FTCA case?

17           MR. BATEMAN:  SEC case.

18           THE COURT:  I asked you what FTC Act or CUTPA

19   deception case best supports your theory that Leadclick is

20   not directly liability.

21           MR. BATEMAN:  I don't think there are any cases and

22   your Honor is going to be the first to deal with this.

23           THE COURT:  That's why they pay me the big bucks.

24           MR. BATEMAN:  The bright line test applies.  I don't

25   know any other case that visited this in the FTC context.

1    Can you ask me one question about CDA 230?

2         THE COURT:  Say whatever you want to say.

3         Would you like, Mr. Hancock?

4         THE COURT:  Yes, I have some Corelogic questions,

5    not quite as many, but I have a few.

6         MR. HANCOCK:  Paul Hancock on behalf of Corelogic.

7         THE COURT:  Yes, sir.  You seem to argue in your

8    memorandum in support of your motion that if Leadclick isn't

9    liable then Corelogic can't be liable.  And I think my

10   fundamental question is why.  The reason why I need to ask a

11   why question is it seems to me the standard for disgorgement

12   from a relief defendant, which is what you are, is possession

13   of ill-gotten gains and lacking a legitimate claim to the

14   fund.  Do you dispute that these are ill-gotten gains?

15        MR. HANCOCK:  Yes, of course, we dispute they are

16   ill-gotten gains.

17        THE COURT:  You think it is fine to have fake news

18   sites and generate revenues from that and money and take it

19   from your sub and it is not ill-gotten because it is in your

20   hands now.

21        MR. HANCOCK: The issue of whether it is ill-gotten

22   gains reverts to whether Leadclick is liable for deceptive

23   practices.

24        THE COURT:  Let's say they pled the wrong theory and

25   I find they haven't proved a direct deception, but there's no

1    question in my mind that this is an unfair practice under the

2    statutes up the wazoo and around the pole and back again,

3    there's no question in my mind that the gains are ill-gotten.

4    The record I find is no material issue of fact that these are

5    ill-gotten.

6              MR. HANCOCK:  Let me try and answer that with some

7    explanation.  I think ill-gotten means they are liable.  A

8    judgment can be entered against the conduct defendant.  The

9    idea of a relief defendant.  It is only a nominal defendant.

10   The courts have used a lot of different language.  There's

11   only a nominal defendant.  The Ninth Circuit in the Collello

12   case talked about it is usually a bank that is holding money

13   that belongs to the conduct defendant.  That's their money.

14   That the concept of the relief defendant.  The relief

15   defendant has money that's not theirs.  It is rightfully

16   owned by the conduct defendant.  If there's a disgorgement

17   order --

18             THE COURT:  If that was the case -- I don't think --

19   that's not my understanding.  My understanding is -- I don't

20   know.  It is not theirs because it was ill-gotten, and they

21   don't have a legitimate claim.  If that's what you are

22   saying, I would agree with you.  It is in the hands of and in

23   the title ownership of that third person.

24             MR. HANCOCK:  Not rightfully.

25             THE COURT:  That's the ultimate question in this

1    case.  That begs the question.

2          MR. HANCOCK: The purpose of a relief defendant is it

3    is not their money.  The money belongs to the conduct

4    defendant.

5          THE COURT:  The reason it belongs to the conduct

6    defendant is because it is ill-gotten and you don't have any

7    legitimate claim.

8          MR. HANCOCK: That's right.  It ought to be subject

9    to a disgorgement in an order at the conduct defendant.  It

10   is part of the disgorgement remedy.  If the conduct defendant

11   is not liable for disgorgement, then they can't take that

12   money.  It's nominal.  It is a derivative of the conduct

13   defendant's liability.  If the conduct defendant isn't

14   liable, they don't have to disgorge any money including money

15   that's theirs that's in the bank.  If the bank is holding

16   money of the conduct defendant under this theory the FTC

17   could file against a bank that it is holding money of a

18   nonliable party and say that money belongs to the FTC.  There

19   has to be an order directed at the conduct saying you

20   violated the law, you have to disgorge, you have to satisfy a

21   judgment and some of your money is being held by somebody

22   else so that money is going to be used as part of the

23   disgorgement.  That's the whole concept of a relief

24   defendant.  There's never been, never a case like the FTC

25   claims here.

1          THE COURT:  Is there a case like you claim?  What's

2     your best case?

3          MR. HANCOCK: Our best case are the cases like <u>Walsh</u>

4     that FTC starts.  The issue is whether there's any legitimate

5     claim to the funds.

6          THE COURT:  Let's assume the FTC didn't choose to

7     sue Leadclick.  Does that mean it can't trace money to you?

8          MR. HANCOCK: They can't come and seek money from a

9     party that they are not going to attach any violation of the

10    law to.

11         THE COURT:  Most of the people in this case entered

12    into stipulated judgments in which they say they don't

13    anytime anything.  But the government comes forward with

14    proof, assume for the moment, I find there's no material

15    issue of fact, as a matter of law conduct was deceptive that

16    was engaged in here forget about who did it.  There was

17    deceptive conduct.  Would you agree with me?

18         MR. HANCOCK: Some of this is very basic concepts on

19    the law that an agency has to file a legal claim alleging a

20    violation and a court has to find a violation.  Yes, parties

21    can consent to a remedy.  They can withhold an admission of

22    the liability.  The government can't come and take a

23    corporation's money without filing a violation of the law.

24    You can't do it in a vacuum.  You can't say there's no

25    allegation or violation here, I think there's a violation so

1   I'm going to take this money.  The relief defendant again is

2   holding money that rightfully belongs to the conduct

3   defendant, the concept of relief defendant is that that money

4   ought to be part of a disgorgement order directed at the

5   conduct defendant.  If you can't direct an order of

6   disgorgement against the conduct defendant, then that money

7   that belongs to the conduct defendant can't be disgorged

8   either.

9          THE COURT:  Let me ask again.  Do you agree that the

10  FTC and the Connecticut has proven on undisputed facts on the

11  record before me that deceptive conduct was engaged in by

12  someone?

13         MR. HANCOCK: By someone?

14         THE COURT:  Yes, sir.

15         MR. HANCOCK:  We're not defending that.

16         THE COURT:  Just answer my question.  It is the

17  second time I asked it.

18         MR. HANCOCK:  Was LeanSpa engaged in deceptive

19  conduct?  I'm not contesting whether that they weren't.  I

20  don't know much about what LeanSpa was doing.

21         THE COURT:  Do you concede that the FTC and the

22  State of Connecticut has put before this court evidence that

23  is uncontested that evidence deceptive conduct by some party,

24  some person or entity?

25         MR. HANCOCK:  I would say LeanSpa they did consent

1  to a judgment and I wouldn't contest that.  I don't know.  I

2  haven't researched the facts but LeanSpa seem not to

3  challenge it.

4         THE COURT:  Do you agree that it has been

5  demonstrated that the ads which ran on the Internet, the

6  banner ads what are called quote, fake new ads, end quote

7  were deceptive?

8         MR. HANCOCK:  I don't contest it, your Honor.  Were

9  they deceptive to consumers?  I don't know.

10        THE COURT:  You don't know.  Seriously, sir, you

11  don't know.  That's your answer.  You don't know that when

12  something is published on the Internet that says the New York

13  Times has written a great article about the product and

14  there's no New York Times article, that's not a deceptive

15  act?

16        MR. HANCOCK: It may be misleading.  When I think of

17  deception, I think as a legal standard.  In this case, for

18  example, with some exception, virtually all the consumers

19  that were complaining to government agencies were complaining

20  about credit card issues when they went to the LeanSpa

21  website, their credit cards were charged.  They couldn't get

22  that reversed.  I'm thinking of the legal standard.

23        THE COURT:  I have four pages of questions I'm

24  thinking I will recess right now.  Thank you all very much

25  for your arguments.  I don't know that you are ever going to

1    answer one of my questions.

2            MR. HANCOCK:  I will do better.  Keep going if you

3    would.

4            THE COURT:  Assume that the news sites that

5    affiliates placed on the web are fake, are deceptive as a

6    legal standard would find them to be, can you do that for me?

7            MR. HANCOCK: Yes.

8            THE COURT:  Wasn't the money that Corelogic

9    received from Leadclick originated because of those fake

10   sites?

11           MR. HANCOCK: Yes, money came to Corelogic.  The

12   money came to Leadclick then Corelogic.

13           THE COURT:  Okay.  So why aren't the funds

14   ill-gotten as that word is used in the first part of the

15   two-step part for the claim against you?

16           MR. HANCOCK:  That's your case, your Honor.  I would

17   concede for purposes of this discussion that the gains would

18   be ill-gotten and we can talk about the rest of the test.

19           THE COURT:  I thought that's what you were arguing.

20   I thought you were arguing that you had a legitimate claim to

21   it, i.e., the second prong of the test is what you were

22   resting on.  That's maybe why I'm so surprised having to

23   wrestle with you about the deception here, but anyway I will

24   move on to the second one.  As the fact they have to show you

25   have lack or have no legitimate claim to these funds, right?

1          MR. HANCOCK:  Right.

2          THE COURT:  I think you argued this is in your memo

3    in support, am I correct that because you advanced money to

4    Leadclick, the 13, I think the figure is the 13,3 figure, you

5    advance that to Leadclick, that you had the expectation that

6    you would recover those and that I suppose 4.1 is part of

7    that recovery.  Is that generally your portion?

8          A.   That's right.

9          Q.   Let's take the hypothetical that Leadclick never

10   advanced any money.  That Corelogic never advanced any money

11   to Leadclick.  Can you assume that for the sake of

12   argument?

13         MR. HANCOCK:  Yes.

14         THE COURT:  Then would Corelogic have a legitimate

15   claim to the 4.1 that it got from Leadclick?

16         MR. HANCOCK:  Yes because Leadclick was also in debt

17   on promissory note to Corelogic US.  That's who the money was

18   transferred to so you had a written agreement, a promissory

19   note that Leadclick still owed 8 million dollars to Corelogic

20   US.  The money that came from Leadclick went to Corelogic

21   U.S. first, then came to Corelogic, so there's been no claim

22   here that that transfer wasn't in exchange for valuable

23   consideration.  We think a promissory note is obvious as it

24   possibly can be.  Again the burden of the FTC here,

25   Connecticut is not involved here, just the FTC, the FTC has

1  to show there's not any, any legitimate claim to the money.

2  Any legitimate claim to the money means Corelogic is entitled

3  to summary judgment.  You have the promissory note that shows

4  they have a legitimate claim to the money, then you have a

5  shared services system that you talked about.

6       THE COURT:  I thought you conceded.  I'm trying to

7  find the paragraph.  I think it is 200 to the Defendant's

8  56(a)(2).  I thought you didn't dispute there were no agreed

9  upon payment schedule or payment deadline, no security, no

10  written loan agreement, no interest due, that gives you a

11  problem on a number of AutoStyle factors, doesn't it?

12       MR. HANCOCK:  AutoStyle is a standard that's applied

13  here.  AutoStyle is a bankruptcy case that talked about

14  equitable subordination issues.

15       THE COURT:  What test should I apply for legitimate,

16  for legitimate claim, what's your test for legitimate claim?

17       MR. HANCOCK:  Let me read to you what the FTC agrees

18  is undisputed.  Leadclick and Corelogic's understanding and

19  agreement, this is Corelogic statement fact number 18.

20  Leadclick and Corelogic understanding and agreement from the

21  outset of the shared services transition, meaning late 2010,

22  was that Corelogic would use its treasury funds to pay

23  Leadclick's invoices during this transition period but that

24  Corelogic would eventually collecting Leadclick's receipts

25  into the treasury funds as well.  Thereby recouping those

1    prior advances.  That's undisputed.  The agreement between

2    the parties is undisputed so Corelogic was providing valuable

3    consideration to Leadclick and Leadclick was agreeing that

4    when revenues came in, those would repay those advances.

5    That's all that's necessary to say they have a legitimate

6    claim to the fund.

7            THE COURT:  I'm sorry, the record is really large

8    here so I apologize if I'm forgetting something that I have

9    seen.  Before they swept the 4.1, were they sweeping

10   regularly, were they sweeping whenever Leadclick had money?

11   Is that in the record and where will I find that pattern?

12           MR. HANCOCK:  It is in the record.  In any share

13   services agreement, the standard Mr. Blake testified that

14   half of the Fortune 500 companies in the United States use a

15   shared services agreement like Corelogic.  The FTC's

16   purported expert agreed that shared services are very common.

17   Everyone agrees shared services program.  You start with the

18   accounts payable because that's the easiest way to do it.

19   Accounts receivable take longer to implement because you have

20   to notify customers, you have to change the process of

21   receiving payment.  They began with accounts payable and

22   transition to accounts receivable.  That's when they

23   transition to the accounts receivable that's when the four

24   million came in.

25           THE COURT:  Before the 4.1 million came in, nothing

1   had come over the transom to Corelogic under the agreed

2   services?

3          MR. HANCOCK:  They were transitioning before that

4   time I don't know.  This was in a very truncated period.

5          THE COURT:  My question is where will I find a

6   pattern of sweeping Leadclick bank account because of all of

7   the money you advanced for it.

8          MR. HANCOCK:  I don't know you will find a

9   pattern.

10         THE COURT:  Is it true that I wouldn't find it?

11         MR. HANCOCK:  That's right.  You won't find it.  I

12   think you will find there's no valid dispute there was an

13   agreement this was going to happen.  It is standard business

14   practice to do it this way.  To begin implementing shared

15   services by paying the bills of the subsidiary and over a

16   couple of months it takes to the transition so you receive

17   their payments and that's the way it was done here.

18         THE COURT:  Let's assume that Corelogic collected

19   the 13,3 that's advanced.  That's not owed to it, then the

20   4.1 was in Leadclick account and Corelogic grabs it, does it

21   have a legitimate claim to it?

22         MR. HANCOCK:  No, that would be Leadclick's money.

23   If I understand your hypothetical, if Leadclick had been a

24   profitable business and making profit, Corelogic was managing

25   the cash, keeping a record of payments and receipts, if there

1    was a positive at the end of the day, that would be

2    Corelogic's that would be Leadclick's money.  Corelogic would

3    be a proper relief defendant to provide that money.  If

4    there's a judgment against Leadclick, it could be used to

5    satisfy it.

6            THE COURT:  Like 20 answers ago, I asked about

7    assuming Corelogic didn't advance the 13 million, would

8    Corelogic have a legitimate claim.  You said yes because

9    Leadclick was in debt to Corelogic USA.

10            MR. HANCOCK:  Yes.

11            THE COURT:  How long did Corelogic hold this four

12   million?  A nanosecond?

13            MR. HANCOCK:  Corelogic U.S.?

14            THE COURT:  Yes.

15            MR. HANCOCK:  No, it was the immediately

16   transferred to Corelogic.

17            THE COURT:  Which Corelogic.

18            MR. HANCOCK:  Corelogic U.S. received the money.

19            THE COURT:  In a nanosecond it went out?

20            MR. HANCOCK:  Yes.

21            THE COURT:  Did it get registered on the books to

22   Corelogic USA as a payment back for a loan under the

23   promissory note?

24            MR. HANCOCK:  No.  The legal standard is not what

25   somebody does with the money.  It is not a very difficult

1    legal standard.

2         THE COURT:  Obviously if you give me $5.00 and I

3    turn around to give it to Zak, it doesn't mean I didn't have

4    it.  I agree with that argument.  My problem is if you are

5    trying to prove that I had a legitimate claim to it because

6    you owed me this money, right, I would expect before I gave

7    it to Zak, I might note on my books and records you have paid

8    me back my $5.00 loan, right?

9         MR. HANCOCK:  Yes.  Yes.  There was a recording of

10   the payment.  Again this was --

11        THE COURT:  Was it a write down of the loan.  Did

12   promissory notes on the accounting books get written down so

13   that the loan now less was due?

14        MR. HANCOCK:  No, your Honor.  I don't mean to be

15   two contentious here but the standard is whether there's any

16   legitimate claim to the money, not what you do to the money.

17   If you have any legitimate claim to the money and you receive

18   it under the Second Circuit standard, you are not a proper

19   relief defendant.

20        THE COURT:  The legitimate claim you advance is that

21   this arrangement between Corelogic and Leadclick.  Leadclick

22   is what gives you the legitimate claim, right?  There's a

23   phrase for it.  Shared services.  The shared services system

24   used by 50 percent of the companies in this country, that's

25   what gives you the legitimate claim, right?

1          MR. HANCOCK:  That's one of the reasons. There's

2     also the other.  Any legitimate claim.  So there's the shared

3     services agreement gives us a legitimate claim.  The note to

4     Corelogic U.S. gives you a legitimate claim.  Both of those

5     shows that they can't show there's absolutely no legitimate

6     claim to the money.

7          THE COURT:  But I know you don't like the AutoStyle

8     factors, but I will make you look at them now anyways.  Why

9     shouldn't I use the AutoStyle factors to test whether the

10    bases for your legitimate claim defense is in fact

11    legitimate?  I hate to use the word again but.  Why

12    shouldn't -- what's wrong with these factors?

13         MR. HANCOCK:  Again I have said what I said before

14    about bankruptcy and equitable subordination.  This isn't a

15    typical loan.  This is a shared services agreement where

16    there's no dispute on this record that virtually every

17    company uses it doesn't have a note.  They don't charge

18    interest.  It is not repayment schedules.  It is not that

19    type of a loan.  We manage your cash.  We pay your bills and

20    we take your receipts. That's what shared services are all

21    about.  Sometime the balance is positive, sometimes the

22    balance is negative.  If the balance is positive, that's your

23    money, subsidiary.

24         THE COURT:  What do you think the bankruptcy courts

25    would do under subordination and all those nice bankruptcy

1    principles that play in AutoStyle, they would do with the

2    shared services structure.  Everybody uses it so it must be

3    legitimate.  Is that what they are going to say because it

4    seems to me it very susceptible to manipulation.

5         MR. HANCOCK:  The bankruptcy courts are looking at a

6    different issue.  They are looking at equitable

7    subordination.  They are trying to classify what is a valid

8    debt and what isn't a valid debt because creditors get paid

9    first.  That has no applicability to this.  We're not talking

10   about a typical creditor relationship here.  We're talking

11   about a company that manages revenues and expenditures for

12   their subsidiaries.

13        THE COURT:  Right, but a company that wants to have

14   the benefit of being a separate entity from the people the

15   company whose services they are managing.  They don't want to

16   be liable for Leadclick's conduct.  They are a separate

17   corporate entity or LLC, whatever you want to call it.  They

18   want to have their own identity separate and apart from.  I

19   don't know what the law is where you practice, but in the

20   state of Connecticut, I spent a lot of time on cases about is

21   this really Corelogic or are they really Leadclick.  We have

22   wonderful case law in Connecticut in my view.  We have very

23   little case law on many subjects, but on this subject,

24   piercing the corporate veil, fraudulent creation of entities

25   to sort of operate through, we have great case law in

1    Connecticut.  One of the things we always look to, you look

2    at any case in Connecticut, the Supreme Court is going to

3    start with the books and records.  How do you keep the books

4    and records?  Do you have separate books and records?  When

5    there's a transaction between the two of you, do you make

6    note of it in your books and records?  What happened here

7    clearly you moved the money.  When I ask about Corelogic USA,

8    you conceded, which I think you have to, there's no record on

9    the books and records that says ah-hah, this is to pay back

10   the loan.  Is it to pay back the USA Corelogic loan or is it

11   to pay back the shared service advance?  It can't be both.

12   It came through Corelogic USA.  Do you understand why I'm a

13   little concerned about the fuzziness of your corporate

14   structure?

15        MR. HANCOCK:  Let me try and address it.  We're

16   giving both of those reasons because the burden of the FTC is

17   to show there's no legitimate claim.  We have to look at both

18   of them.  The Corelogic U.S. promissory note we think gives a

19   legitimate claim to the money.  The time that money came in,

20   Corelogic -- Leadclick was failing badly.  They were deciding

21   what to do with the company.  Within a month of that, they

22   decided to close the company down.  It wasn't going to make

23   any difference in the overall scheme of things how this

24   money, whether it was credited to the note or whether it

25   was --.

1          THE COURT:  It makes a difference to Leadclick.  It

2   is like you, me and Zak.  Zak is Leadclick.  I'm USA and you

3   are Corelogic.  If the money Zak gives to me satisfies the

4   debt that is owed to me, well, that matters to Zak.  He knows

5   he's paid that debt.  If it didn't, I turned it over to you.

6   I didn't have any intention it was satisfying my debt and you

7   took it and you said well, I have done all of these

8   things for Zak.  He owes me that.  I'm going to apply it to

9   that.  It makes a difference.  Otherwise you will claim 13

10  million against Zak.  It makes a big difference to Zak it.

11          MR. HANCOCK:  It doesn't affect if you had any

12  legitimate claim to the money to begin with.

13          THE COURT:  I understand you say both of us have a

14  legitimate claim in my example, but to me, it puts your

15  claims on the shakier ground.  You claim both for the reason

16  the money is paid because I say it cannot be for both

17  reasons.

18          MR. HANCOCK:  We agree that this was done pursuant

19  to the normal operation of the shared services system.

20          THE COURT:  The claim is the shared services claim.

21          MR. HANCOCK:  We're responding to a legal standard.

22  The legal standard is is there any legitimate claim.  The

23  note is relevant to that because it provides a legitimate

24  claim.

25          THE COURT:  But did you mark -- let's say it is a

1   coupon note.  When he paid the 4.1 to me, I should have torn

2   off three coupons and returned to him.  How much was owed on

3   the note?

4            MR. HANCOCK:  Eight million dollars.

5            THE COURT:  Say there's 10 coupons, I should give

6   him back five of them because he paid off half the loan,

7   right?  I didn't do that.  It makes me wonder if your claim

8   is the legitimate claim that was legitimate here.  It is not

9   Corelogic USA that's claiming they have the right to have

10  money, right?  You are claiming it.

11           MR. HANCOCK:  That's who was the recipient of the

12  money.  Let me turn to shared services.  I don't think I'm

13  getting anywhere on this issue.  In shared services, your

14  Honor, the records were kept in a commercially reasonable

15  manner.  Tom Blake's expert report describes how Corelogic

16  properly maintained all records of receipts and

17  disbursements.  The FTC consents to the fact as early as

18  2010, this was the agreement between the parent and the

19  subsidiary.  That is not in dispute.  When that agreement is

20  effectuated, there's no basis for saying Corelogic is

21  extending valuable consideration to its subsidiary by paying

22  it bills.  That can't be disputed.  When the money comes back

23  in, they are recording it on the intercompany balance sheet

24  as a receipt of money that offsets the amount they have

25  expended, that's a return for them extending valuable

1    consideration.

2         THE COURT:  It's a loan.  Parents extended valuable

3    consideration in the form of equity.  What I was answering to

4    your argument you are assuming it's a loan.  You are assuming

5    away the question.  There's no dispute that this money was

6    advanced, but parents advance equity, too.  They don't just

7    advance loans.  They advance equity investment.

8         MR. HANCOCK:  Let me make a couple of points if I

9    could.  First of all, there's no reasonable basis to conclude

10   on this record that this was an equity investment.

11   Everybody, Tom Blake said it wasn't an equity investment.

12   The Corelogic controller got so exasperated with the FTC's

13   questioning that said cash from customers doesn't flow

14   through equity.  That's mad.  That's virtually his quote.

15        THE COURT:  I don't understand that quote.  He must

16   have been raving mad because I don't know what that means.

17        MR. HANCOCK:  From accounting perspective, cash

18   coming from customers is not paid in equity.

19        THE COURT:  You are my parent corp. You are me.  I

20   go out and sell stuff on the green.  I have money.  I'm

21   sitting here.  I have cash. You have advanced me money to

22   allow me to go out and buy my product that I'm going to sell.

23   You could ask for a return on equity.  You may want to have

24   it be for tax returns or whatever other reasons.

25        MR. HANCOCK:  If that were the case, if you advanced

1    the money to sell on the Green and they came and paid you,

2    you would have a legitimate claim to that money regardless of

3    whether it is an advance, regardless of whether it is equity.

4    It doesn't change the outcome here.  The point is that

5    Corelogic had a legitimate claim to the money, whatever you

6    call it, because it was advancing money.  You can call it a

7    loan.  You can call it equity but some of it came back, not

8    all of it came back, but some of it came back. The

9    implementation of that by paying a valuable consideration,

10   you are getting a return.  You are not getting a profit.  If

11   they got a profit, we would agree with you it could be

12   recouped.  There's no profit here.  You are getting a return.

13   You had a legitimate interest.  You had a legitimate claim to

14   that money.

15        THE COURT:  I think I have asked this before.  I

16   understand your answer was AutoStyle bankruptcy, there's all

17   these equitable subordination issues, and all of that.

18   Assume I know a little bit about bankruptcy, tell me in a

19   nutshell why it is wrong to the use AutoStyle here.  I'm an

20   equity court.  We're talking about a disgorgement.

21        MR. HANCOCK:  For one thing, it doesn't change the

22   outcome of the case.  AutoStyle is looking to whether it is

23   debt or equity.  Even if is equity, they got a return.  They

24   got some of their equity back.  They have a legitimate claim

25   to that money.  It doesn't matter but again shared services,

1    with all respect to the Court, these issues have to be

2    analyzed factually into the unique circumstances of how it is

3    implemented.  There's nothing in the record from any party

4    who testified including the FTC's purported expert that

5    shared services normally has a note that it has defined dates

6    for payment, interest is charged.  Nobody says that somehow

7    makes a shared services system suspect.

8            THE COURT:  Let's go back to your concession a

9    moment ago that even if it is equity, you still would have a

10   legitimate claim.  What did the court in Aragon Capital

11   Advisors in the Southern District and FTC versus AIC in the

12   Eastern District of Tennessee when they said in this case,

13   the relief defendants made equity contributions to Aragon,

14   not loans.  Therefore, were not creditors, therefore not

15   entitled to be did not have a legitimate claim.

16           MR. HANCOCK:  There's two points.  One on appeal the

17   Second Circuit in Aragon said that they were illegal

18   dividends. That's why they couldn't be recouped because they

19   were illegal dividends. If they were valid dividends, the

20   investor would have a valid claim to those dividends, but you

21   know, illegal dividends present a different issue.  There's

22   no claim here that anything that Corelogic did with the

23   shared service was illegal or even tainted, your Honor.

24   There's no question of the good faith of Corelogic in

25   implementing the shared services.

1          THE COURT:  Very briefly but on your motion in

2    limine doesn't Mr. Van Wazer have extensive experience

3    identifying fraudulent loans which requires an understanding

4    of what a legitimate loan would look like, what paperwork and

5    documentation you would expect if it was a legitimate loan.

6    It may go to the weight of what he's testifying to.  He

7    clearly has experience.

8          MR. HANCOCK:  We don't think so.

9          THE COURT:  No defendant ever thinks the plaintiff's

10   expert has any experience and no plaintiff every thinks the

11   defendant's expert has experience.  Isn't that subject to

12   cross-examination.  It is not like putting Zak on the witness

13   stand as an expert or fraudulent loans or loans aren't really

14   loans.  No offense, Zak.  I don't think he has any

15   experience.  Mr. Van Wazer has some experience.

16         MR. HANCOCK:  It is unfortunate we had to bring that

17   kind of motion before Court.

18         THE COURT:  I agree with that.

19         MR. HANCOCK:  He's a fine lawyer.  Has a

20   distinguished career as a lawyer.  He's not an accountant.

21   He doesn't have experience as an accountant.  He worked as a

22   first year person for nine months with an accounting firm.

23   He's in an employer position with the FTC.  He has a fraud

24   certificate from Georgetown.  He can trace the transfer of

25   funds just like he did in the Strano portion of this case.

1    He doesn't have any experience with consolidation accounting

2    that publicly-traded corporations are subject to.

3            THE COURT:  It may be that I conclude that he can

4    tell me what traditional loans look like.  There's may be a

5    UCC or this note and this schedule of papers. He can tell me

6    that.  You may say that's not what we're talking about here,

7    Judge.  He may be a fine man, but his opinion isn't helpful

8    because he's testifying his experience is in sort of the old

9    world. Now we're in the world of shared services.  Look at my

10   expert that's going to explain this is completely

11   legitimate.

12           MR. HANCOCK:  I must say he helps us a lot with his

13   testimony.  He talks about the understanding of shared

14   services that's precisely like our understanding of shares

15   services.  You don't have a note.  You don't charge interest.

16   There's not a definite time for payment. Where he goes beyond

17   his expertise is when he starts talking about --

18           THE COURT:  Where did he get expertise in shared

19   services?

20           MR. HANCOCK:  He worked as a lawyer, not as an

21   accountant, as a lawyer companies that employed shared

22   services.  He said they did it virtually the same way

23   Corelogic did it.

24           THE COURT:  As a lawyer, didn't he have a practice

25   that involved business loans, things like that for his

1   clients?

2           MR. HANCOCK:  The purposes of his testimony is to

3   offer an opinion on a financial statement.  That is well

4   beyond the scope of his expertise.  His license precludes him

5   from doing it.  Not that he doesn't have a license to do it.

6   The license he does have says he can't.  He's not authorized

7   to offer an opinion on a financial statement or a component

8   of a financial statement.  He's trying to tell you that

9   Corelogic in effectuating public consolidation accounting,

10  that's reported pursuant to the standards of the FTC, didn't

11  do it right.  They should have been considering the equity

12  investments, not the normal operation of a shared services

13  system.  In all due respect, I regret that we had to bring

14  this motion.  He doesn't have any experience, any knowledge,

15  any education that allows him to make that kind of opinion.

16          THE COURT:  I have exhausted myself and my

17  questions.  Thank you very much.  Can I ask Attorney

18  Lubetzky, would you address the motion in limine issue.  If

19  he's not licensed to give the opinion is sort of the argument

20  I just heard made.  How can I let him in the court of law

21  come and give an opinion he isn't authorized by law to give?

22          MR. LUBETZKY:  I think the simple answer is Rule 702

23  of the Federal Rule of Evidence governs when this Court can

24  allow admissible of an accounting expert or any expert not a

25  state certification law.  The Court doesn't defer to the 50

1   different states about what their accounting certifications

2   are.

3         THE COURT:  So I can have a lawyer who tried medical

4   malpractice cases all his life and always tried Ob-gyn cases,

5   he would come in and testify about the medical standards?

6         MR. LUBETZKY:  I don't think so, your Honor, but I

7   think the Court has to look a Daubert, Wilson, the 02 case

8   law and understand that the case law we cite says under Rule

9   702, the Court is not requiring any type of certification but

10   looks to the flexible standard.  Looks to what the person's

11   acquired experience and education in any type of field.

12         THE COURT:  Okay.  It's unfortunate you are standing

13   at the podium.  Act like you are sitting in your chair.  I

14   will ask every party if they have something if they don't get

15   30 seconds to say it, will burst. Otherwise I'm recessing

16   with a thank you.  Anybody have something that they really

17   have to tell me that in either response or they forgot to

18   make an argument or they didn't get a chance to make a

19   argument?

20         MR. HANCOCK:  Yes, your Honor.  We didn't get into

21   this.  I want to make it clear in case the court has any

22   concern about this.  When we talk about good faith in

23   Corelogic's eyes, the standard in the Second Circuit is

24   whether the transfer was done to defraud creditors.  The FTC

25   has said that's a fraudulent conveyance standard and doesn't

1    apply here but the very case they cite CFTC versus Walsh that

2    they say is the deciding case actually references and relies

3    on New York's fraudulent conveyance law and the Second

4    Circuit in the HBE Leasing case said quoting a treatise says

5    the requirement of good faith refers solely, solely whether

6    the grantee knew or should have known he was not trading

7    normally.  Put the purpose of the trade so far as the debtor

8    was concerned was defrauding his creditors.

9          THE COURT:  What's the best case for your position

10    that the standard is good faith equals transfer to deceive a

11    creditor?  What's the best case you would point me to for

12    your proposition that the standard of good faith is measured

13    by whether it is a transfer to deceive creditors?

14          MR. HANCOCK:  HBE Leasing versus Frank, the Second

15    Circuit.

16          THE COURT:  Thank you.  Anything else?

17          MR. HANCOCK:  No.

18          THE COURT:  Anything else?  You are all set.  All

19    right.  Thank you very much.  The Court will take it under

20    advisement.  We're in recess.

21       (Whereupon, the above hearing adjourned.)

22

23

24

25

1

2

3

4

5    COURT REPORTER'S TRANSCRIPT CERTIFICATE

6    I hereby certify that the within and foregoing is a true and

7    correct transcript taken from the proceedings in the

8    above-entitled matter.

9

10   /s/  Terri Fidanza

11   Terri Fidanza, RPR

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25